IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,<br>*Plaintiffs/Counter-Defendants,*<br>v.<br>LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, and AD DALLAS CLINICS, LLC,<br>*Defendants/Counter-Plaintiffs.* | Civil Action No. 3:26-cv-02783-S<br><br>Removed from the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848 (Hon. Kim Bailey Phipps, Presiding). |

## APPENDIX IN SUPPORT OF PLAINTIFF TED VENTURES, LLC'S, AMENDED MOTION TO REMAND

Appendix 01 Plaintiffs' Original Petition

Appendix 02 Defendants' Original Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction.

Appendix 03 Defendants' First Amended Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction.

Appendix 04 Defendants' Second Amended Answer, Counterclaim, and Application For Temporary Restraining Order, Temporary Injunction, and Permanent Injunction.

Appendix 05 Agreed Scheduling Order.

Appendix 06 Agreed Motion for Continuance of Trial Setting and to Enter Amended Agreed Scheduling Order.

Appendix 07 Defendants' Third Amended Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction.

Appendix 08 Plaintiffs' Second Amended Petition.

Appendix 09 Trial Setting Notice (August 17)

Appendix 10 Trial Setting Notice (July 21)

Appendix 11 Suggestion of Bankruptcy for Defendants Trend Physicians Group, Inc. and AD Dallas Clinics, LLC.

Appendix 12 Order Lifting Stay - USBC SDTX

Appendix 13 Order Granting Motion To Transfer Case - USBC SDTX

Appendix 14 Declaration of William W. Camp in Support of Plaintiffs' Motion for Remand.

Appendix 15 Declaration of Derek Gove in Support of Creditors' Motion for Relief From the Automatic Stay and Related Motions.

Appendix 16 Transcript of Motion for Relief from Stay Before the Honorable Jeffrey P. Norman, United States Bankruptcy Court Judge.

Dated: November 15, 2026.

Respectfully submitted,

*/s/ James A. McCorquodale*

James A. McCorquodale
Attorney-in-Charge
Texas State Bar No. 13464900
LAW OFFICE OF SANDY MCCORQUODALE, P.C.
12700 Hillcrest Road, Suite 125, Dallas TX 75230
Direct Tel. 214-712-4472 Direct Fax 815-572-9448
Email: Sandy@SMQLAW.com
*Attorney for TED Ventures, LLC*

FILE PER ATTY



FILED
4/14/2025 5:23 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Mychele Galimore DEPUTY

CAUSE NO. DC-25-05848

| | |
|---|---|
| TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, NS ENRIQUE STOWHAS, *Plaintiffs*, | IN THE DISTRICT COURT |
| vs. | 162nd JUDICIAL DISTRICT |
| LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, and TREND PHYSICIANS GROUP, INC., *Defendants*. | DALLAS COUNTY, TEXAS |

# Plaintiffs' Original Petition

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES TED VENTURES, LLC ("TED Ventures"), TREND MEDICAL MANAGEMENT, LLC ("TMM"), DEREK GOVE ("Gove"), TREY AUSTIN ("Austin") and ENRIQUE STOWHAS ("Stowhas") (hereinafter referred to collectively as "Plaintiffs"), and files this their Original Petition against LUCKY CHOPRA ("Chopra", ZOO CAPITAL HOLDINGS, LLC ("Zoo Capital"), and AD DALLAS CLINICS, LLC ("AD Dallas") (hereinafter referred to collectively as "Defendants"), and for cause of action would respectfully show unto the Court the following:

## I. Discovery Control Plan & Related Case

1. Plaintiff requests that discovery be conducted via level 2, and the matter is a related case pursuant to 1.06 – 1.08 in the 134th District Court previously filed bearing similar or identical facts and issues.

## II. Rule 47 Statement

2. Plaintiffs seek monetary relief over in excess of $12,000,000, excluding interest, statutory or punitive damages and penalties, and attorney fees and costs.

## III. Parties

3. Plaintiffs TED Ventures LLC and Trend Medical Management LLC are limited liability companies formed under the laws of Texas, with their principal places of business in Texas.

4. Plaintiff Derek Gove is a resident of Texas.

5. Plaintiff Trey Austin is a resident of Texas.

6. Plaintiff Enrique Stowhas is a resident of Texas.

7. **Defendant Lucky Chopra** is a resident of Texas and **may be served at 1911 Bagby Street, Suite 300, Houston TX 77002 or wherever he may be found**.

8. **Defendant Ryan Reneau** is a resident of Texas and **may be served at 1911 Bagby Street, Suite 300, Houston TX 77002 or wherever he may be found**.

9. Defendant AD Dallas Clinics LLC is a limited liability company formed under the laws of Texas with a principal place of business in Texas. **Defendant AD Dallas Clinics LLC may be served through its registered agent: Lucky Atul Chopra at 1911 Bagby Street, Suite 300, Houston TX 77002 or where he may be found**.

10. Defendant Zoo Capital Holdings LLC is a limited liability company formed under the laws of Texas, with a principal place of business in Texas. **Defendant Zoo Capital Holdings LLC may be served through its registered agent: Marcos Lopez at 1911 Bagby Street, Suite 300, Houston TX 77002 or where he may be found**.

## IV. Jurisdiction and Venue

11. This Court has subject matter jurisdiction over this action because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

12. This Court has personal jurisdiction over Lucky Chopra, Ryan Reneau, AD Dallas Clinics LLC, and Zoo Capital Holdings LLC because they are residents of, conduct business in, or have sufficient connections to Texas, such that it is fair and just to require them to defend this lawsuit in this Court.

13. Venue is proper in this Court pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Dallas County, Texas. Venue is also proper in this Court under ¶ 8.12 of the Asset Purchase and Contribution Agreement entered into by the Parties, which forms the basis of the claims herein and in which the Parties agreed to venue in Dallas County, Texas.

## V. Statement of Facts

14. Plaintiff TREND MEDICAL MANAGEMENT, LLC ("TMM") is engaged in the business of providing certain management, administrative and related business services to physicians and certain medical practices. In December 2023, this included TREND Physicians Group, Inc. ("TPG").

15. TPG is a nonprofit corporation organized pursuant to the Texas Nonprofit Corporation Act and is certified as a health organization by the Texas Medical Board, that duly renders professional medical services and services incident thereto, through its employees and independent contractors who are duly licensed to practice medicine in the State of Texas.

16. TED Ventures is the sole legal and beneficial owner of all of the issued and outstanding membership interests of TREND MEDICAL MANAGEMENT, LLC. In December 2023, TMM was the sole member of TPG.

17. On December 12, 2023, Plaintiffs and Defendants Zoo Capital and AD Dallas entered into an Asset Purchase and Contribution Agreement (the "Agreement"). Under the Agreement, TMM contributed, assigned, transferred and conveyed to Defendant ZOO Capital substantially all of the assets of TMM, including TMM's ownership interest in TPG — the "Contributed Assets," as more particularly set forth in the Agreement — but excluding certain "Excluded Assets," as more particularly set forth in the Agreement. Defendant ZOO Capital subsequently contributed, assigned, transferred and conveyed the Contributed Assets to Defendant AD Dallas.

18. The Contributed Assets were valued by the Parties and Defendants' own third-party consultant, VMG, at over thirteen million dollars ($13,000,000.00).

19. The parties agreed to a purchase price of twelve million dollars ($12,000,000.00).

20. The total consideration that Defendants Zoo Capital and AD Dallas were obligated to pay was composed of the following components:

a. *Base Cash Consideration*: Three Million Dollars ($3,000,000), due at closing;

b. *Seller Note*: Three Million Dollars ($3,000,000), to be paid quarterly; and

c. *Rollover Securities*: Six Million Dollars ($6,000,000).

21. Contemporaneously with the Asset Purchase and Contribution Agreement, AD Dallas Clinics LLC, as maker, and executed a Subordinated Promissory Note in favor of Trend Medical Management LLC, as payee, in the original principal amount of $3,000,000.00, with an interest rate based on the Applicable Federal Rate (AFR) of 5.16%. (the "Note").

22. AD Dallas Clinics LLC, as Debtor, also executed a Security Agreement in favor of and Trend Medical Management LLC, as Secured Party, to secure the payment and performance of the Note.

23. TREND Medical Management LLC and Zoo Capital Holdings LLC executed a Bill of Sale, Assignment, and Assumption Agreement, transferring Contributed Assets and Transferred Contracts to Zoo Capital Holdings LLC.

24. Defendants failed to make the agreed payments for the Base Cash Consideration, stating they would pay one million dollars each in January, February, and March of 2024.

25. Defendants presented bad checks that were returned for insufficient funds, causing further damage to Plaintiffs' banking relations.

26. Defendants defaulted on the Note, causing it to become accelerated.

27. Defendants failed to provide the promised Rollover Securities.

28. Defendants breached every facet of the Agreement.

## VI. Claims for Relief

### A. Breach of Contract

29. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

30. This claim is made against Defendants Zoo Capital and AD Dallas.

31. Plaintiffs and Defendants Zoo Capital and AD Dallas entered into a valid and enforceable contract.

32. The Asset Purchase and Contribution Agreement, along with the associated Security Agreement, Subordinated Promissory Note, and Bill of Sale, Assignment, and Assumption Agreement, constitute valid and binding contracts between the parties.

33. Plaintiffs performed all of their obligations under the contracts.

34. Plaintiffs sold their medical care businesses, including clinics, employees, and business of medical care, as agreed in the contracts.

35. Defendants breached the contracts.

36. Defendants failed to make the agreed payments for the Base Cash Consideration of $3,000,000.

37. Defendants presented bad checks that were returned for insufficient funds.

38. Defendants defaulted on the Seller Note of $3,000,000.

39. Defendants failed to provide the promised Rollover Securities valued at $6,000,000.

40. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages.

41. Plaintiffs have suffered damages in the amount of at least $12,000,000, representing the full value of the contract.

42. Plaintiffs have also suffered consequential damages due to the harm to their banking relations caused by Defendants' bad checks.

### B. UCC Article 3 — Tex. Bus. & Com. Code § 3.414(b).

43. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

44. This claim is made against Defendants Zoo Capital and AD Dallas.

45. Defendants tendered checks in ostensible payment of portions of the Base Cash Consideration and/or the Note; however, the checks were dishonored by the bank they were

drawn on and Defendants have failed to pay the amounts of the checks to the Plaintiff holders of the checks according to their terms at the time they were issued.

46. Defendants are thus liable to the Plaintiff holders of the checks for the full amount of the checks in accordance with TEX. BUS. & COM. CODE § 3.414(b).

## C. Common Law Fraud

47. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

48. This claim is made against all Defendants.

### 1. Affirmative Misrepresentations

49. Defendants Lucky Chopra and Ryan Reneau made material representations to Plaintiffs. The representations were made on behalf of Defendants Zoo Capital and AD Dallas, of which Chopra and Reneau were principals, thereby rendering Defendants Zoo Capital and AD Dallas legally responsible for the misrepresentations described below.

50. Defendants represented that they had the intent and ability to pay the agreed purchase price of $12,000,000 for Plaintiffs' medical care businesses.

51. These representations were false.

52. Defendants' subsequent actions, including their failure to make agreed payments, presentation of bad checks, and default on the Seller Note, demonstrate that their representations were false.

53. At the time the representations were made, Defendants knew they were false or made them recklessly without knowledge of their truth.

54. Information from the Defendants themselves and the officers of the entity subsequent to the execution of the agreements admitted that Chopra and Reneau commonly

operate to enter agreements with no intention of fulfilling them and converting the assets for their own.

55. Defendants made these representations with the intent that Plaintiffs should act upon them.

56. Defendants made these representations to induce Plaintiffs to enter into the Asset Purchase and Contribution Agreement and related contracts.

57. Plaintiffs acted in reliance on Defendants' representations.

58. Plaintiffs entered into the Asset Purchase and Contribution Agreement and related contracts in reliance on Defendants' representations about their intent and ability to pay the agreed purchase price.

59. Plaintiffs have suffered injury as a result of their reliance on Defendants' representations.

60. Plaintiffs have suffered financial injury in the amount of at least $12,000,000, representing the full value of the contract that Defendants fraudulently induced them to enter.

61. Plaintiffs have also suffered consequential damages due to the harm to their banking relations caused by Defendants' fraudulent actions.

**2. Fraud by Nondisclosure**

62. Defendants Lucky Chopra and Ryan Reneau concealed and failed to disclose material facts to Plaintiffs. The concealment and failures to disclose were made on behalf of Defendants Zoo Capital and AD Dallas, of which Chopra and Reneau were principals, thereby rendering Defendants Zoo Capital and AD Dallas legally responsible for the concealment and failures to disclose described below.

63. Defendants concealed and failed to disclose that they did not have the intent or ability to pay the agreed purchase price of $12,000,000 for Plaintiffs' medical care businesses.

64. Defendants had a duty to disclose the information to Plaintiffs because Defendants partially disclosed information to Plaintiffs, which created a substantially false impression.

65. Defendants knew Plaintiffs were ignorant of the information and did not have an equal opportunity to discover the truth.

66. Defendants deliberately remained silent and did not disclose the information to Plaintiffs.

67. By deliberately remaining silent, Defendants intended for Plaintiffs to act without the information.

68. Plaintiffs justifiably relied on defendant's deliberate silence.

69. By deliberately remaining silent, Defendant proximately caused injury to Plaintiffs, as set forth herein.

70. Plaintiffs have suffered financial injury in the amount of at least $12,000,000, representing the full value of the contract that Defendants fraudulently induced them to enter.

71. Plaintiffs have also suffered consequential damages due to the harm to their banking relations caused by Defendants' fraudulent actions.

72. Plaintiff seeks damages within the jurisdictional limits of this Court.

### D. Statutory Fraud in a Stock Transaction

73. Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein.

74. This claim is made against all Defendants.

75. The conduct of Defendants Lucky Chopra and Ryan Reneau as described above constitutes fraud in a stock transaction under TEX. BUS. & COM. CODE § 27.01, which resulted in injury and damages, both direct and consequential, to the Plaintiffs.

76. Defendants Lucky Chopra and Ryan Reneau each has actual awareness of the falsity of the representations and promises made by the other and failed to disclose the falsity of the representations and promises to the Plaintiffs.

## VII. Exemplary damages

77. Plaintiffs' injuries and damages resulted from Defendants Lucky Chopra and Ryan Reneau's fraud or malice. Defendants Lucky Chopra and Ryan Reneau's fraud or malice was committed while they were principals of Defendants Zoo Capital and AD Dallas. Plaintiffs are thus entitled to exemplary damages from all Defendants under TEX. CIV. PRAC. & REM. CODE § 41.003(a) and TEX. BUS. & COM. CODE § 27.01(c) & (d).

## VIII. Conditions Precedent

78. Plaintiffs have fully performed all of their duties and obligations under the Agreement.

79. All obligations and conditions precedent to Plaintiffs' claims herein and their right to recovery have been performed or have occurred.

## IX. Attorney's Fees.

80. As a result of their failure to comply with the terms of the Agreement, Defendants Zoo Capital and AD Dallas are obligated to pay Plaintiffs all fees, costs and expenses incurred by them herein, including reasonable attorneys' fees and court costs, in accordance with ¶ 8.15 of the Agreement.

81. Plaintiffs are entitled to recover their reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court in accordance with TEX. BUS. & COM. CODE § 27.01(e).

82. Plaintiffs are entitled to recover their reasonable and necessary attorney's fees under TEX. CIV. PRAC. & REM. CODE § 38.001(8).

## X. Jury Demand

83. Plaintiffs demand a trial by jury on all issues so triable.

## Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein and that upon final hearing herein, Plaintiffs be awarded judgment against Defendants for :

a. Actual damages against all Defendants in an amount to be proven at trial;
b. Consequential damages against all Defendants in an amount to be proven at trial;
c. Punitive damages against Defendants Lucky Chopra and Ryan Reneau in an amount to be determined at trial;
d. Pre-judgment and post-judgment interest as allowed by law; and
e. Reasonable attorney's fees and costs of suit.

Plaintiffs further pray for such other and further relief to which they may show themselves entitled, whether at law or in equity, whether general or special.

Respectfully submitted,

*/s/ William W. Camp*
William W. Camp
State Bar No. 00789196
WILLIAM W. CAMP, P.C.
12700 Hillcrest Rd., Suite 125
Dallas, TX 75230
Tel: (214) 638-8400
Facsimile: (214) 638-8884
Email: Rule21a-Service@camplaw.com
ATTORNEY FOR PLAINTIFFS

Case 3:26-cv-02783-E Document 1-6 Filed 08/19/26 Page 1 of 24 PageID 27

FILED
5/12/2025 7:53 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
John Bailey DEPUTY

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs*,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | |
| ***Defendants*.** | § | **162nd JUDICIAL DISTRICT** |

**DEFENDANTS' ORIGINAL ANSWER, COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Defendants, Lucky Chopra, AD Dallas Clinics, LLC, Trend Physicians Group, Inc., and Zoo Capital Holdings, LLC ("Defendants"), file this Original Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, related to the claims asserted by Ted Ventures, LLC, Trend Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs") as follows.

## I.
## GENERAL DENIAL

1. Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally and categorically deny the allegations contained in Plaintiffs' Original Petition and demand strict proof thereof in accordance with the laws and Constitution of the State of Texas.

## II.
## AFFIRMATIVE DEFENSES

2. To the extent that any defenses, other than the General Denial, pled in this Answer are in conflict, they are pled in the alternative.

a. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of discharge or excused performance.

b. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of prior material breach.

c. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of unclean hands.

d. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of offset.

e. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of fraud.

## III.
## ORIGINAL COUNTERCLAIM

### A. Discovery Control Plan

3. Pursuant to TEX. R. CIV. P. 190.1, Defendants intend to conduct discovery by rule under Texas Rule of Civil Procedure 190.3 ("Level 2").

### B. Claims for Relief

4. Pursuant to Texas Rule of Civil Procedure 47(c), Defendants seek monetary relief from Plaintiffs as pleaded herein, of over $1,000,000.00, as well as non-monetary relief.

### C. Parties

5. Plaintiff TED Ventures, LLC ("TED Ventures") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

6. Plaintiff Trend Medical Management, LLC ("Trend Medical") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

7. Plaintiff Derek Gove is a citizen and resident of the state of Texas.

8. Plaintiff Trey Austin is a citizen and resident of the state of Texas.

9. Plaintiff Enrique Stowhas is a citizen and resident of the state of Texas.

10. Defendant Luck Chopra is a citizen and resident of the state of Texas.

11. Defendant Ryan Reneau is a citizen and resident of the state of Texas.

12. Defendant Trend Physicians Group, LLC ("Trend Physicians") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

13. Defendant Advanced Dallas Clinics, LLC ("AD") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Dallas County, Texas.

14. Defendant Zoo Capital Holdings, LLC is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Harris County, Texas.

**D. Jurisdiction and Venue**

15. This Court has subject matter jurisdiction over this dispute because Defendants seek monetary relief in excess of $1,000,000.

16. This Court has personal jurisdiction over Plaintiffs TED Ventures and Trend Medical in this dispute because TED Ventures and Trend Medical are entities doing business in Texas as the term "doing business" is understood in law. TED Ventures and Trend Medical have

purposefully availed themselves of the laws of the State of Texas and have sufficient minimum contacts in the State of Texas for this Court to exercise personal jurisdiction over it. This matter arises out of TED Ventures' and Trend Medical's contacts within the State of Texas and exercising personal jurisdiction over them comports with traditional notions of fair play and substantial justice.

17. This Court has personal jurisdiction over Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas because they are residents and citizens of the State of Texas.

18. Venue is proper in this Court pursuant to TEX. CIV. PRAC. & REM. CODE ¶ 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.

## E. Factual Allegations

### i. The Asset and Purchase and Contribution Agreement.

19. Plaintiffs, either directly or indirectly, own and manage medical clinics, physical rehabilitation clinics, and pharmacies throughout the Dallas area. Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas are direct or indirect owners of TED Ventures and Trend Medical.

20. Defendants, either directly or indirectly, own and manage several hospitals and medical facilities around Texas.

21. Plaintiffs and Defendants met in mid-2023.

22. Based on representations by Plaintiffs, Defendants were interested in acquiring several of Plaintiffs' medical clinics and medical management entities.

23. On December 12, 2023, AD, Zoo Capital, and Plaintiffs entered into a contract for Defendants to acquire substantially all the assets of Trend Medical Management, LLC ("Trend Medical"), including Trend Medical's ownership of Trend Physicians (the "Agreement").

Defendant Zoo Capital then contributed, transferred, and conveyed the assets to AD. Plaintiffs and Defendants agreed on a purchase price of twelve million dollars ($12,000,000) based on Plaintiffs' representations about TED Ventures and Trend Medical. That amount was to be paid over time. To date, Plaintiffs have been paid approximately two million dollars ($2,000,000).

24. Almost immediately after the Agreement was signed, Defendants began uncovering facts and circumstances that contradicted the representations made by Plaintiffs during negotiations for the Agreement. For example, despite representations by Plaintiffs prior to entering into the deal, Defendants had to start paying out sums of money to keep the clinics running because the clinics and businesses were not cashflow positive, and payroll could not be covered without help and intervention from Defendants. The clinics made just enough money to pay for rent, but not payroll, and there certainly was no profit, as promised under the representations by Plaintiffs. When AD tried doing an audit, Plaintiffs stopped AD at every turn. Plaintiffs would occasionally produce PDF spreadsheets, but nothing in Excel format and no QuickBooks or the actual data behind the inputs.

25. Based on the information the auditor was finally able to uncover from Plaintiffs, significant discrepancies were uncovered. First, the revenue that Plaintiffs had reported before the agreement was signed was $2.3 million less than they had represented. Second, the payroll expenses were hundreds of thousands of dollars higher than Plaintiffs had represented to Defendants. Third, the professional fees were likewise hundreds of thousands of dollars greater than Plaintiffs had originally reported. These discrepancies were not minor, but significant, and Defendants would not have ever entered into the deal with Plaintiffs had Plaintiffs been forthright from the beginning.

26. Plaintiffs had sorely misrepresented the value in their clinics. Additionally, the management team's performance was unsatisfactory across the board, which caused even more financial strain on the clinics. As detailed further below, the concealed management issues led to the for-cause termination of several AD officers.

27. Plaintiffs also misrepresented their collections. In the medical field, what medical clinics charge versus what they collect can vary widely based on insurance companies' and government entities' actual payments for the rendered medical services. Plaintiffs purposefully conflated their charges with their actual collections to entice Defendants to enter into the deal. Only the smallest fraction of what Plaintiffs represented actually materialized.

28. Defendants have also been made aware that Plaintiffs were having patients and owing-entities pay Plaintiffs directly for services that the clinics provided. Defendants' diversion of funds continued even after Defendants entered the deal to purchase the clinics. For example, Defendants have uncovered evidence that from 2024 to 2025, certain receivables owed to Defendants were accounted for as if paid, but the related payments were deposited to non-affiliated third parties. Defendants' investigation is ongoing, but an initial investigation has uncovered that thousands of dollars of Defendants' receivables have been diverted. Plaintiffs cut Defendants out and stole the money that was due to Plaintiffs.

29. Further, the deal between Defendants and Plaintiffs encompassed certain pharmacies originally owned by Plaintiffs. Defendants agreed to use Plaintiffs' pharmacies to obtain the medications needed for their patients at the clinics, and AD also entered into a purchase agreement for Southern Star Pharmacy. Plaintiffs' pharmacies then charged the medications at exorbitant profits, which resulted in issues for many of Defendants patients. Additionally, with respect to Southern Star Pharmacy, AD has evidence that Plaintiffs took receivables that AD

bought under the Agreement and had payments sent directly to Plaintiffs. Southern Star Pharmacy has since engaged in harassing conduct towards Defendants' clinics and affiliates.

30. Additionally, as part of the Agreement, Plaintiffs represented that they would release underlying encumbrances. Specifically, Plaintiffs failed to perform their release obligations related to a loan for over $9,600,000 from Enterprise Bank, that encompassed Trend Physician Group, Inc., which is an entity that Defendants purchased in the deal. In March 2025, Enterprise Bank sued entities associated with Defendants, including Trend Physician Group, Inc., for defaulting on the $9.6 million loan.

31. The circumstances surrounding the Agreement show Plaintiffs' disregard for their contractual obligations and their willingness to engage in fraud.

**ii. Employment Agreement Breaches and Unlawful Competition.**

32. On November 1, 2023, Defendants entered into employment agreements with Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs' Officers"). The employment agreements provided that Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

33. While uncovering Plaintiffs' above-referenced misconduct concerning the Agreement, Defendants also identified that Plaintiffs' officers were contributing to the fraud by breaching their respective employment agreements. Accordingly, On April 10, 2025, AD terminated Plaintiffs' Officers for cause.

34. Leading up to the terminations, Defendants were made aware of statements made and messages sent by Plaintiffs' Officers in an effort to divert Defendants' business while Plaintiffs' Officers were actively directing and managing the operations of Defendants' business.

Specifically, Defendants received evidence that Plaintiffs' Officers were contacting clinics, patients, and physicians affiliated with Defendants, and directing those affiliates to direct payment to entities or individual not affiliated with AD for services rendered by AD. Essentially, Plaintiffs' Officers took or diverted monies owed to AD and directed that money to themselves or other entities in which they had some economic interest. That is embezzlement and theft, not to mention a breach of Plaintiffs' Officers' contractual and fiduciary obligations to AD. AD therefore terminated Plaintiffs' Officers, and did so in accordance with the terms of the employment agreements.

35. Additionally, after Plaintiffs' Officers termination, Plaintiffs' Officers violated their non-competition and non-solicitation agreements by: (1) soliciting AD's physicians to work for entities unaffiliated with Plaintiff but affiliated with Plaintiffs; (2) soliciting AD's patients to receive treatment at entities unaffiliated with AD but affiliated with Plaintiffs; and (3) continuing to steal money from AD by directing parties owing monies to AD to pay entities affiliated with Plaintiffs instead.

36. According to each employment agreement, Plaintiffs' Officers were prohibited from competing with AD in Texas, soliciting AD's business in Texas, and accessing AD's records for a twelve-month period following termination (the "Restrictive Period"), except for certain unrelated business functions. Each agreement provided the Plaintiffs' Officers shall not:

- Directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company;

- Directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any

Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company;

- Access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify, or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

The employment agreements offered clear and reasonable limitations on Plaintiffs' Officers' post-termination conduct. The employment agreements also included cooperation provisions, requiring Plaintiffs' Officers to cooperate with AD, during and after their employment period, to help resolve any disputes with third parties.

37. After their lawful termination, Plaintiffs' Officers continue to violate their obligations to AD by immediately and continually violating their non-competition and non-solicitation clauses, among other provisions of the employment agreements. Plaintiffs' Officers continued to contact AD's patients and physicians to entice them to become patients at and doctors of other clinics and hospitals that Plaintiffs are affiliated with. Specifically, Plaintiffs' and/or Plaintiffs' Officers attempted to gain or access to Defendants valuable patient data and communications after Plaintiffs' Officers were terminated and lost lawful access to such data. Plaintiffs' Officers accessed Defendants' confidential information in an effort to use that information to usurp or divert AD's business opportunities for themselves. Plaintiffs' Officers did so as soon as the day after their termination, demonstrating their malicious intent and furthering their illegal conduct. Moreover, Plaintiffs have recently sent text messages, or directed text

messages to be sent, to current patients of Defendants' clinics, offering to provide the patients services at clinics not affiliated with Defendants. Plaintiffs have unlawfully accessed, used, or otherwise misappropriated Defendants' confidential information—such as patient lists and patient contact information—to further their scheme.

38. Plaintiffs' Officers have also refused to cooperate with AD after termination, effectively preventing AD access to certain medical databases and systems for which Defendants' consent is required. Plaintiffs' Officers' conduct shows their willingness to illegally compete with AD, including by soliciting AD's affiliates and accessing AD's records, all in contravention of the employment agreements.

39. In sum, Plaintiffs' statements and conduct surrounding the Agreement were fraudulent, considering evidence that the purchased facilities had overstated value and financials, shady underlying practices, and undisclosed debt. Plaintiffs' Officers' continued their misconduct by engaging in competitive practices that went against their employment agreements. The deal has resulted in Defendants holding the bag, a bag that was propped up by Plaintiffs' misrepresentations prior to the deal, but depleted by Plaintiffs prior to, during, and after transfer.

## F. Causes of Action

### i. <u>Count One: Breach of Contract (the Agreement) as to all Plaintiffs</u>

40. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs for breach of contract as to the Agreement.

41. Specifically, Defendants AD and Zoo Capital were parties to a valid, enforceable contract with Defendants—the Agreement—and are proper parties to bring suit for breach of that contract. AD and Zoo capital have at all times complied with its obligations under the Agreement.

42. The Agreement incorporates various representations and warranties made by Plaintiffs, concerning the clinics and assets to be purchased by Defendants. The Agreement also required Plaintiffs to make disclose information regarding their assets and liabilities on a good faith basis. Finally, the Agreement required Plaintiffs to act in good faith when performing various aspects of Agreement.

43. Plaintiffs breached the agreement. Plaintiffs' breaches included, but are not necessarily limited to, the following actions or omissions contrary to their obligations under the Agreement:

a. Overstating the value of the businesses and assets purchased pursuant to the Agreement;
b. Misrepresenting receivables value, debt, and other financial aspects underlying the assets purchased under the Agreement;
c. Misrepresenting the nature of the businesses underlying the Agreement; and,
d. Concealing unfavorable facts and circumstances during the negotiations for and commencement of the Agreement.

44. Plaintiffs' breach caused AD and Zoo Capital injury in the form of economic damages in an amount in excess of the minimum jurisdictional limits of this Court.

45. Defendants have incurred costs for attorneys in connection with pursuing remedies under the Agreement. Defendants are therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**ii. <u>Count Two: Breach of Contract (employment agreements) as to Plaintiffs' Officers</u>**

46. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate

that AD is entitled to recover monetary damages against Plaintiffs' Officers for breach of their employment agreements.

47. Specifically, the employment agreements provide that during the one year following Plaintiffs' Officers' termination, Plaintiffs' Officers shall not directly or indirectly own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business within Texas, that competes with the Business in any respect as conducted by AD. Further, the agreements provide that during the Restrictive Period, Plaintiffs' Officers shall not solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of AD, for Plaintiffs' Officers benefit or for any purpose related to or competitive with AD's business. Additionally, Plaintiffs' Officers shall not access, interfere with, disrupt, modify, or change AD's files or information during the Restrictive Period.

48. AD has at all times complied with its obligations under the employment agreements.

49. Plaintiffs' Officers breached their employment agreements. Specifically, and without limitation, Plaintiffs' Officers breached those agreements by:

a. Communicating with AD's patients, clinics, and physicians affiliated with AD for Plaintiffs' direct or indirect benefit and in a manner that competes with AD's business;
b. Competing with AD and profiting from AD's business relationships for Plaintiffs' direct or indirect benefit; and/or,
c. Using, accessing, disrupting, modifying, and/or changing AD's confidential information in a manner harmful to AD's access to such information and for Plaintiffs' benefit.

50. Each of the foregoing breaches, and all of them collectively, threaten to cause AD imminent and irreparable harm and/or monetary damages in an amount in excess of the minimum jurisdictional limits of this Court.

51. AD has incurred costs for attorneys in connection with pursuing AD's remedies under the parties' agreement. AD is therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**iii. Count Three: Breach of Fiduciary Duty as to Plaintiffs' Officers**

52. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that AD is entitled to recover against Plaintiffs' Officers for breach of fiduciary duty.

53. Plaintiffs' Officers owed a fiduciary duty to AD as officers of AD. Specifically, prior to termination, Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

54. Plaintiffs' Officers breached their fiduciary duties to AD. Specifically, Plaintiffs' Officers' conduct, as described above, directly contradicted the best interests of the company. In connection with and in furtherance of the conduct described above, Plaintiffs' Officers engaged in acts of self-dealing, usurpation of AD's business opportunities, misappropriation and improper use of AD's confidential information, and competition with AD.

55. Plaintiffs' Officers breaches of fiduciary duties proximately caused AD injury, including a loss of business in the form of lost patient, clinic, and physician relationships and opportunities, as well as damage to AD's reputation and anticipated future profits from the relationships with such persons/entities.

56. Plaintiffs' Officers' breaches of fiduciary duties resulted in a benefit to Plaintiffs, including (1) directly or indirectly profiting from the opportunities stolen from AD, as well as (2) securing and continuing access to AD's valuable and confidential business information and records.

57. Further and in the alternative, AD has suffered actual damages as a result of the breaches of fiduciary duties by Plaintiffs' Officers, in an amount in excess of the minimum jurisdictional limits of this Court. The harm suffered by AD is distinct and individual harm as a result of Plaintiffs' Officers' breaches of fiduciary duties and is separate and apart from damages for breach of their employment contracts.

**iv. <u>Count Four: Fraudulent Misrepresentation as to all Plaintiffs</u>**

58. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for fraud.

59. Specifically, Plaintiffs made misrepresentations to Defendants concerning the facts underlying the financial state, value, and general nature of the businesses and assets underlying the Agreement. Plaintiffs made promises to Defendants, concerning their obligations and representations under the Agreement and otherwise, with the present intention not to perform as promised. Those misrepresentations were material to Defendants' decisions to enter into the Agreement and continue with other related aspects of the deal.

60. The misrepresentations detailed above were false in that they were false statements of existing fact that Plaintiffs knew to be false, and/or were promises made by Plaintiffs with the present intention, when made, not to perform as promised. Plaintiffs made the misrepresentations

with the intent that Defendants would rely on them, and Defendants did in fact rely on the misrepresentations by moving forward with the Agreement and related deals.

61. Defendants have suffered actual economic injury as a result of Plaintiffs' fraud and their reliance on Plaintiffs' fraudulent misrepresentations in an amount in excess of the minimum jurisdictional limits of this Court. Further, because Defendants' injuries arise out of Plaintiffs' fraud, Defendants are entitled to exemplary damages up to the maximum amount allowed by law.

**v. Count Five: Conversion as to all Plaintiffs**

62. Plaintiffs incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for conversion.

63. Plaintiffs have wrongfully exercised dominion or control over Defendants property, in denial of or inconsistent with Defendants' rights. Specifically, Plaintiffs have caused the diversion of funds belonging to Defendants. Plaintiffs' conduct was wrongful in that it contradicted the terms of the Agreement which assigned the rights to certain receivables to Defendants. Plaintiffs exercised control by diverting the funds to themselves or to their affiliates.

64. Defendants have suffered actual economic injury as a result of Plaintiffs' conversion in excess of the minimum jurisdictional limits of this Court.

## IV.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

65. Defendant AD asks the Court for temporary injunctive relief preventing Plaintiffs' Officers from (1) wrongfully communicating with patients, clinics, physicians, vendors, lenders, and other persons or entities associated with AD in an effort to divert their business and working relationships away from AD, (2) accessing, viewing, taking, using, copying, downloading, or

modifying AD's confidential business information, including but not limited to patient records, patient lists, and physician referral lists.

66. AD is likely to recover from Plaintiffs' Officers after a trial on the merits because (1) Plaintiffs' Officers were subject to valid and enforceable employment agreements; (2) during their employment, Plaintiffs' Officers owed AD fiduciary duties as employees; and (3) during and after termination of their employment, Plaintiffs' Officers acted and continue to act in breach of those obligations by (1) communicating with patients, clinics, and physicians associated with AD to leave AD and go to other clinics associated with Plaintiffs, (2) stealing business opportunities from AD and otherwise cause damage, and (3) illegally accessing and misappropriating AD's confidential business information in furtherance of their efforts to interfere with and take AD's business opportunities. AD terminated Plaintiffs' Officers from their respective roles after discovering some of their activities, and Plaintiffs' Officers conduct both before and since that termination is clearly wrongful and has caused and threatens to continue causing irreparable harm to AD's business.

67. If this Court does not grant this request to restrain the Plaintiffs' Officers, AD will suffer imminent and irreparable harm in that Plaintiffs' Officers are utilizing information and records belonging to AD and using AD's established relationships to divert business from AD for Plaintiffs' benefit, and will likely continue such conduct, which Plaintiffs' Officers lack authorization to do. Such conduct has interfered with AD's business and will ultimately lead to severe and likely irreparable damage to AD's business and reputation.

68. AD has no adequate remedy at law because allowing such unchecked conduct to continue while AD conducts discovery and proceeds to trial on the underlying causes of action will cause irreparable harm. The conduct must be halted immediately before more damage is done and

cannot be undone. Any monetary award for the measurable damage to AD's business will not adequately compensate AD for the ongoing devaluation, loss of goodwill, and reputational damage, the potential disruption of AD's patients' needed medical care, the proper and timely payment of medical providers for that care, and the resulting reputational harm to AD. The cascade effect of Plaintiffs' Officers' conduct, if it is allowed to continue, cannot be adequately measured or compensated in damages, especially against individual plaintiffs with finite economic resources to pay a money judgment in AD's favor equal to the harm they have caused.

69. There is insufficient time to serve notice on Plaintiffs' Officers and to hold a hearing on this petition and application. Plaintiffs' Officers have been notified several times of their wrongful conduct since their April 10, 2025 termination, including an April 16, 2025 email demanding Plaintiffs' Officers cease and desist any activity in breach of the non-compete and non-solicitation clauses of the employment agreements. Nonetheless, Plaintiffs' Officers continue to wrongfully and illegally use AD's business information and communicate with patients, clinics, and physicians associated with AD in a manner which is completely detrimental to AD's business.

70. Based on the above, the Defendants request this Honorable Court to order the following:

1. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with the patients of Defendant AD DALLAS CLINICS, LLC in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates.

2. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with physicians and other medical and administrative staff, vendors, lenders, and clinics associated with Defendant AD DALLAS CLINICS, LLC, in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates, including but not limited to the following persons/entities:

    - Advanced Healthcare Clinics Plano;
    - Advanced Healthcare Clinics Hurst;

- Advanced Healthcare Clinics Mesquite;
- Advanced Healthcare Clinics Buckner;
- Advanced Healthcare Clinics South Dallas; and
- Advanced Healthcare Clinics Denton.

3. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, not use, interfere, disrupt, modify, or change the AD's confidential business information or any data owned by AD or its affiliates.

4. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, return all digital and tangible property of the AD including all data or access to data, and including but not limited to the following:

   - AD Records which contain contact information for patients, including records containing patient phone numbers, email addresses, or addresses.

5. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not disclose any of AD's data or confidential business information to any other person or entity.

6. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not compete with AD by gaining employment with, partnering with, engaging in business transactions with competitors of AD, aside from businesses outside of the geographical, temporal, and categorical scopes referenced in Plaintiffs' Officers' employment agreements.

71. AD is willing to post a reasonable bond for the temporary restraining order and requests the Court to set the reasonable bond.

## V.
## REQUEST FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

72. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below.

73. Defendant AD asks the Court to set this application for temporary injunction for hearing and to issue a temporary injunction against Plaintiffs' Officers after hearing.

74. Additionally, AD further requests that following a trial on the merits of this case, that the court enter a permanent injunction against Plaintiffs' Officers.

**VI.**
**REQUEST FOR RELIEF**

75. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs as follows:

a. Actual damages, including but not limited to the monetary damages suffered by Defendants as a result of Plaintiffs' conduct;

b. A temporary restraining order that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

c. A temporary and permanent injunction that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

d. Reasonable and necessary attorney's fees;

e. Costs of suit; and,

f. Pre- and post-judgment interest as allowed by law.

**VII.**
**CONDITIONS PRECEDENT**

76. To the extent necessary to do so, Defendants affirmatively plead that all conditions precedent to their recovery on the facts and theories set above have been satisfied, have occurred, or have been waived.

**VIII.**
**NOTICE OF INTENT TO USE DISCOVERY**

77. Pursuant to Texas Rule of Civil Procedure 193.7, Defendants hereby give notice that Defendants intend to use all discovery instruments and information produced in this case at trial. Such discovery instruments and information include, but are not limited to, all documents

and discovery responses Defendants have produced or will produce in response to Defendants' discovery requests and/or any party's discovery requests.

## IX.
## DUTY TO PRESERVE EVIDENCE

78. Defendants demand that Plaintiffs as well as their agents, representatives, employees, officers, managers, affiliates, and attorneys preserve and maintain all evidence in any way related to the transactions, acts, events, and omissions described herein, or the damages resulting therefrom, including but not limited to photographs, videotapes, audiotapes, recordings, correspondence, memoranda, calendars, diaries, notes, drafts, files, facsimiles, email, voice mail, text messages, other electronically stored information, or cellular telephone records. Failure to maintain such items will constitute "spoliation" of the evidence and Defendants will seek sanctions or other available penalties or remedies against Plaintiffs for failure to comply with its duty to preserve evidence in connection with this matter.

## X.
## JURY DEMAND

79. Defendants respectfully demand a trial by jury and have tendered the appropriate jury fee along with the filing of this counterclaim.

## XI.
## CONCLUSION AND PRAYER

WHEREFORE, Defendants respectfully pray that, upon final disposition of this case, Plaintiffs take nothing by reason of Plaintiffs' allegations against Defendants and that this Court grant Defendants such other relief to which they may be entitled, including but not limited to reimbursement for the costs incurred by Defendants in responding to and defending the allegations raised against them in Plaintiffs' Original Petition. Further, Defendants pray that judgment should be entered against Plaintiff in favor of Defendants, that Defendants be awarded actual damages in

an amount to be proven at trial in addition to pre- and post-judgment interest, that Defendants be awarded equitable relief as requested above, that Plaintiffs reimburse Defendants for all reasonable and necessary attorney's fees and expenses and all court costs, and for all such other relied to which Defendants may be entitled.

Dated: May 12, 2025

Respectfully submitted,

**DANIELS & TREDENNICK, PLLC**

By: */s/ Douglas A. Daniels*

Douglas A. Daniels
State Bar No. 00793579
doug.daniels@dtlawyers.com
Sabrina R. Tour
State Bar No. 24093271
sabrina@dtlawyers.com
Timothy Bond
State Bar No. 24131860
tim@dtlawyers.com
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

***Attorneys for Defendants***

***LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.***

**CERTIFICATE OF SERVICE**

I hereby certify that I have complied with Tex. R. Civ. P. 21 and 21a. I further certify that a true and correct copy of the foregoing document has been served on all counsel of record by e-File electronic service on May 12, 2025.

*/s/ Douglas A. Daniels*
Douglas A. Daniels

**DECLARATION**

| | |
|---|---|
| **STATE OF TEXAS** | **§** |
| | **§** |
| **COUNTY OF HARRIS** | **§** |

I, Robert Turner, state that the facts stated within this Declaration are true and correct based on my personal knowledge, and if called as a witness, could testify competently as follows:

I am the Chief Executive Officer of Advanced Diagnostics Healthcare System. I have read *Defendants' Original Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction*, and all facts stated therein are true and correct to the best of my knowledge.

My name is Robert Turner, my date of birth is February 12, 1971, and my address is 8088 Park Lane, Apartment F604, Dallas, Texas 75231. I declare under penalty of perjury that the foregoing is true and correct.

Robert Turner

Executed in Harris County, Texas on this 12th day of May 2025.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kasia Olkowski on behalf of Douglas Daniels
Bar No. 793579
kasia@DTlawyers.com
Envelope ID: 100742442
Filing Code Description: Counter Claim
Filing Description: DEFENDANTS' ORIGINAL ANSWER, COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION
Status as of 5/13/2025 8:40 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 5/12/2025 7:53:31 PM | SENT |
| camp staff | | campstaff@camplaw.com | 5/12/2025 7:53:31 PM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 5/12/2025 7:53:31 PM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 5/12/2025 7:53:31 PM | SENT |
| Timothy EBond | | tim@dtlawyers.com | 5/12/2025 7:53:31 PM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 5/12/2025 7:53:31 PM | SENT |

FILED
5/13/2025 4:29 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
John Bailey DEPUTY

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs*,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | **162nd JUDICIAL DISTRICT** |
| ***Defendants*.** | | |

**DEFENDANTS' FIRST AMENDED ANSWER, COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Defendants, Lucky Chopra, AD Dallas Clinics, LLC, Trend Physicians Group, Inc., and Zoo Capital Holdings, LLC ("Defendants"), file this First Amended Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, related to the claims asserted by Ted Ventures, LLC, Trend Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs") as follows.

## I.
## GENERAL DENIAL

1. Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally and categorically deny the allegations contained in Plaintiffs' Original Petition and demand strict proof thereof in accordance with the laws and Constitution of the State of Texas.

## II.
## AFFIRMATIVE DEFENSES

2. To the extent that any defenses, other than the General Denial, pled in this Answer are in conflict, they are pled in the alternative.

a. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of discharge or excused performance.

b. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of prior material breach.

c. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of unclean hands.

d. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of offset.

e. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of fraud.

## III.
## ORIGINAL COUNTERCLAIM

### A. Discovery Control Plan

3. Pursuant to TEX. R. CIV. P. 190.1, Defendants intend to conduct discovery by rule under Texas Rule of Civil Procedure 190.3 ("Level 2").

### B. Claims for Relief

4. Pursuant to Texas Rule of Civil Procedure 47(c), Defendants seek monetary relief from Plaintiffs as pleaded herein, of over $1,000,000.00, as well as non-monetary relief.

### C. Parties

5. Plaintiff TED Ventures, LLC ("TED Ventures") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

6. Plaintiff Trend Medical Management, LLC ("Trend Medical") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

7. Plaintiff Derek Gove is a citizen and resident of the state of Texas.

8. Plaintiff Trey Austin is a citizen and resident of the state of Texas.

9. Plaintiff Enrique Stowhas is a citizen and resident of the state of Texas.

10. Defendant Luck Chopra is a citizen and resident of the state of Texas.

11. Defendant Ryan Reneau is a citizen and resident of the state of Texas.

12. Defendant Trend Physicians Group, LLC ("Trend Physicians") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

13. Defendant Advanced Dallas Clinics, LLC ("AD") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Dallas County, Texas.

14. Defendant Zoo Capital Holdings, LLC is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Harris County, Texas.

**D. Jurisdiction and Venue**

15. This Court has subject matter jurisdiction over this dispute because Defendants seek monetary relief in excess of $1,000,000.

16. This Court has personal jurisdiction over Plaintiffs TED Ventures and Trend Medical in this dispute because TED Ventures and Trend Medical are entities doing business in

Texas as the term "doing business" is understood in law. TED Ventures and Trend Medical have purposefully availed themselves of the laws of the State of Texas and have sufficient minimum contacts in the State of Texas for this Court to exercise personal jurisdiction over it. This matter arises out of TED Ventures' and Trend Medical's contacts within the State of Texas and exercising personal jurisdiction over them comports with traditional notions of fair play and substantial justice.

17. This Court has personal jurisdiction over Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas because they are residents and citizens of the State of Texas.

18. Venue is proper in this Court pursuant to TEX. CIV. PRAC. & REM. CODE ¶ 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.

## E. Factual Allegations

### i. The Asset and Purchase and Contribution Agreement.

19. Plaintiffs, either directly or indirectly, own and manage medical clinics, physical rehabilitation clinics, and pharmacies throughout the Dallas area. Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas are direct or indirect owners of TED Ventures and Trend Medical.

20. Defendants, either directly or indirectly, own and manage several hospitals and medical facilities around Texas.

21. Plaintiffs and Defendants met in mid-2023.

22. Based on representations by Plaintiffs, Defendants were interested in acquiring several of Plaintiffs' medical clinics and medical management entities.

23. On December 12, 2023, AD, Zoo Capital, and Plaintiffs entered into a contract for Defendants to acquire substantially all the assets of Trend Medical Management, LLC ("Trend Medical"), including Trend Medical's ownership of Trend Physicians (the "Agreement"). Defendant Zoo Capital then contributed, transferred, and conveyed the assets to AD. Plaintiffs and Defendants agreed on a purchase price of twelve million dollars ($12,000,000) based on Plaintiffs' representations about TED Ventures and Trend Medical. That amount was to be paid over time. To date, Plaintiffs have been paid approximately two million dollars ($2,000,000).

24. Almost immediately after the Agreement was signed, Defendants began uncovering facts and circumstances that contradicted the representations made by Plaintiffs during negotiations for the Agreement. For example, despite representations by Plaintiffs prior to entering into the deal, Defendants had to start paying out sums of money to keep the clinics running because the clinics and businesses were not cashflow positive, and payroll could not be covered without help and intervention from Defendants. The clinics made just enough money to pay for rent, but not payroll, and there certainly was no profit, as promised under the representations by Plaintiffs. When AD tried doing an audit, Plaintiffs stopped AD at every turn. Plaintiffs would occasionally produce PDF spreadsheets, but nothing in Excel format and no QuickBooks or the actual data behind the inputs.

25. Based on the information the auditor was finally able to uncover from Plaintiffs, significant discrepancies were uncovered. First, the revenue that Plaintiffs had reported before the agreement was signed was $2.3 million less than they had represented. Second, the payroll expenses were hundreds of thousands of dollars higher than Plaintiffs had represented to Defendants. Third, the professional fees were likewise hundreds of thousands of dollars greater

than Plaintiffs had originally reported. These discrepancies were not minor, but significant, and Defendants would not have ever entered into the deal with Plaintiffs had Plaintiffs been forthright from the beginning.

26. Plaintiffs had sorely misrepresented the value in their clinics. Additionally, the management team's performance was unsatisfactory across the board, which caused even more financial strain on the clinics. As detailed further below, the concealed management issues led to the for-cause termination of several AD officers.

27. Plaintiffs also misrepresented their collections. In the medical field, what medical clinics charge versus what they collect can vary widely based on insurance companies' and government entities' actual payments for the rendered medical services. Plaintiffs purposefully conflated their charges with their actual collections to entice Defendants to enter into the deal. Only the smallest fraction of what Plaintiffs represented actually materialized.

28. Defendants have also been made aware that Plaintiffs were having patients and owing-entities pay Plaintiffs directly for services that the clinics provided. Defendants' diversion of funds continued even after Defendants entered the deal to purchase the clinics. For example, Defendants have uncovered evidence that from 2024 to 2025, certain receivables owed to Defendants were accounted for as if paid, but the related payments were deposited to non-affiliated third parties. Defendants' investigation is ongoing, but an initial investigation has uncovered that thousands of dollars of Defendants' receivables have been diverted. Plaintiffs cut Defendants out and stole the money that was due to Plaintiffs.

29. Further, the deal between Defendants and Plaintiffs encompassed certain pharmacies originally owned by Plaintiffs. Defendants agreed to use Plaintiffs' pharmacies to obtain

the medications needed for their patients at the clinics, and AD also entered into a purchase agreement for Southern Star Pharmacy. Plaintiffs' pharmacies then charged the medications at exorbitant profits, which resulted in issues for many of Defendants patients. Additionally, with respect to Southern Star Pharmacy, AD has evidence that Plaintiffs took receivables that AD bought under the Agreement and had payments sent directly to Plaintiffs. Southern Star Pharmacy has since engaged in harassing conduct towards Defendants' clinics and affiliates.

30. Additionally, as part of the Agreement, Plaintiffs represented that they would release underlying encumbrances. Specifically, Plaintiffs failed to perform their release obligations related to a loan for over $9,600,000 from Enterprise Bank, that encompassed Trend Physician Group, Inc., which is an entity that Defendants purchased in the deal. In March 2025, Enterprise Bank sued entities associated with Defendants, including Trend Physician Group, Inc., for defaulting on the $9.6 million loan.

31. The circumstances surrounding the Agreement show Plaintiffs' disregard for their contractual obligations and their willingness to engage in fraud.

**ii. <u>Employment Agreement Breaches and Unlawful Competition.</u>**

32. On November 1, 2023, Defendants entered into employment agreements with Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs' Officers").[1] The employment agreements provided that Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

---

[1] *See* Affidavit of Robert Turner, Exhibit A, at Exhibits A-1, A-2, and A-3.

33. While uncovering Plaintiffs' above-referenced misconduct concerning the Agreement, Defendants also identified that Plaintiffs' officers were contributing to the fraud by breaching their respective employment agreements. Accordingly, On April 10, 2025, AD terminated Plaintiffs' Officers for cause.

34. Leading up to the terminations, Defendants were made aware of statements made and messages sent by Plaintiffs' Officers in an effort to divert Defendants' business while Plaintiffs' Officers were actively directing and managing the operations of Defendants' business. Specifically, Defendants received evidence that Plaintiffs' Officers were contacting clinics, patients, and physicians affiliated with Defendants, and directing those affiliates to direct payment to entities or individual not affiliated with AD for services rendered by AD.[2] Essentially, Plaintiffs' Officers took or diverted monies owed to AD and directed that money to themselves or other entities in which they had some economic interest. That is embezzlement and theft, not to mention a breach of Plaintiffs' Officers' contractual and fiduciary obligations to AD. AD therefore terminated Plaintiffs' Officers, and did so in accordance with the terms of the employment agreements.

35. Additionally, after Plaintiffs' Officers termination, Plaintiffs' Officers violated their non-competition and non-solicitation agreements by: (1) soliciting AD's physicians to work for entities unaffiliated with Plaintiff but affiliated with Plaintiffs; (2) soliciting AD's patients to receive treatment at entities unaffiliated with AD but affiliated with Plaintiffs; and (3) continuing to steal money from AD by directing parties owing monies to AD to pay entities affiliated with Plaintiffs instead.[3]

---

[2] *See* Exhibit A.
[3] *See* Exhibit A.

36. According to each employment agreement, Plaintiffs' Officers were prohibited from competing with AD in Texas, soliciting AD's business in Texas, and accessing AD's records for a twelve-month period following termination (the "Restrictive Period"), except for certain unrelated business functions. Each agreement provided the Plaintiffs' Officers shall not:

- Directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company;

- Directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company;

- Access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify, or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

The employment agreements offered clear and reasonable limitations on Plaintiffs' Officers' post-termination conduct. The employment agreements also included cooperation provisions, requiring Plaintiffs' Officers to cooperate with AD, during and after their employment period, to help resolve any disputes with third parties.

37. After their lawful termination, Plaintiffs' Officers continue to violate their obligations to AD by immediately and continually violating their non-competition and non-solicitation clauses, among other provisions of the employment agreements. Plaintiffs' Officers continued to contact AD's patients and physicians to entice them to become patients at and doctors of other clinics and hospitals that Plaintiffs are affiliated with. Specifically, Plaintiffs' and/or Plaintiffs' Officers attempted to gain or access to Defendants valuable patient data and communications after Plaintiffs' Officers were terminated and lost lawful access to such data.[4] Plaintiffs' Officers accessed Defendants' confidential information in an effort to use that information to usurp or divert AD's business opportunities for themselves. Plaintiffs' Officers did so as soon as the day after their termination, demonstrating their malicious intent and furthering their illegal conduct. Moreover, Plaintiffs have recently sent text messages, or directed text messages to be sent, to current patients of Defendants' clinics, offering to provide the patients services at clinics not affiliated with Defendants.[5] Plaintiffs have unlawfully accessed, used, or otherwise misappropriated Defendants' confidential information—such as patient lists and patient contact information—to further their scheme.

38. Plaintiffs' Officers have also refused to cooperate with AD after termination, effectively preventing AD access to certain medical databases and systems for which Defendants' consent is required. Plaintiffs' Officers' conduct shows their willingness to illegally compete with AD, including by soliciting AD's affiliates and accessing AD's records, all in contravention of the employment agreements.

---

[4] *See* Exhibit A.
[5] *See* Exhibit A.

39. In sum, Plaintiffs' statements and conduct surrounding the Agreement were fraudulent, considering evidence that the purchased facilities had overstated value and financials, shady underlying practices, and undisclosed debt. Plaintiffs' Officers' continued their misconduct by engaging in competitive practices that went against their employment agreements. The deal has resulted in Defendants holding the bag, a bag that was propped up by Plaintiffs' misrepresentations prior to the deal, but depleted by Plaintiffs prior to, during, and after transfer.

## F. Causes of Action

### i. <u>Count One: Breach of Contract (the Agreement) as to all Plaintiffs</u>

40. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs for breach of contract as to the Agreement.

41. Specifically, Defendants AD and Zoo Capital were parties to a valid, enforceable contract with Defendants—the Agreement—and are proper parties to bring suit for breach of that contract. AD and Zoo capital have at all times complied with its obligations under the Agreement.

42. The Agreement incorporates various representations and warranties made by Plaintiffs, concerning the clinics and assets to be purchased by Defendants. The Agreement also required Plaintiffs to make disclose information regarding their assets and liabilities on a good faith basis. Finally, the Agreement required Plaintiffs to act in good faith when performing various aspects of Agreement.

43. Plaintiffs breached the agreement. Plaintiffs' breaches included, but are not necessarily limited to, the following actions or omissions contrary to their obligations under the Agreement:

a. Overstating the value of the businesses and assets purchased pursuant to the Agreement;
b. Misrepresenting receivables value, debt, and other financial aspects underlying the assets purchased under the Agreement;
c. Misrepresenting the nature of the businesses underlying the Agreement; and,
d. Concealing unfavorable facts and circumstances during the negotiations for and commencement of the Agreement.

44. Plaintiffs' breach caused AD and Zoo Capital injury in the form of economic damages in an amount in excess of the minimum jurisdictional limits of this Court.

45. Defendants have incurred costs for attorneys in connection with pursuing remedies under the Agreement. Defendants are therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**ii. Count Two: Breach of Contract (employment agreements) as to Plaintiffs' Officers**

46. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that AD is entitled to recover monetary damages against Plaintiffs' Officers for breach of their employment agreements.

47. Specifically, the employment agreements provide that during the one year following Plaintiffs' Officers' termination, Plaintiffs' Officers shall not directly or indirectly own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business within Texas, that competes with the Business in any respect as conducted by AD.

Further, the agreements provide that during the Restrictive Period, Plaintiffs' Officers shall not solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of AD, for Plaintiffs' Officers benefit or for any purpose related to or competitive with AD's business. Additionally, Plaintiffs' Officers shall not access, interfere with, disrupt, modify, or change AD's files or information during the Restrictive Period.

48. AD has at all times complied with its obligations under the employment agreements.

49. Plaintiffs' Officers breached their employment agreements. Specifically, and without limitation, Plaintiffs' Officers breached those agreements by:

a. Communicating with AD's patients, clinics, and physicians affiliated with AD for Plaintiffs' direct or indirect benefit and in a manner that competes with AD's business;
b. Competing with AD and profiting from AD's business relationships for Plaintiffs' direct or indirect benefit; and/or,
c. Using, accessing, disrupting, modifying, and/or changing AD's confidential information in a manner harmful to AD's access to such information and for Plaintiffs' benefit.

50. Each of the foregoing breaches, and all of them collectively, threaten to cause AD imminent and irreparable harm and/or monetary damages in an amount in excess of the minimum jurisdictional limits of this Court.

51. AD has incurred costs for attorneys in connection with pursuing AD's remedies under the parties' agreement. AD is therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

### iii. Count Three: Breach of Fiduciary Duty as to Plaintiffs' Officers

52. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that AD is entitled to recover against Plaintiffs' Officers for breach of fiduciary duty.

53. Plaintiffs' Officers owed a fiduciary duty to AD as officers of AD. Specifically, prior to termination, Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

54. Plaintiffs' Officers breached their fiduciary duties to AD. Specifically, Plaintiffs' Officers' conduct, as described above, directly contradicted the best interests of the company. In connection with and in furtherance of the conduct described above, Plaintiffs' Officers engaged in acts of self-dealing, usurpation of AD's business opportunities, misappropriation and improper use of AD's confidential information, and competition with AD.

55. Plaintiffs' Officers breaches of fiduciary duties proximately caused AD injury, including a loss of business in the form of lost patient, clinic, and physician relationships and opportunities, as well as damage to AD's reputation and anticipated future profits from the relationships with such persons/entities.

56. Plaintiffs' Officers' breaches of fiduciary duties resulted in a benefit to Plaintiffs, including (1) directly or indirectly profiting from the opportunities stolen from AD, as well as (2) securing and continuing access to AD's valuable and confidential business information and records.

57. Further and in the alternative, AD has suffered actual damages as a result of the breaches of fiduciary duties by Plaintiffs' Officers, in an amount in excess of the minimum

jurisdictional limits of this Court. The harm suffered by AD is distinct and individual harm as a result of Plaintiffs' Officers' breaches of fiduciary duties and is separate and apart from damages for breach of their employment contracts.

**iv. Count Four: Fraudulent Misrepresentation as to all Plaintiffs**

58. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for fraud.

59. Specifically, Plaintiffs made misrepresentations to Defendants concerning the facts underlying the financial state, value, and general nature of the businesses and assets underlying the Agreement. Plaintiffs made promises to Defendants, concerning their obligations and representations under the Agreement and otherwise, with the present intention not to perform as promised. Those misrepresentations were material to Defendants' decisions to enter into the Agreement and continue with other related aspects of the deal.

60. The misrepresentations detailed above were false in that they were false statements of existing fact that Plaintiffs knew to be false, and/or were promises made by Plaintiffs with the present intention, when made, not to perform as promised. Plaintiffs made the misrepresentations with the intent that Defendants would rely on them, and Defendants did in fact rely on the misrepresentations by moving forward with the Agreement and related deals.

61. Defendants have suffered actual economic injury as a result of Plaintiffs' fraud and their reliance on Plaintiffs' fraudulent misrepresentations in an amount in excess of the minimum jurisdictional limits of this Court. Further, because Defendants' injuries arise out of Plaintiffs' fraud, Defendants are entitled to exemplary damages up to the maximum amount allowed by law.

v. **Count Five: Conversion as to all Plaintiffs**

62. Plaintiffs incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for conversion.

63. Plaintiffs have wrongfully exercised dominion or control over Defendants property, in denial of or inconsistent with Defendants' rights. Specifically, Plaintiffs have caused the diversion of funds belonging to Defendants. Plaintiffs' conduct was wrongful in that it contradicted the terms of the Agreement which assigned the rights to certain receivables to Defendants. Plaintiffs exercised control by diverting the funds to themselves or to their affiliates.

64. Defendants have suffered actual economic injury as a result of Plaintiffs' conversion in excess of the minimum jurisdictional limits of this Court.

## IV.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

65. Defendant AD asks the Court for temporary injunctive relief preventing Plaintiffs' Officers from (1) wrongfully communicating with patients, clinics, physicians, vendors, lenders, and other persons or entities associated with AD in an effort to divert their business and working relationships away from AD, (2) accessing, viewing, taking, using, copying, downloading, or modifying AD's confidential business information, including but not limited to patient records, patient lists, and physician referral lists.

66. AD is likely to recover from Plaintiffs' Officers after a trial on the merits because (1) Plaintiffs' Officers were subject to valid and enforceable employment agreements; (2) during their employment, Plaintiffs' Officers owed AD fiduciary duties as employees; and (3) during and after termination of their employment, Plaintiffs' Officers acted and continue to act in breach of those

obligations by (1) communicating with patients, clinics, and physicians associated with AD to leave AD and go to other clinics associated with Plaintiffs, (2) stealing business opportunities from AD and otherwise cause damage, and (3) illegally accessing and misappropriating AD's confidential business information in furtherance of their efforts to interfere with and take AD's business opportunities. AD terminated Plaintiffs' Officers from their respective roles after discovering some of their activities, and Plaintiffs' Officers conduct both before and since that termination is clearly wrongful and has caused and threatens to continue causing irreparable harm to AD's business.

67. If this Court does not grant this request to restrain the Plaintiffs' Officers, AD will suffer imminent and irreparable harm in that Plaintiffs' Officers are utilizing information and records belonging to AD and using AD's established relationships to divert business from AD for Plaintiffs' benefit, and will likely continue such conduct, which Plaintiffs' Officers lack authorization to do. Such conduct has interfered with AD's business and will ultimately lead to severe and likely irreparable damage to AD's business and reputation.

68. AD has no adequate remedy at law because allowing such unchecked conduct to continue while AD conducts discovery and proceeds to trial on the underlying causes of action will cause irreparable harm. The conduct must be halted immediately before more damage is done and cannot be undone. Any monetary award for the measurable damage to AD's business will not adequately compensate AD for the ongoing devaluation, loss of goodwill, and reputational damage, the potential disruption of AD's patients' needed medical care, the proper and timely payment of medical providers for that care, and the resulting reputational harm to AD. The cascade effect of Plaintiffs' Officers' conduct, if it is allowed to continue, cannot be adequately measured or

compensated in damages, especially against individual plaintiffs with finite economic resources to pay a money judgment in AD's favor equal to the harm they have caused.

69. There is insufficient time to serve notice on Plaintiffs' Officers and to hold a hearing on this petition and application. Plaintiffs' Officers have been notified several times of their wrongful conduct since their April 10, 2025 termination, including an April 16, 2025 email demanding Plaintiffs' Officers cease and desist any activity in breach of the non-compete and non-solicitation clauses of the employment agreements. Nonetheless, Plaintiffs' Officers continue to wrongfully and illegally use AD's business information and communicate with patients, clinics, and physicians associated with AD in a manner which is completely detrimental to AD's business.

70. Based on the above, the Defendants request this Honorable Court to order the following:

1. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with the patients of Defendant AD DALLAS CLINICS, LLC in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates.

2. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with physicians and other medical and administrative staff, vendors, lenders, and clinics associated with Defendant AD DALLAS CLINICS, LLC, in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates, including but not limited to the following persons/entities:

    - Advanced Healthcare Clinics Plano;
    - Advanced Healthcare Clinics Hurst;
    - Advanced Healthcare Clinics Mesquite;
    - Advanced Healthcare Clinics Buckner;
    - Advanced Healthcare Clinics South Dallas; and
    - Advanced Healthcare Clinics Denton.

3. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, not use, interfere, disrupt, modify, or change the AD's confidential business information or any data owned by AD or its affiliates.

4. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, return all digital and tangible property of the AD including all data or access to data, and including but not limited to the following:

   - AD Records which contain contact information for patients, including records containing patient phone numbers, email addresses, or addresses.

5. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not disclose any of AD's data or confidential business information to any other person or entity.

6. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not compete with AD by gaining employment with, partnering with, engaging in business transactions with competitors of AD, aside from businesses outside of the geographical, temporal, and categorical scopes referenced in Plaintiffs' Officers' employment agreements.

71. AD is willing to post a reasonable bond for the temporary restraining order and requests the Court to set the reasonable bond.

## V.
## REQUEST FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

72. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below.

73. Defendant AD asks the Court to set this application for temporary injunction for hearing and to issue a temporary injunction against Plaintiffs' Officers after hearing.

74. Additionally, AD further requests that following a trial on the merits of this case, that the court enter a permanent injunction against Plaintiffs' Officers.

## VI.
## REQUEST FOR RELIEF

75. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs as follows:

a. Actual damages, including but not limited to the monetary damages suffered by Defendants as a result of Plaintiffs' conduct;

b. A temporary restraining order that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

c. A temporary and permanent injunction that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

d. Reasonable and necessary attorney's fees;

e. Costs of suit; and,

f. Pre- and post-judgment interest as allowed by law.

## VII.
## CONDITIONS PRECEDENT

76. To the extent necessary to do so, Defendants affirmatively plead that all conditions precedent to their recovery on the facts and theories set above have been satisfied, have occurred, or have been waived.

## VIII.
## NOTICE OF INTENT TO USE DISCOVERY

77. Pursuant to Texas Rule of Civil Procedure 193.7, Defendants hereby give notice that Defendants intend to use all discovery instruments and information produced in this case at trial. Such discovery instruments and information include, but are not limited to, all documents and discovery responses Defendants have produced or will produce in response to Defendants' discovery requests and/or any party's discovery requests.

## IX.
## DUTY TO PRESERVE EVIDENCE

78. Defendants demand that Plaintiffs as well as their agents, representatives, employees, officers, managers, affiliates, and attorneys preserve and maintain all evidence in any way related to the transactions, acts, events, and omissions described herein, or the damages resulting therefrom, including but not limited to photographs, videotapes, audiotapes, recordings, correspondence, memoranda, calendars, diaries, notes, drafts, files, facsimiles, email, voice mail, text messages, other electronically stored information, or cellular telephone records. Failure to maintain such items will constitute "spoliation" of the evidence and Defendants will seek sanctions or other available penalties or remedies against Plaintiffs for failure to comply with its duty to preserve evidence in connection with this matter.

## X.
## JURY DEMAND

79. Defendants respectfully demand a trial by jury and have tendered the appropriate jury fee along with the filing of this counterclaim.

## XI.
## CONCLUSION AND PRAYER

WHEREFORE, Defendants respectfully pray that, upon final disposition of this case, Plaintiffs take nothing by reason of Plaintiffs' allegations against Defendants and that this Court grant Defendants such other relief to which they may be entitled, including but not limited to reimbursement for the costs incurred by Defendants in responding to and defending the allegations raised against them in Plaintiffs' Original Petition. Further, Defendants pray that judgment should be entered against Plaintiff in favor of Defendants, that Defendants be awarded actual damages in an amount to be proven at trial in addition to pre- and post-judgment interest, that Defendants be

awarded equitable relief as requested above, that Plaintiffs reimburse Defendants for all reasonable and necessary attorney's fees and expenses and all court costs, and for all such other relied to which Defendants may be entitled.

Dated: May 13, 2025

Respectfully submitted,

**DANIELS & TREDENNICK, PLLC**

By: */s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
doug.daniels@dtlawyers.com
Sabrina R. Tour
State Bar No. 24093271
sabrina@dtlawyers.com
Timothy Bond
State Bar No. 24131860
tim@dtlawyers.com
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

***Attorneys for Defendants LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.***

## CERTIFICATE OF SERVICE

I hereby certify that I have complied with Tex. R. Civ. P. 21 and 21a. I further certify that a true and correct copy of the foregoing document has been served on all counsel of record by e-File electronic service on May 13, 2025.

*/s/ Douglas A. Daniels*
Douglas A. Daniels

# Exhibit A

**AFFIDAVIT OF ROBERT TURNER**

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

BEFORE ME, the undersigned authority, on this day personally appeared Robert Turner, who having been first by me duly sworn, upon his oath deposed and said as follows:

> "My name is Robert Turner. I am above the age of eighteen years, am of sound mind, have never been convicted of a felony, and am competent to make this affidavit. I have personal knowledge of the facts contained in this affidavit, and those facts are true and correct. I am the Chief Executive Officer of the Dallas Market of Advanced Diagnostics Healthcare System ('Advanced'). Advanced shares common ownership and/or management with Defendant AD Dallas Clinics, LLC and its affiliates ('AD'). I am providing this Affidavit in my capacity as CEO and as a corporate representative of Advanced. By virtue of by job responsibilities as CEO and my personal involvement in the investigation into matters described below in this Affidavit, I have personal knowledge of Advanced's investigation and evidence of the facts contained both in this Affidavit and in *Defendants' First Amended Answer, Counterclaim, and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction,* (the 'Answer, Counterclaim, and TRO'). All facts stated both in this Affidavit and in the Answer, Counterclaim, and TRO are true and correct.
>
> "I am actively participating in an ongoing investigation, by AD and Advanced, into financial discrepancies, management deficiencies, and numerous reports of actions, statements, and misconduct of Plaintiffs TED Ventures, LLC, Trend Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas (the "Investigation"), related to the transaction for the purchase of the assets of Trend Medical Management, LLC and related to the post-transaction employment of Messrs. Gove, Austin, and Stowhas. As CEO and in furtherance of Advanced's investigation, I have personally had direct discussions with the employees and officers of Advanced and/or AD throughout the duration of the Investigation. Additionally, I have personally reviewed business records and other evidence related to the Investigation.
>
> "On or around April 10, 2025, Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs' Officers") were terminated from their respective roles with AD, for cause, as a direct result of matters uncovered during the Investigation.
>
> "In connection with the Investigation, AD has obtained evidence that prior to their termination, Plaintiffs' Officers' diverted AD business by directing third parties to make payments to non-AD affiliates, for payments due and owing to AD. Specifically, payments due to AD were marked as paid in internal accounting systems but the related payments were never deposited or transferred to AD accounts.

"In connection with the Investigation, AD has also obtained evidence that since their termination, Plaintiffs' Officers accessed, or caused their affiliates or others working on their behalf to access, AD databases starting less than twenty-four hours after their termination, thereby obtaining confidential AD business data. Specifically, Plaintiffs' Officers or those acting at their direction accessed AD's databases containing AD's patient scheduling information and rescheduled patient appointments from AD clinics to third party clinics.

"In connection with the Investigation, AD has also obtained evidence that since termination, Plaintiffs' Officers have contacted, or caused their affiliates or others working on their behalf, to contact AD's physicians and staff and directed their services to parties not affiliated with AD.

"In connection with the Investigation, AD has also obtained evidence that since termination, Plaintiffs' Officers have contacted, or caused their affiliates or others working on their behalf to contact, AD's patients and directed their business to parties not affiliated with AD. Specifically, I have personally reviewed communications and records evidencing Plaintiffs' Officers or their affiliates or others working on their behalf attempting to solicit AD patients to take their appointments from AD to third party clinics.

"A true and correct copy of the employment agreement between AD Dallas Clinics, LLC ("AD") and Plaintiff Enrique Stowhas, related to the Answer, Counterclaim, and TRO, is attached to this affidavit as **Exhibit A-1**.

"A true and correct copy of the employment agreement between AD Dallas Clinics, LLC ("AD") and Plaintiff Derek Gove, related to the Answer, Counterclaim, and TRO, is attached to this affidavit as **Exhibit A-2**.

"A true and correct copy of the employment agreement between AD Dallas Clinics, LLC ("AD") and Plaintiff Trey Austin, related to the Answer, Counterclaim, and TRO, is attached to this affidavit as **Exhibit A-3**."

FURTHER Affiant sayeth naught.

Robert Turner

SUBSCRIBED AND SWORN TO before me this 13th day of May, 2025, by Robert Turner.

Notary Public, State of Texas

Maryrose Jones
My Commission Expires
10/11/2027
Notary ID 134600653

# Exhibit A-1

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "***Agreement***") is made and entered into as of November 1st, 2023 (the "***Effective Date***"), by and between **AD DALLAS CLINICS, LLC.**, a Texas limited liability company (the "***Company***"), and **ENRIQUE STOWHAS**, a resident of the State of Texas ("***Employee***"). Certain capitalized terms used herein but not otherwise defined shall have the meanings as set forth in Section 14 of this Agreement.

## RECITALS:

A. Pursuant to that certain Asset Purchase and Contribution Agreement dated as of November 1st, 2023, by and among the Company and the other parties named therein (the "***Purchase Agreement***"), the Company has agreed to, among other things, acquire substantially all of the assets of TREND Medical Management, LLC, a Texas limited liability company (the "***Transaction***").

B. The Company's obligation to consummate the Transaction is subject to the satisfaction of certain terms and conditions, including the execution and delivery of this Agreement by Employee.

C. The Company desires to employ Employee, and Employee desires to be employed with the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements and understandings contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Employment**. The Company shall employ Employee on a full-time basis, and Employee hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date and ending as of the expiration of the Term.

2. **Position and Duties**.

(a) During the Term, Employee shall be employed by the Company in the role of Chief Marketing Officer, with such customary responsibilities, duties and authority as may from time to time be assigned to Employee by the Board of Managers of the Company (the "**Board**"), and shall perform the services and fulfill the duties to the Company set forth in the Employee Function Description attached hereto as ***Exhibit A*** (such services and duties, the "***Services***"). The assignment of Services to the Employee shall be subject to the power and authority of the Chief Executive Officer of the Company (the "***CEO***") to expand or limit such Services.

(b) Employee shall initially report to Lucky Chopra and/or such other individuals as the CEO may designate, and Employee shall be available on a full-time basis, devoting a minimum average of thirty-two (32) hours per week to the business and affairs of the Company and its Affiliates. Employee shall perform Employee's duties and responsibilities to the best of Employee's abilities in a diligent, trustworthy, businesslike and efficient manner. Employee shall comply with all written policies and procedures of the Company in effect from time to time, to the extent applicable to Employee.

(c) During the Term, Employee shall work primarily out of the Company's Dallas, Texas office. Employee shall be available to travel on behalf of the Company at such times as shall be reasonably requested by the Board and/or the CEO or his designees, and the Company shall reimburse Employee for all reasonable business expenses (including round-trip airfare, car travel,

reasonable hotel accommodations and meal allowance), in each case, subject to the Company's requirements with respect to reporting and documentation of such expenses and the Company's travel policy as then in effect.

(d) The Company shall provide such telephone, office, facilities, equipment, personnel and supplies as the Company deems reasonable and appropriate for the performance of Employee's duties and responsibilities under this Agreement.

3. **Base Salary, Benefits and Bonus**.

(a) During the Term, Employee's base salary as a full-time employee shall be One Hundred and Twenty Thousand Dollars ($120,000.00) per annum (pro-rated for any partial year) (the "***Base Salary***"), which shall be payable in regular installments in accordance with the Company's general payroll practices as may be in effect from time to time. The Base Salary shall be subject to deduction and withholding authorized or required by applicable law. The Base Salary shall be subject to periodic review by the CEO and may be increased, but not decreased, during the Term. In addition, Employee shall be entitled to receive such perquisites and fringe benefits and participate in all of the Company's employee benefit programs and/or plans for which he is eligible in accordance with the policies and procedures of the Company in effect from time to time, including, but not limited to, Paid Time Off, medical insurance and retirement plans.

(b) Employee shall be entitled to twenty (20) days of Paid Time Off per calendar year (pro-rated for any partial calendar year) as a full-time employee during the Term. The Company encourages Employee to use Paid Time Off during the calendar year in which it is accrued. Paid Time Off and other eligible employee benefits and/or plans will be administered in accordance with the Company's policies and procedures in effect from time to time.

(c) The Company shall reimburse Employee for all reasonable business expenses incurred by Employee in the course of performing Employee's duties under this Agreement, which are consistent with the Company's policies and procedures in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(d) Not later than ninety (90) days after the end of each calendar year during the Term, the Company shall determine, award and pay to Employee an annual performance bonus with a targeted amount of One Hundred Twenty Thousand Dollars ($120,000) per year (the "***Performance Bonus***"). The Employee shall be eligible to receive the Performance Bonus or the earned portion thereof, upon the achievement of certain performance criteria, including certain personal and Company financial performance targets (collectively, the "***Performance Targets***"). All Performance Targets applicable to Employee's Performance Bonus for each calendar year during the Term shall be determined by the Board, in its reasonable discretion, in consultation with Employee. The initial Performance Targets are set forth on ***Exhibit B*** attached hereto. Unless otherwise stated herein, Employee must be employed by the Company on the last day of the applicable calendar year to be entitled to receive any Performance Bonus with respect to such calendar year.

4. **Term and Termination**.

(a) The initial term of this Agreement (the "***Initial Term***") shall commence on the Effective Date and shall terminate upon the earliest to occur of: (i) the thirty-six (36) month anniversary of this Agreement; (ii) Employee's death or Disability; or (iii) the termination of this

Agreement in accordance with the provisions hereof. Upon the expiration of the Initial Term, this Agreement will automatically renew for additional, successive one (1) year terms (each, a "***Renewal Term***") unless either party provides the other party written notice of its desire to not renew this Agreement at least thirty (30) days prior to the expiration of the Initial Term or any Renewal Term. The Initial Term and any Renewal Terms are collectively referred to herein as the "***Term***." For the avoidance of doubt, this Agreement will remain subject to termination as set forth in this Section 4 during any Renewal Term.

(b) This Agreement may be terminated by the Company at any time in the sole discretion of the Company, for any reason or no reason whatsoever; *provided*, *that*, in the event the Company terminates this Agreement without Cause, the Company shall provide Employee with at least thirty (30) days' prior written notice of the effective date of such termination; *provided*, *further*, that in the event of a termination of this Agreement by the Company without Cause, at the Company's request, Employee shall cease to perform all duties hereunder and shall not enter the Company's premises during such thirty (30)-day period prior to the effective date of such termination.

(c) This Agreement may be terminated by Employee at any time; *provided*, *that*, in the event Employee terminates this Agreement without Good Reason, Employee shall provide the Company with at least thirty (30) days' prior written notice of the effective date of such termination; *provided*, *further*, that in the event of a termination of this Agreement by Employee without Good Reason, at the Company's request, Employee shall cease to perform all duties hereunder and shall not enter the Company's premises during such thirty (30)-day period prior to the effective date of such termination.

(d) This Agreement may be terminated at any time upon the mutual agreement of the Company and Employee for (i) Employee to cease to be employed as a full-time employee of the Company and (ii) to thereafter serve as a part-time consultant of the Company. In the event of a termination of this Agreement pursuant to this Section 4(d), Employee shall receive any Base Salary earned through the date of termination, and any earned but unpaid Performance Bonus as of the date of termination, both payable pursuant to the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law. For the avoidance of doubt, a termination of this Agreement pursuant to this Section 4(d) shall not be deemed to be a termination of this Agreement by the Company or Employee that is subject to the provisions of Sections 4(b), 4(c), 4(e) or 4(f).

(e) Upon a termination of this Agreement for any reason other than a termination by the Company without Cause or by Employee for Good Reason, all future compensation to which Employee would otherwise be entitled and all future benefits for which Employee would otherwise be eligible shall cease and terminate as of the date of such termination; *provided*, *that*, Employee shall receive any Base Salary earned through the date of termination, payable pursuant to the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law.

(f) Upon a termination of this Agreement by the Company without Cause or by Employee thirty (30) days after the occurrence of the event giving rise to Good Reason, the Company shall, in consideration of Employee's continuing obligations hereunder after such termination (including, without limitation, the provisions of Sections 5, 6, 7 and 8 hereof), continue to pay Employee's Base Salary for, the lesser of (i) twelve (12) months thereafter or (ii) the duration that the Restrictive Period is in full force and effect and Employee is in compliance with all applicable restrictive covenants during such period (the "***Severance Period***"), payable pursuant to

the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law (the "***Severance Payment***"). In addition, if Employee timely elects to participate in a healthcare continuation coverage program such as under Section 4980B of the Internal Revenue Code ("***COBRA***") or any similar state medical insurance continuation coverage program, the Company will pay the employer portion of the premium (such that Employee will continue to pay the employee portion of the premium consistent with the amount Employee otherwise would be required to pay under the Company's health insurance program as a continuing employee) for family-covered group health insurance after the Separation Date through the earliest of (i) the end of the Severance Period, (ii) the date Employee becomes employed with benefits substantially comparable to the benefits under the corresponding Company plan, and (iii) the date Employee becomes ineligible for COBRA benefits (the "***Benefits Continuation***").

The Severance Payment and Benefits Continuation shall be subject to Employee's execution and delivery of a separation agreement containing a general release of claims and other standard terms in a form acceptable to the Company within thirty (30) days following the date of termination; *provided*, *that* Employee shall not have revoked such separation agreement within the allotted time of revocation, and Employee shall not have applied for unemployment compensation chargeable to the Company or its Affiliates during the Severance Period. Notwithstanding the foregoing, the Severance Payment will be directly reduced on a dollar-for-dollar basis by any income, fees, compensation or other remuneration that Employee receives from any Person in exchange for Employee's services to such Person or its Affiliates during the Severance Period. During the Severance Period, Employee agrees to provide monthly certifications of employment status and proof of income, fees, compensation or other remuneration (including Form 1099s, paystubs, Form W-2s and tax returns) requested by the Company.

(g) Notwithstanding any provision contained herein to the contrary, if following the termination of the Term Employee is entitled to any payments or other benefits pursuant to Section 4(f), but the Board later determines that Cause exists or existed on, prior to or after such termination (including any violations of Sections 5, 6, 7 or 8 hereof), all future payments Employee would otherwise receive and all future benefits for which Employee would otherwise be eligible pursuant to Section 4(f) shall cease and terminate as of the date of such determination.

(h) Upon the expiration of the Term and the corresponding termination of this Agreement, the terms and provisions of this Agreement shall be of no further force and effect; *provided*, *that*, notwithstanding the foregoing or any other provisions to the contrary in this Agreement, the provisions of Sections 5, 6, 7, 8, 10, 13 and 17 shall survive the expiration of the Term and the corresponding termination of this Agreement indefinitely in accordance with their terms.

5. **Confidential Information**. Employee acknowledges and agrees that all Confidential Information to which Employee shall have access and which shall be provided to Employee during the Term shall be the sole and exclusive property of the Company and its Affiliates. Therefore, Employee agrees that Employee shall not disclose to any unauthorized Person or use for Employee's own purposes any Confidential Information without the prior written consent of the Company's CEO, unless and to the extent that (a) the aforementioned matters become generally known to and available for use by the public other than as a result of Employee's acts or omissions, or (b) the disclosure of Confidential Information is made in response to a valid order of a court or other governmental body, or was otherwise required by law. Employee shall deliver to the Company at the termination of the Employment Period, or at any other time as the Company may reasonably request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential

Information, Work Product (as defined below) or the business of the Company or any Affiliate which Employee may then possess or have under Employee's reasonable control. Upon the termination of the Employment Period, Employee will use commercially reasonable efforts to delete, permanently remove or otherwise erase those copies of any Company-owned property that reside on Employee's personal hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems. The obligations of Employee with respect to any such Company-owned property shall survive until the same is deleted, removed or otherwise erased from such hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems.

6. **Intellectual Property and Work Product**. Employee acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its Affiliates' actual or anticipated business, research and development or existing or future products or services and which were or are conceived, developed, contributed to or made or reduced to practice by Employee (whether alone or jointly with others) while employed by the Company or any of its predecessors, whether before or after the date of this Agreement ("***Work Product***"), shall belong to the Company and its Affiliates. Notwithstanding any of the foregoing, Work Product shall not include the trademarks, copyright, and any other proprietary or other information arising out of or related to Employee's Outside Activities (as hereafter defined), including without limitation, TED Ventures LLC, SONAR, Performance Medicine, and Sports Therapy. Employee shall promptly disclose such Work Product to the Company's CEO and shall perform all actions reasonably requested by the Company's CEO (whether during or after the Employment Period) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments). Employee acknowledges that all copyrightable Work Product shall be deemed to constitute "works made for hire" under the U.S. Copyright Act of 1976, as amended, and that the Company shall own all rights therein. To the extent that any such copyrightable work is not a "work made for hire," Employee hereby assigns and agrees to assign to the Company all right, title and interest, including a copyright, in and to such copyrightable work.

7. **Non-Compete, Non-Solicit and Non-Hire**. In consideration for the commitments made by the Company to Employee in this Agreement regarding the Company's employment of Employee and the Company's disclosure of its Confidential Information to Employee, Employee agrees to the restrictions set forth in this Section 7. Employee acknowledges that during the Employment Period, Employee will become familiar with the Company's trade secrets and other Confidential Information concerning the Company and its Affiliates and that Employee's services shall be of special, unique and extraordinary value to the Company and its Affiliates. Employee recognizes and agrees that these restrictions, which are separate and independent covenants from those set forth in the Purchase Agreement, are necessary to protect the Company's customer base, goodwill, Confidential Information and other legitimate business interests. Accordingly, Employee hereby covenants and agrees as follows:

(a) during the Employment Period and for a period of twelve (12) months thereafter (the "***Restrictive Period***"), Employee shall not, directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company as of the date of termination of the Employment Period. For the avoidance of doubt, nothing set forth in this Section 7 shall prohibit Employee from (i) being an equity holder in a mutual fund or a diversified investment company, (ii) being a passive owner of not more than three percent (3%) in the aggregate of an outstanding class of publicly traded securities, or (iii) being an equity holder in the Company or its Affiliates.

(b) during the Restrictive Period, Employee shall not, directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company.

Notwithstanding anything to the contrary herein, the restrictions set forth in this Section 7 shall not apply in the event (i) Company terminates this Agreement without Cause; or (ii) Employee terminates this Agreement with Good Reason.

Notwithstanding anything to the contrary herein, the restrictions set forth in this Section 7 shall not apply to the following (collectively, the "**Outside Activities**"): (i) performance medicine, sports therapy, and physical therapy services; (ii) pharmacy services, including without limitation, the operation and business of Southern Star Pharmacy 002, LLC and U&Me Pharmacy LLC; (iii) healthcare management services, including without limitation, the operation and business of TED Ventures, LLC and its affiliates; (iv) medical distribution services, including without limitation, the operation and business of Tritin Medical Distribution, LLC; and (v) laboratory services.

8. **Non-Access**. Commencing on the date of termination of the Employment Period and continuing thereafter, Employee shall not access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

9. **Enforcement**. If, at the time of enforcement of Sections 5, 6, 7 or 8 of this Agreement, a court of competent jurisdiction holds that the restrictions stated therein are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Because Employee's services are unique and because Employee has access to Confidential Information and Work Product, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security). In addition, in the event of an alleged breach or violation by Employee of Section 7, the Restrictive Period shall be tolled until such breach or violation has been duly cured to the reasonable satisfaction of the Board. Employee agrees that the restrictions contained in Sections 5, 6, 7 and 8 of this Agreement are reasonable and necessary for the protection of the Company's trade secrets and Confidential Information.

10. **Whistleblower Protection**. Employee shall not be held criminally or civilly liable under any federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a federal, State or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. Employee shall not be held criminally or civilly liable under

any federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Employee files a lawsuit for retaliation for reporting a suspected violation of law, then he may disclose the trade secret to his attorney and use the trade secret information in the court proceeding, if he files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

11. **Withholding**. The Company and its Affiliates shall be entitled to deduct or withhold from any amounts owing from the Company or any of its Affiliates to Employee under this Agreement between the Company and any Affiliates of the Company, on the one hand, and Employee and any Affiliates of Employee, on the other hand, any United States federal, state or local or non-United States withholding taxes, excise taxes or employment taxes (collectively, "***Taxes***") imposed with respect to Employee's compensation or other payments from the Company under this Agreement (including wages). In the event that Employee fails to (a) return to the Company all documents and data (and copies thereof) relating to the Confidential Information, Work Product or the business of the Company or its Affiliates or (b) pay all outstanding charges or other expenses owed by Employee to the Company or its Affiliates as of the date of termination of the Employment Period, Employee authorizes the Company to deduct from Employee's final paycheck an amount equal to the fair market value of such Company property or the amount of such outstanding charges or expenses owed by Employee to the Company or its Affiliates as of the date of termination of the Employment Period.

12. **Corporate Opportunities**. During the Employment Period, Employee shall submit to the Company's CEO all business, commercial and investment opportunities or offers presented to Employee or of which Employee becomes aware which relate to the business of the Company or any of its Affiliates at any time during the Employment Period ("***Corporate Opportunities***"). Unless specifically approved in writing by the Company's CEO, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Employee's own behalf. Notwithstanding anything to the contrary herein, the obligations set forth in this Section 12 shall not apply to the extent business, commercial and investment opportunities or offers relate to or arise out of Outside Activities.

13. **Employee's Cooperation**. During the Employment Period and at any time thereafter, Employee shall, at reasonable times and with due regard for Employee's other obligations, cooperate with the Company and its Affiliates in any internal investigation, any administrative, regulatory or judicial proceeding or any dispute with a third Person as reasonably requested by the Company or any of its Affiliates (including Employee being available to the Company and its Affiliates upon reasonable notice for interviews and factual investigations, appearing at the Company's or any of its Affiliates' request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company and its Affiliates all pertinent information and turning over to the Company and its Affiliates all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments). Following the Employment Period, if the Company or any of its Affiliates requires Employee's cooperation in accordance with this Section 13, the Company or such Affiliate shall reimburse Employee for all reasonable out-of-pocket travel expenses (including lodging and meals) upon submission of receipts, subject to the policies and procedures of the Company in effect from time to time.

14. **Definitions**. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"***Affiliate***" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person. For purposes of this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" as used with respect to any Person) means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.

"***Business***" means the business of providing certain management, administrative and related business services to physicians and certain medical practices.

"***Business Day***" means any day that is not a Saturday, Sunday or national holiday.

"***Cause***" means, with respect to Employee, one or more of the following, in each case as determined by the Board in good faith: (i) Employee is formally indicted or charged by a governmental agency or authority with a felony or other crime involving moral turpitude; (ii) the commission by Employee of an act of fraud or embezzlement with respect to the Company or any of its Affiliates or any of their respective clients, customers, vendors or suppliers, (iii) the deliberate disregard of the material policies or practices of the Company (including but not limited to employment discrimination or harassment), which results in loss, damage or injury to the Company or its Affiliates, or otherwise adversely affects the business activities, reputation, goodwill or image of the Company or its Affiliates; (iv) repeated failure to perform material duties as lawfully directed by the Board and/or the CEO which is not cured to the reasonable satisfaction of the Board or the CEO, as applicable, within ten (10) days after written notice thereof to Employee; (v) any act or omission aiding or abetting a competitor, client, customer, vendor or supplier of the Company or any of its Affiliates to the material disadvantage or detriment of the Company and/or its Affiliates; (vi) breach of fiduciary duty or duty of loyalty owed to the Company and/or its Affiliates that adversely affects the business activities, reputation, goodwill or image of the Company or its Affiliates; (vii) gross negligence or willful misconduct with respect to the Company or any of its Affiliates (which, in the case of gross negligence, results in material harm to the Company or any of its Affiliates); (viii) continued or repeated absence from the workplace, unless such absence is (A) in compliance with this Agreement, the Company's policies then in effect or otherwise approved or excused by the Board, or (B) the result of Employee's illness or Disability; (ix) continued abuse of alcohol or illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or its Affiliates substantial public disgrace or disrepute or substantial economic harm; or (x) any other material breach of this Agreement which is not cured (if capable of being cured) to the Board's reasonable satisfaction within ten (10) days after written notice thereof to Employee.

"***Confidential Information***" means all operating manuals, policies and procedures, symbols, trademarks, trade names, service marks, designs, contracts, education program materials, promotional materials, quality assurance and compliance guidelines, procedures, protocols, processes, systems, records and files, customer lists and fee schedules, vendor price lists, documentation, trade secrets relating to the Business and other copyrighted, patented, trademarked or legally protectable information that is confidential and proprietary to the Company and its Affiliates. Confidential Information does not include information which (i) generally available in the public domain other than as a result of a breach of this Agreement; (ii) information already in recipient's lawful possession or lawfully disclosed to recipient by a third party; or (iii) any Confidential Information required to be disclosed by a recipient under applicable law, provided that, consistent with such applicable law, the recipient agrees, prior to such disclosure, to provide the other party with sufficient notice of the intended disclosure to permit the other party to obtain protective orders or other appropriate relief.

"***Disability***" means Employee's inability, due to illness, accident, injury, physical or mental incapacity or other disability, to carry out effectively Employee's duties and obligations to the Company and/or its Affiliates or to participate effectively and actively in the management of the

Company and/or its Affiliates for a period of at least ninety (90) consecutive days or for shorter periods aggregating thirty (30) Business Days (whether or not consecutive) during consecutive three (3) month periods, as determined by an independent physician selected by agreement of the Employee or his personal representatives and the Company.

"***Employment Period***" means the period during which Employee is employed by the Company or any of its Affiliates, including the Term and any period of at-will employment following the expiration of the Term.

"***Good Reason***" means the occurrence of any of the following events without Employee's express written consent: (i) a material diminution in the Employee's duties and responsibilities, or a change in the Employee's position within the Company which constitutes a demotion; (ii) a reduction in the Employee's Base Salary to an amount below the amount set forth in Section 3(a), except in circumstances when the Employee's Base Salary is reduced in connection with a pay reduction plan generally applicable to the Company's management and employees; (iii) a change in the principal workplace of the Employee to a location outside of a 50-mile radius from Dallas, Texas; or (iv) any material breach by the Company of any provision of this Agreement, which is not cured to Employee's reasonable satisfaction within thirty (30) days after written notice thereof has been provided to the Board. For the avoidance of doubt, the expiration of the Term or the Company's delivery to Employee of a notice terminating this Agreement shall preclude Employee's resignation with Good Reason. In order for Employee's resignation for Good Reason to be effective: (x) Employee must deliver to the Company written notice detailing the specific circumstances alleged to constitute Good Reason within thirty (30) days after the first occurrence of any such event, (y) the Company shall have thirty (30) days after receipt of such notice during which the Company may remedy the occurrence giving rise to the claim for "Good Reason" termination, and if the Company cures such occurrence within such 30-day period, there shall be no "Good Reason," and (z) Employee must actually resign if the Company does not cure such Good Reason event by the end of the 30-day cure period.

"***Paid Time Off***" means any days or half-days used by Employee for vacation, sick time, medical appointments or personal business.

"***Person***" means any natural person, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

"***Restricted Area***" means the State of Texas.

15. **Representations and Warranties**. Employee hereby represents and warrants to the Company that Employee is not a party to or bound by any other agreement or commitment, or subject to any restriction or agreement related to previous employment or consultation containing confidentiality or non-compete covenants or other relevant restrictions which may have a possible present or future adverse effect on the Company or its Affiliates in the performance of Employee's duties under this Agreement. Employee hereby acknowledges and represents that Employee has had the opportunity to consult with independent legal counsel regarding Employee's rights and obligations under this Agreement and that Employee fully understands the terms and conditions contained herein. Employee shall immediately notify the Company's **[CEO]** of any act or circumstance which occurs or is discovered during the Term, which in itself or with the passage of time and/or the combination with other reasonably anticipated factors renders would render any of the foregoing representations and warranties to be untrue.

16. **Notices**. Any notice provided for in this Agreement must be in writing (including portable document format) and must be either personally delivered, mailed by first class mail (postage prepaid and

return receipt requested), sent by email transmission or sent by reputable overnight courier service (charges prepaid) to the addresses indicated below:

If to Employee:

Enrique Stowhas
5631 Judy Drive
Midlothian, TX 76065
Email: enrique@groupted.com

If to the Company:

**AD Dallas Clinics, LLC**
Address:
City, State, Zip:
Attention:
Email:

with a copy (which shall not constitute notice to the Company) to:

Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attention: William W. Meier, III
E-mail: wmeier@hallettperrin.com

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.

All such notices, requests and other communications shall be deemed to have been received (i) on the date of delivery thereof, if delivered by hand, (ii) on the fifth day after the mailing thereof, if mailed, (iii) on the next Business Day after the sending thereof, if sent by overnight courier, (iv) on the day of sending, if sent by email transmission prior to 5:00 p.m. (Central Time) on any Business Day, or (v) on the next Business Day, if sent by email transmission after 5:00 p.m. (Central Time) on any Business Day or on any day other than a Business Day.

17. **General Provisions**.

(a) Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(b) Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding between the parties and supersede and preempt any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

(c) Counterparts. This Agreement may be signed in one or more counterparts, each of which once signed shall be deemed to be an original. All such counterparts together shall constitute one and the same instrument. Notwithstanding the date of execution of any counterpart, each counterpart shall be deemed to bear the date first above written. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

(d) Successors and Assigns. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of Employee, the Company and their respective successors and assigns; *provided*, *that*, neither Employee nor the Company may assign any of its rights or obligations under this Agreement without the prior written consent of the other party, except that the Company may assign this Agreement and all of the provisions hereof without the consent of Employee to an Affiliate of the Company or to any successor to all or substantially all of its assets, by merger or otherwise.

(e) Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement will be governed by the laws of the State of Texas applicable to contracts made and to be performed entirely within the State of Texas without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.

(f) Jurisdiction and Venue. If any party to this Agreement commences a lawsuit or other proceeding relating to or arising from this Agreement, the parties hereto agree that the state or federal courts located in Dallas, Texas shall have sole and exclusive jurisdiction over any such proceeding. The parties hereto consent to and agree to submit to the jurisdiction of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in these courts. Process in any action or proceeding referred to in the preceding sentence may be served on any party hereto anywhere in the world.

(g) Waiver of Jury Trial. BECAUSE (A) DISPUTES ARISING IN CONNECTION WITH ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT ARE LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, (B) SUCH DISPUTES WILL BE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON, AND (C) THE PARTIES HERETO WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM, AND UNDERSTANDING THEY ARE WAIVING A CONSTITUTIONAL RIGHT, THE PARTIES HERETO (BY ACCEPTANCE HEREOF) WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT.

(h) Remedies. Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other

rights existing in its favor. Notwithstanding anything contained in this Agreement to the contrary, the parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that either party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(i) Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee.

(j) Expenses. Each of the parties to this Agreement shall pay its own expenses incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby.

(k) No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

(l) Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or its severance from this Agreement; and such provision shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in such provision as will render such restrictions valid and enforceable.

(m) No Third Party Beneficiaries. Nothing contained herein, express or implied, is intended to confer upon any Person other than the parties hereto and their respective successors in interest and permitted assigns any rights or remedies under or by reason of this Agreement.

18. **Change In Law**. Notwithstanding any other provision of this Agreement, if any governmental agency (or its representatives) or any payor passes, issues or promulgates any law, rule, regulation, standard or interpretation at any time while this Agreement is in effect which prohibits, restricts, limits or in any way changes the Services to be rendered under this Agreement, method or amount of reimbursement or payment for services rendered by any party to this Agreement, or which otherwise materially and adversely affects another party's rights or obligations hereunder, the affected party shall give the other parties notice of its intent to amend this Agreement to the satisfaction of the affected party to avoid such prohibition, restriction, limitation or change, and the other parties agree to negotiate in good faith in an attempt to so amend this Agreement. If this Agreement is not so amended in writing within thirty (30) days after said notice was given, this Agreement may be terminated by any party upon an additional thirty (30) days written notice and the restrictions set forth in Section 7 shall not be applicable.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

**COMPANY:**

**AD DALLAS CLINICS, LLC**,
a Texas limited liability company

By: ________________________________

Name:

Title:

**EMPLOYEE:**

**ENRIQUE STOWHAS,**

________________________________

**EXHIBIT A**

**EMPLOYEE FUNCTION DESCRIPTION**

- Develop business strategies and plans ensuring their alignment with short-term and long-term objectives;
- Lead and motivate to advance employee engagement and develop a high performing managerial team;
- Oversee all operations and business activities to ensure they produce the desired results and are consistent with the overall strategy and mission;
- Propose investing decisions to advance the business and increase profits;
- Enforce adherence to legal guidelines and in-house policies to maintain the team's legality and business ethics at the direction of the CEO and the Board;
- Review financial and non-financial reports to devise solutions or improvements;
- Build trust relations with key partners and stakeholders; and
- All other functions consistent with executive leadership.

**EXHIBIT B**

**INITIAL PERFORMANCE TARGETS**

**[TO COME]**

# Exhibit A-2

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "***Agreement***") is made and entered into as of November 1st, 2023 (the "***Effective Date***"), by and between **AD DALLAS CLINICS, LLC.**, a Texas limited liability company (the "***Company***"), and **DEREK GOVE**, a resident of the State of Texas ("***Employee***"). Certain capitalized terms used herein but not otherwise defined shall have the meanings as set forth in Section 14 of this Agreement.

**RECITALS:**

A. Pursuant to that certain Asset Purchase and Contribution Agreement dated as of November 1st, 2023, by and among the Company and the other parties named therein (the "***Purchase Agreement***"), the Company has agreed to, among other things, acquire substantially all of the assets of TREND Medical Management, LLC, a Texas limited liability company (the "***Transaction***").

B. The Company's obligation to consummate the Transaction is subject to the satisfaction of certain terms and conditions, including the execution and delivery of this Agreement by Employee.

C. The Company desires to employ Employee, and Employee desires to be employed with the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements and understandings contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Type text here

1. **Employment**. The Company shall employ Employee on a full-time basis, and Employee hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date and ending as of the expiration of the Term.

2. **Position and Duties**.

(a) During the Term, Employee shall be employed by the Company in the role of Chief Executive Officer, with such customary responsibilities, duties and authority as may from time to time be assigned to Employee by the Board of Managers of the Company (the "**Board**"), and shall perform the services and fulfill the duties to the Company set forth in the Employee Function Description attached hereto as ***Exhibit A*** (such services and duties, the "***Services***"). The assignment of Services to the Employee shall be subject to the power and authority of the Chief Executive Officer of the Company (the "***CEO***") to expand or limit such Services.

(b) Employee shall initially report to Lucky Chopra and/or such other individuals as the CEO may designate, and Employee shall be available on a full-time basis, devoting a minimum average of thirty-two (32) hours per week to the business and affairs of the Company and its Affiliates. Employee shall perform Employee's duties and responsibilities to the best of Employee's abilities in a diligent, trustworthy, businesslike and efficient manner. Employee shall comply with all written policies and procedures of the Company in effect from time to time, to the extent applicable to Employee.

(c) During the Term, Employee shall work primarily out of the Company's Dallas, Texas office. Employee shall be available to travel on behalf of the Company at such times as shall be reasonably requested by the Board and/or the CEO or his designees, and the Company shall reimburse Employee for all reasonable business expenses (including round-trip airfare, car travel,

reasonable hotel accommodations and meal allowance), in each case, subject to the Company's requirements with respect to reporting and documentation of such expenses and the Company's travel policy as then in effect.

(d) The Company shall provide such telephone, office, facilities, equipment, personnel and supplies as the Company deems reasonable and appropriate for the performance of Employee's duties and responsibilities under this Agreement.

3. **Base Salary, Benefits and Bonus**.

(a) During the Term, Employee's base salary as a full-time employee shall be One Hundred and Twenty Thousand Dollars ($120,000.00) per annum (pro-rated for any partial year) (the "***Base Salary***"), which shall be payable in regular installments in accordance with the Company's general payroll practices as may be in effect from time to time. The Base Salary shall be subject to deduction and withholding authorized or required by applicable law. The Base Salary shall be subject to periodic review by the CEO and may be increased, but not decreased, during the Term. In addition, Employee shall be entitled to receive such perquisites and fringe benefits and participate in all of the Company's employee benefit programs and/or plans for which he is eligible in accordance with the policies and procedures of the Company in effect from time to time, including, but not limited to, Paid Time Off, medical insurance and retirement plans.

(b) Employee shall be entitled to twenty (20) days of Paid Time Off per calendar year (pro-rated for any partial calendar year) as a full-time employee during the Term. The Company encourages Employee to use Paid Time Off during the calendar year in which it is accrued. Paid Time Off and other eligible employee benefits and/or plans will be administered in accordance with the Company's policies and procedures in effect from time to time.

(c) The Company shall reimburse Employee for all reasonable business expenses incurred by Employee in the course of performing Employee's duties under this Agreement, which are consistent with the Company's policies and procedures in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(d) Not later than ninety (90) days after the end of each calendar year during the Term, the Company shall determine, award and pay to Employee an annual performance bonus with a targeted amount of One Hundred Twenty Thousand Dollars ($120,000) per year (the "***Performance Bonus***"). The Employee shall be eligible to receive the Performance Bonus or the earned portion thereof, upon the achievement of certain performance criteria, including certain personal and Company financial performance targets (collectively, the "***Performance Targets***"). All Performance Targets applicable to Employee's Performance Bonus for each calendar year during the Term shall be determined by the Board, in its reasonable discretion, in consultation with Employee. The initial Performance Targets are set forth on ***Exhibit B*** attached hereto. Unless otherwise stated herein, Employee must be employed by the Company on the last day of the applicable calendar year to be entitled to receive any Performance Bonus with respect to such calendar year.

4. **Term and Termination**.

(a) The initial term of this Agreement (the "***Initial Term***") shall commence on the Effective Date and shall terminate upon the earliest to occur of: (i) the thirty-six (36) month anniversary of this Agreement; (ii) Employee's death or Disability; or (iii) the termination of this

Agreement in accordance with the provisions hereof. Upon the expiration of the Initial Term, this Agreement will automatically renew for additional, successive one (1) year terms (each, a "***Renewal Term***") unless either party provides the other party written notice of its desire to not renew this Agreement at least thirty (30) days prior to the expiration of the Initial Term or any Renewal Term. The Initial Term and any Renewal Terms are collectively referred to herein as the "***Term***." For the avoidance of doubt, this Agreement will remain subject to termination as set forth in this Section 4 during any Renewal Term.

(b) This Agreement may be terminated by the Company at any time in the sole discretion of the Company, for any reason or no reason whatsoever; *provided*, *that*, in the event the Company terminates this Agreement without Cause, the Company shall provide Employee with at least thirty (30) days' prior written notice of the effective date of such termination; *provided*, *further*, that in the event of a termination of this Agreement by the Company without Cause, at the Company's request, Employee shall cease to perform all duties hereunder and shall not enter the Company's premises during such thirty (30)-day period prior to the effective date of such termination.

(c) This Agreement may be terminated by Employee at any time; *provided*, *that*, in the event Employee terminates this Agreement without Good Reason, Employee shall provide the Company with at least thirty (30) days' prior written notice of the effective date of such termination; *provided*, *further*, that in the event of a termination of this Agreement by Employee without Good Reason, at the Company's request, Employee shall cease to perform all duties hereunder and shall not enter the Company's premises during such thirty (30)-day period prior to the effective date of such termination.

(d) This Agreement may be terminated at any time upon the mutual agreement of the Company and Employee for (i) Employee to cease to be employed as a full-time employee of the Company and (ii) to thereafter serve as a part-time consultant of the Company. In the event of a termination of this Agreement pursuant to this Section 4(d), Employee shall receive any Base Salary earned through the date of termination, and any earned but unpaid Performance Bonus as of the date of termination, both payable pursuant to the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law. For the avoidance of doubt, a termination of this Agreement pursuant to this Section 4(d) shall not be deemed to be a termination of this Agreement by the Company or Employee that is subject to the provisions of Sections 4(b), 4(c), 4(e) or 4(f).

(e) Upon a termination of this Agreement for any reason other than a termination by the Company without Cause or by Employee for Good Reason, all future compensation to which Employee would otherwise be entitled and all future benefits for which Employee would otherwise be eligible shall cease and terminate as of the date of such termination; *provided*, *that*, Employee shall receive any Base Salary earned through the date of termination, payable pursuant to the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law.

(f) Upon a termination of this Agreement by the Company without Cause or by Employee thirty (30) days after the occurrence of the event giving rise to Good Reason, the Company shall, in consideration of Employee's continuing obligations hereunder after such termination (including, without limitation, the provisions of Sections 5, 6, 7 and 8 hereof), continue to pay Employee's Base Salary for, the lesser of (i) twelve (12) months thereafter or (ii) the duration that the Restrictive Period is in full force and effect and Employee is in compliance with all applicable restrictive covenants during such period (the "***Severance Period***"), payable pursuant to

the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law (the "***Severance Payment***"). In addition, if Employee timely elects to participate in a healthcare continuation coverage program such as under Section 4980B of the Internal Revenue Code ("***COBRA***") or any similar state medical insurance continuation coverage program, the Company will pay the employer portion of the premium (such that Employee will continue to pay the employee portion of the premium consistent with the amount Employee otherwise would be required to pay under the Company's health insurance program as a continuing employee) for family-covered group health insurance after the Separation Date through the earliest of (i) the end of the Severance Period, (ii) the date Employee becomes employed with benefits substantially comparable to the benefits under the corresponding Company plan, and (iii) the date Employee becomes ineligible for COBRA benefits (the "***Benefits Continuation***").

The Severance Payment and Benefits Continuation shall be subject to Employee's execution and delivery of a separation agreement containing a general release of claims and other standard terms in a form acceptable to the Company within thirty (30) days following the date of termination; *provided*, *that* Employee shall not have revoked such separation agreement within the allotted time of revocation, and Employee shall not have applied for unemployment compensation chargeable to the Company or its Affiliates during the Severance Period. Notwithstanding the foregoing, the Severance Payment will be directly reduced on a dollar-for-dollar basis by any income, fees, compensation or other remuneration that Employee receives from any Person in exchange for Employee's services to such Person or its Affiliates during the Severance Period. During the Severance Period, Employee agrees to provide monthly certifications of employment status and proof of income, fees, compensation or other remuneration (including Form 1099s, paystubs, Form W-2s and tax returns) requested by the Company.

(g) Notwithstanding any provision contained herein to the contrary, if following the termination of the Term Employee is entitled to any payments or other benefits pursuant to Section 4(f), but the Board later determines that Cause exists or existed on, prior to or after such termination (including any violations of Sections 5, 6, 7 or 8 hereof), all future payments Employee would otherwise receive and all future benefits for which Employee would otherwise be eligible pursuant to Section 4(f) shall cease and terminate as of the date of such determination.

(h) Upon the expiration of the Term and the corresponding termination of this Agreement, the terms and provisions of this Agreement shall be of no further force and effect; *provided*, *that*, notwithstanding the foregoing or any other provisions to the contrary in this Agreement, the provisions of Sections 5, 6, 7, 8, 10, 13 and 17 shall survive the expiration of the Term and the corresponding termination of this Agreement indefinitely in accordance with their terms.

5. **Confidential Information**. Employee acknowledges and agrees that all Confidential Information to which Employee shall have access and which shall be provided to Employee during the Term shall be the sole and exclusive property of the Company and its Affiliates. Therefore, Employee agrees that Employee shall not disclose to any unauthorized Person or use for Employee's own purposes any Confidential Information without the prior written consent of the Company's CEO, unless and to the extent that (a) the aforementioned matters become generally known to and available for use by the public other than as a result of Employee's acts or omissions, or (b) the disclosure of Confidential Information is made in response to a valid order of a court or other governmental body, or was otherwise required by law. Employee shall deliver to the Company at the termination of the Employment Period, or at any other time as the Company may reasonably request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential

Information, Work Product (as defined below) or the business of the Company or any Affiliate which Employee may then possess or have under Employee's reasonable control. Upon the termination of the Employment Period, Employee will use commercially reasonable efforts to delete, permanently remove or otherwise erase those copies of any Company-owned property that reside on Employee's personal hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems. The obligations of Employee with respect to any such Company-owned property shall survive until the same is deleted, removed or otherwise erased from such hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems.

6. **Intellectual Property and Work Product**. Employee acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its Affiliates' actual or anticipated business, research and development or existing or future products or services and which were or are conceived, developed, contributed to or made or reduced to practice by Employee (whether alone or jointly with others) while employed by the Company or any of its predecessors, whether before or after the date of this Agreement ("***Work Product***"), shall belong to the Company and its Affiliates. Notwithstanding any of the foregoing, Work Product shall not include the trademarks, copyright, and any other proprietary or other information arising out of or related to Employee's Outside Activities (as hereafter defined), including without limitation, TED Ventures LLC, SONAR, Performance Medicine, and Sports Therapy. Employee shall promptly disclose such Work Product to the Company's CEO and shall perform all actions reasonably requested by the Company's CEO (whether during or after the Employment Period) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments). Employee acknowledges that all copyrightable Work Product shall be deemed to constitute "works made for hire" under the U.S. Copyright Act of 1976, as amended, and that the Company shall own all rights therein. To the extent that any such copyrightable work is not a "work made for hire," Employee hereby assigns and agrees to assign to the Company all right, title and interest, including a copyright, in and to such copyrightable work.

7. **Non-Compete, Non-Solicit and Non-Hire**. In consideration for the commitments made by the Company to Employee in this Agreement regarding the Company's employment of Employee and the Company's disclosure of its Confidential Information to Employee, Employee agrees to the restrictions set forth in this Section 7. Employee acknowledges that during the Employment Period, Employee will become familiar with the Company's trade secrets and other Confidential Information concerning the Company and its Affiliates and that Employee's services shall be of special, unique and extraordinary value to the Company and its Affiliates. Employee recognizes and agrees that these restrictions, which are separate and independent covenants from those set forth in the Purchase Agreement, are necessary to protect the Company's customer base, goodwill, Confidential Information and other legitimate business interests. Accordingly, Employee hereby covenants and agrees as follows:

(a) during the Employment Period and for a period of twelve (12) months thereafter (the "***Restrictive Period***"), Employee shall not, directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company as of the date of termination of the Employment Period. For the avoidance of doubt, nothing set forth in this Section 7 shall prohibit Employee from (i) being an equity holder in a mutual fund or a diversified investment company, (ii) being a passive owner of not more than three percent (3%) in the aggregate of an outstanding class of publicly traded securities, or (iii) being an equity holder in the Company or its Affiliates.

(b) during the Restrictive Period, Employee shall not, directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company.

Notwithstanding anything to the contrary herein, the restrictions set forth in this Section 7 shall not apply in the event (i) Company terminates this Agreement without Cause; or (ii) Employee terminates this Agreement with Good Reason.

Notwithstanding anything to the contrary herein, the restrictions set forth in this Section 7 shall not apply to the following (collectively, the "**Outside Activities**"): (i) performance medicine, sports therapy, and physical therapy services; (ii) pharmacy services, including without limitation, the operation and business of Southern Star Pharmacy 002, LLC and U&Me Pharmacy LLC; (iii) healthcare management services, including without limitation, the operation and business of TED Ventures, LLC and its affiliates; (iv) medical distribution services, including without limitation, the operation and business of Tritin Medical Distribution, LLC; and (v) laboratory services.

8. **Non-Access**. Commencing on the date of termination of the Employment Period and continuing thereafter, Employee shall not access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

9. **Enforcement**. If, at the time of enforcement of Sections 5, 6, 7 or 8 of this Agreement, a court of competent jurisdiction holds that the restrictions stated therein are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Because Employee's services are unique and because Employee has access to Confidential Information and Work Product, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security). In addition, in the event of an alleged breach or violation by Employee of Section 7, the Restrictive Period shall be tolled until such breach or violation has been duly cured to the reasonable satisfaction of the Board. Employee agrees that the restrictions contained in Sections 5, 6, 7 and 8 of this Agreement are reasonable and necessary for the protection of the Company's trade secrets and Confidential Information.

10. **Whistleblower Protection**. Employee shall not be held criminally or civilly liable under any federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a federal, State or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. Employee shall not be held criminally or civilly liable under

any federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Employee files a lawsuit for retaliation for reporting a suspected violation of law, then he may disclose the trade secret to his attorney and use the trade secret information in the court proceeding, if he files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

11. **Withholding**. The Company and its Affiliates shall be entitled to deduct or withhold from any amounts owing from the Company or any of its Affiliates to Employee under this Agreement between the Company and any Affiliates of the Company, on the one hand, and Employee and any Affiliates of Employee, on the other hand, any United States federal, state or local or non-United States withholding taxes, excise taxes or employment taxes (collectively, "***Taxes***") imposed with respect to Employee's compensation or other payments from the Company under this Agreement (including wages). In the event that Employee fails to (a) return to the Company all documents and data (and copies thereof) relating to the Confidential Information, Work Product or the business of the Company or its Affiliates or (b) pay all outstanding charges or other expenses owed by Employee to the Company or its Affiliates as of the date of termination of the Employment Period, Employee authorizes the Company to deduct from Employee's final paycheck an amount equal to the fair market value of such Company property or the amount of such outstanding charges or expenses owed by Employee to the Company or its Affiliates as of the date of termination of the Employment Period.

12. **Corporate Opportunities**. During the Employment Period, Employee shall submit to the Company's CEO all business, commercial and investment opportunities or offers presented to Employee or of which Employee becomes aware which relate to the business of the Company or any of its Affiliates at any time during the Employment Period ("***Corporate Opportunities***"). Unless specifically approved in writing by the Company's CEO, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Employee's own behalf. Notwithstanding anything to the contrary herein, the obligations set forth in this Section 12 shall not apply to the extent business, commercial and investment opportunities or offers relate to or arise out of Outside Activities.

13. **Employee's Cooperation**. During the Employment Period and at any time thereafter, Employee shall, at reasonable times and with due regard for Employee's other obligations, cooperate with the Company and its Affiliates in any internal investigation, any administrative, regulatory or judicial proceeding or any dispute with a third Person as reasonably requested by the Company or any of its Affiliates (including Employee being available to the Company and its Affiliates upon reasonable notice for interviews and factual investigations, appearing at the Company's or any of its Affiliates' request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company and its Affiliates all pertinent information and turning over to the Company and its Affiliates all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments). Following the Employment Period, if the Company or any of its Affiliates requires Employee's cooperation in accordance with this Section 13, the Company or such Affiliate shall reimburse Employee for all reasonable out-of-pocket travel expenses (including lodging and meals) upon submission of receipts, subject to the policies and procedures of the Company in effect from time to time.

14. **Definitions**. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"***Affiliate***" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person. For purposes of this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" as used with respect to any Person) means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.

"***Business***" means the business of providing certain management, administrative and related business services to physicians and certain medical practices.

"***Business Day***" means any day that is not a Saturday, Sunday or national holiday.

"***Cause***" means, with respect to Employee, one or more of the following, in each case as determined by the Board in good faith: (i) Employee is formally indicted or charged by a governmental agency or authority with a felony or other crime involving moral turpitude; (ii) the commission by Employee of an act of fraud or embezzlement with respect to the Company or any of its Affiliates or any of their respective clients, customers, vendors or suppliers, (iii) the deliberate disregard of the material policies or practices of the Company (including but not limited to employment discrimination or harassment), which results in loss, damage or injury to the Company or its Affiliates, or otherwise adversely affects the business activities, reputation, goodwill or image of the Company or its Affiliates; (iv) repeated failure to perform material duties as lawfully directed by the Board and/or the CEO which is not cured to the reasonable satisfaction of the Board or the CEO, as applicable, within ten (10) days after written notice thereof to Employee; (v) any act or omission aiding or abetting a competitor, client, customer, vendor or supplier of the Company or any of its Affiliates to the material disadvantage or detriment of the Company and/or its Affiliates; (vi) breach of fiduciary duty or duty of loyalty owed to the Company and/or its Affiliates that adversely affects the business activities, reputation, goodwill or image of the Company or its Affiliates; (vii) gross negligence or willful misconduct with respect to the Company or any of its Affiliates (which, in the case of gross negligence, results in material harm to the Company or any of its Affiliates); (viii) continued or repeated absence from the workplace, unless such absence is (A) in compliance with this Agreement, the Company's policies then in effect or otherwise approved or excused by the Board, or (B) the result of Employee's illness or Disability; (ix) continued abuse of alcohol or illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or its Affiliates substantial public disgrace or disrepute or substantial economic harm; or (x) any other material breach of this Agreement which is not cured (if capable of being cured) to the Board's reasonable satisfaction within ten (10) days after written notice thereof to Employee.

"***Confidential Information***" means all operating manuals, policies and procedures, symbols, trademarks, trade names, service marks, designs, contracts, education program materials, promotional materials, quality assurance and compliance guidelines, procedures, protocols, processes, systems, records and files, customer lists and fee schedules, vendor price lists, documentation, trade secrets relating to the Business and other copyrighted, patented, trademarked or legally protectable information that is confidential and proprietary to the Company and its Affiliates. Confidential Information does not include information which (i) generally available in the public domain other than as a result of a breach of this Agreement; (ii) information already in recipient's lawful possession or lawfully disclosed to recipient by a third party; or (iii) any Confidential Information required to be disclosed by a recipient under applicable law, provided that, consistent with such applicable law, the recipient agrees, prior to such disclosure, to provide the other party with sufficient notice of the intended disclosure to permit the other party to obtain protective orders or other appropriate relief.

"***Disability***" means Employee's inability, due to illness, accident, injury, physical or mental incapacity or other disability, to carry out effectively Employee's duties and obligations to the Company and/or its Affiliates or to participate effectively and actively in the management of the

Company and/or its Affiliates for a period of at least ninety (90) consecutive days or for shorter periods aggregating thirty (30) Business Days (whether or not consecutive) during consecutive three (3) month periods, as determined by an independent physician selected by agreement of the Employee or his personal representatives and the Company.

"***Employment Period***" means the period during which Employee is employed by the Company or any of its Affiliates, including the Term and any period of at-will employment following the expiration of the Term.

"***Good Reason***" means the occurrence of any of the following events without Employee's express written consent: (i) a material diminution in the Employee's duties and responsibilities, or a change in the Employee's position within the Company which constitutes a demotion; (ii) a reduction in the Employee's Base Salary to an amount below the amount set forth in Section 3(a), except in circumstances when the Employee's Base Salary is reduced in connection with a pay reduction plan generally applicable to the Company's management and employees; (iii) a change in the principal workplace of the Employee to a location outside of a 50-mile radius from Dallas, Texas; or (iv) any material breach by the Company of any provision of this Agreement, which is not cured to Employee's reasonable satisfaction within thirty (30) days after written notice thereof has been provided to the Board. For the avoidance of doubt, the expiration of the Term or the Company's delivery to Employee of a notice terminating this Agreement shall preclude Employee's resignation with Good Reason. In order for Employee's resignation for Good Reason to be effective: (x) Employee must deliver to the Company written notice detailing the specific circumstances alleged to constitute Good Reason within thirty (30) days after the first occurrence of any such event, (y) the Company shall have thirty (30) days after receipt of such notice during which the Company may remedy the occurrence giving rise to the claim for "Good Reason" termination, and if the Company cures such occurrence within such 30-day period, there shall be no "Good Reason," and (z) Employee must actually resign if the Company does not cure such Good Reason event by the end of the 30-day cure period.

"***Paid Time Off***" means any days or half-days used by Employee for vacation, sick time, medical appointments or personal business.

"***Person***" means any natural person, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

"***Restricted Area***" means the State of Texas.

15. **Representations and Warranties**. Employee hereby represents and warrants to the Company that Employee is not a party to or bound by any other agreement or commitment, or subject to any restriction or agreement related to previous employment or consultation containing confidentiality or non-compete covenants or other relevant restrictions which may have a possible present or future adverse effect on the Company or its Affiliates in the performance of Employee's duties under this Agreement. Employee hereby acknowledges and represents that Employee has had the opportunity to consult with independent legal counsel regarding Employee's rights and obligations under this Agreement and that Employee fully understands the terms and conditions contained herein. Employee shall immediately notify the Company's **[CEO]** of any act or circumstance which occurs or is discovered during the Term, which in itself or with the passage of time and/or the combination with other reasonably anticipated factors renders would render any of the foregoing representations and warranties to be untrue.

16. **Notices**. Any notice provided for in this Agreement must be in writing (including portable document format) and must be either personally delivered, mailed by first class mail (postage prepaid and

return receipt requested), sent by email transmission or sent by reputable overnight courier service (charges prepaid) to the addresses indicated below:

If to Employee:

**Derek Gove**
4351 Stonewood Circle
Midlothian, TX 76065
Email: derek@groupted.com

If to the Company:

**AD Dallas Clinics, LLC**
Address:
City, State, Zip:
Attention:
Email:

with a copy (which shall not constitute notice to the Company) to:

Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attention: William W. Meier, III
E-mail: wmeier@hallettperrin.com

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.

All such notices, requests and other communications shall be deemed to have been received (i) on the date of delivery thereof, if delivered by hand, (ii) on the fifth day after the mailing thereof, if mailed, (iii) on the next Business Day after the sending thereof, if sent by overnight courier, (iv) on the day of sending, if sent by email transmission prior to 5:00 p.m. (Central Time) on any Business Day, or (v) on the next Business Day, if sent by email transmission after 5:00 p.m. (Central Time) on any Business Day or on any day other than a Business Day.

17. **General Provisions**.

(a) Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(b) Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding between the parties and supersede and preempt any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

(c) Counterparts. This Agreement may be signed in one or more counterparts, each of which once signed shall be deemed to be an original. All such counterparts together shall constitute one and the same instrument. Notwithstanding the date of execution of any counterpart, each counterpart shall be deemed to bear the date first above written. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

(d) Successors and Assigns. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of Employee, the Company and their respective successors and assigns; *provided*, *that*, neither Employee nor the Company may assign any of its rights or obligations under this Agreement without the prior written consent of the other party, except that the Company may assign this Agreement and all of the provisions hereof without the consent of Employee to an Affiliate of the Company or to any successor to all or substantially all of its assets, by merger or otherwise.

(e) Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement will be governed by the laws of the State of Texas applicable to contracts made and to be performed entirely within the State of Texas without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.

(f) Jurisdiction and Venue. If any party to this Agreement commences a lawsuit or other proceeding relating to or arising from this Agreement, the parties hereto agree that the state or federal courts located in Dallas, Texas shall have sole and exclusive jurisdiction over any such proceeding. The parties hereto consent to and agree to submit to the jurisdiction of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in these courts. Process in any action or proceeding referred to in the preceding sentence may be served on any party hereto anywhere in the world.

(g) Waiver of Jury Trial. BECAUSE (A) DISPUTES ARISING IN CONNECTION WITH ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT ARE LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, (B) SUCH DISPUTES WILL BE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON, AND (C) THE PARTIES HERETO WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM, AND UNDERSTANDING THEY ARE WAIVING A CONSTITUTIONAL RIGHT, THE PARTIES HERETO (BY ACCEPTANCE HEREOF) WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT.

(h) Remedies. Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other

rights existing in its favor. Notwithstanding anything contained in this Agreement to the contrary, the parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that either party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(i) Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee.

(j) Expenses. Each of the parties to this Agreement shall pay its own expenses incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby.

(k) No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

(l) Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or its severance from this Agreement; and such provision shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in such provision as will render such restrictions valid and enforceable.

(m) No Third Party Beneficiaries. Nothing contained herein, express or implied, is intended to confer upon any Person other than the parties hereto and their respective successors in interest and permitted assigns any rights or remedies under or by reason of this Agreement.

18. **Change In Law**. Notwithstanding any other provision of this Agreement, if any governmental agency (or its representatives) or any payor passes, issues or promulgates any law, rule, regulation, standard or interpretation at any time while this Agreement is in effect which prohibits, restricts, limits or in any way changes the Services to be rendered under this Agreement, method or amount of reimbursement or payment for services rendered by any party to this Agreement, or which otherwise materially and adversely affects another party's rights or obligations hereunder, the affected party shall give the other parties notice of its intent to amend this Agreement to the satisfaction of the affected party to avoid such prohibition, restriction, limitation or change, and the other parties agree to negotiate in good faith in an attempt to so amend this Agreement. If this Agreement is not so amended in writing within thirty (30) days after said notice was given, this Agreement may be terminated by any party upon an additional thirty (30) days written notice and the restrictions set forth in Section 7 shall not be applicable.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

**<u>COMPANY</u>:**

**AD DALLAS CLINICS, LLC**,
a Texas limited liability company

By: ____________________________________

Name:

Title:

**<u>EMPLOYEE</u>:**

**DEREK GOVE,**


____________________________________

**EXHIBIT A**

**EMPLOYEE FUNCTION DESCRIPTION**

- Develop business strategies and plans ensuring their alignment with short-term and long-term objectives;
- Lead and motivate to advance employee engagement and develop a high performing managerial team;
- Oversee all operations and business activities to ensure they produce the desired results and are consistent with the overall strategy and mission;
- Propose investing decisions to advance the business and increase profits;
- Enforce adherence to legal guidelines and in-house policies to maintain the team's legality and business ethics at the direction of the CEO and the Board;
- Review financial and non-financial reports to devise solutions or improvements;
- Build trust relations with key partners and stakeholders; and
- All other functions consistent with executive leadership.

**EXHIBIT B**

**INITIAL PERFORMANCE TARGETS**

**[TO COME]**

# Exhibit A-3

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "***Agreement***") is made and entered into as of November 1st, 2023 (the "***Effective Date***"), by and between **AD DALLAS CLINICS, LLC.**, a Texas limited liability company (the "***Company***"), and **TREY AUSTIN**, a resident of the State of Texas ("***Employee***"). Certain capitalized terms used herein but not otherwise defined shall have the meanings as set forth in Section 14 of this Agreement.

## RECITALS:

A. Pursuant to that certain Asset Purchase and Contribution Agreement dated as of November 1st, 2023, by and among the Company and the other parties named therein (the "***Purchase Agreement***"), the Company has agreed to, among other things, acquire substantially all of the assets of TREND Medical Management, LLC, a Texas limited liability company (the "***Transaction***").

B. The Company's obligation to consummate the Transaction is subject to the satisfaction of certain terms and conditions, including the execution and delivery of this Agreement by Employee.

C. The Company desires to employ Employee, and Employee desires to be employed with the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements and understandings contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Employment**. The Company shall employ Employee on a full-time basis, and Employee hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date and ending as of the expiration of the Term.

2. **Position and Duties**.

(a) During the Term, Employee shall be employed by the Company in the role of Chief Financial Officer, with such customary responsibilities, duties and authority as may from time to time be assigned to Employee by the Board of Managers of the Company (the "**Board**"), and shall perform the services and fulfill the duties to the Company set forth in the Employee Function Description attached hereto as ***Exhibit A*** (such services and duties, the "***Services***"). The assignment of Services to the Employee shall be subject to the power and authority of the Chief Executive Officer of the Company (the "***CEO***") to expand or limit such Services.

(b) Employee shall initially report to Lucky Chopra and/or such other individuals as the CEO may designate, and Employee shall be available on a full-time basis, devoting a minimum average of thirty-two (32) hours per week to the business and affairs of the Company and its Affiliates. Employee shall perform Employee's duties and responsibilities to the best of Employee's abilities in a diligent, trustworthy, businesslike and efficient manner. Employee shall comply with all written policies and procedures of the Company in effect from time to time, to the extent applicable to Employee.

(c) During the Term, Employee shall work primarily out of the Company's Dallas, Texas office. Employee shall be available to travel on behalf of the Company at such times as shall be reasonably requested by the Board and/or the CEO or his designees, and the Company shall reimburse Employee for all reasonable business expenses (including round-trip airfare, car travel,

reasonable hotel accommodations and meal allowance), in each case, subject to the Company's requirements with respect to reporting and documentation of such expenses and the Company's travel policy as then in effect.

(d) The Company shall provide such telephone, office, facilities, equipment, personnel and supplies as the Company deems reasonable and appropriate for the performance of Employee's duties and responsibilities under this Agreement.

3. **Base Salary, Benefits and Bonus**.

(a) During the Term, Employee's base salary as a full-time employee shall be One Hundred and Twenty Thousand Dollars ($120,000.00) per annum (pro-rated for any partial year) (the "***Base Salary***"), which shall be payable in regular installments in accordance with the Company's general payroll practices as may be in effect from time to time. The Base Salary shall be subject to deduction and withholding authorized or required by applicable law. The Base Salary shall be subject to periodic review by the CEO and may be increased, but not decreased, during the Term. In addition, Employee shall be entitled to receive such perquisites and fringe benefits and participate in all of the Company's employee benefit programs and/or plans for which he is eligible in accordance with the policies and procedures of the Company in effect from time to time, including, but not limited to, Paid Time Off, medical insurance and retirement plans.

(b) Employee shall be entitled to twenty (20) days of Paid Time Off per calendar year (pro-rated for any partial calendar year) as a full-time employee during the Term. The Company encourages Employee to use Paid Time Off during the calendar year in which it is accrued. Paid Time Off and other eligible employee benefits and/or plans will be administered in accordance with the Company's policies and procedures in effect from time to time.

(c) The Company shall reimburse Employee for all reasonable business expenses incurred by Employee in the course of performing Employee's duties under this Agreement, which are consistent with the Company's policies and procedures in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(d) Not later than ninety (90) days after the end of each calendar year during the Term, the Company shall determine, award and pay to Employee an annual performance bonus with a targeted amount of One Hundred Twenty Thousand Dollars ($120,000) per year (the "***Performance Bonus***"). The Employee shall be eligible to receive the Performance Bonus or the earned portion thereof, upon the achievement of certain performance criteria, including certain personal and Company financial performance targets (collectively, the "***Performance Targets***"). All Performance Targets applicable to Employee's Performance Bonus for each calendar year during the Term shall be determined by the Board, in its reasonable discretion, in consultation with Employee. The initial Performance Targets are set forth on ***Exhibit B*** attached hereto. Unless otherwise stated herein, Employee must be employed by the Company on the last day of the applicable calendar year to be entitled to receive any Performance Bonus with respect to such calendar year.

4. **Term and Termination**.

(a) The initial term of this Agreement (the "***Initial Term***") shall commence on the Effective Date and shall terminate upon the earliest to occur of: (i) the thirty-six (36) month anniversary of this Agreement; (ii) Employee's death or Disability; or (iii) the termination of this

Agreement in accordance with the provisions hereof. Upon the expiration of the Initial Term, this Agreement will automatically renew for additional, successive one (1) year terms (each, a "***Renewal Term***") unless either party provides the other party written notice of its desire to not renew this Agreement at least thirty (30) days prior to the expiration of the Initial Term or any Renewal Term. The Initial Term and any Renewal Terms are collectively referred to herein as the "***Term***." For the avoidance of doubt, this Agreement will remain subject to termination as set forth in this Section 4 during any Renewal Term.

(b) This Agreement may be terminated by the Company at any time in the sole discretion of the Company, for any reason or no reason whatsoever; *provided*, *that*, in the event the Company terminates this Agreement without Cause, the Company shall provide Employee with at least thirty (30) days' prior written notice of the effective date of such termination; *provided*, *further*, that in the event of a termination of this Agreement by the Company without Cause, at the Company's request, Employee shall cease to perform all duties hereunder and shall not enter the Company's premises during such thirty (30)-day period prior to the effective date of such termination.

(c) This Agreement may be terminated by Employee at any time; *provided*, *that*, in the event Employee terminates this Agreement without Good Reason, Employee shall provide the Company with at least thirty (30) days' prior written notice of the effective date of such termination; *provided*, *further*, that in the event of a termination of this Agreement by Employee without Good Reason, at the Company's request, Employee shall cease to perform all duties hereunder and shall not enter the Company's premises during such thirty (30)-day period prior to the effective date of such termination.

(d) This Agreement may be terminated at any time upon the mutual agreement of the Company and Employee for (i) Employee to cease to be employed as a full-time employee of the Company and (ii) to thereafter serve as a part-time consultant of the Company. In the event of a termination of this Agreement pursuant to this Section 4(d), Employee shall receive any Base Salary earned through the date of termination, and any earned but unpaid Performance Bonus as of the date of termination, both payable pursuant to the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law. For the avoidance of doubt, a termination of this Agreement pursuant to this Section 4(d) shall not be deemed to be a termination of this Agreement by the Company or Employee that is subject to the provisions of Sections 4(b), 4(c), 4(e) or 4(f).

(e) Upon a termination of this Agreement for any reason other than a termination by the Company without Cause or by Employee for Good Reason, all future compensation to which Employee would otherwise be entitled and all future benefits for which Employee would otherwise be eligible shall cease and terminate as of the date of such termination; *provided*, *that*, Employee shall receive any Base Salary earned through the date of termination, payable pursuant to the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law.

(f) Upon a termination of this Agreement by the Company without Cause or by Employee thirty (30) days after the occurrence of the event giving rise to Good Reason, the Company shall, in consideration of Employee's continuing obligations hereunder after such termination (including, without limitation, the provisions of Sections 5, 6, 7 and 8 hereof), continue to pay Employee's Base Salary for, the lesser of (i) twelve (12) months thereafter or (ii) the duration that the Restrictive Period is in full force and effect and Employee is in compliance with all applicable restrictive covenants during such period (the "***Severance Period***"), payable pursuant to

the Company's general payroll practices as may be in effect from time to time and subject to deduction and withholding authorized or required by applicable law (the "***Severance Payment***"). In addition, if Employee timely elects to participate in a healthcare continuation coverage program such as under Section 4980B of the Internal Revenue Code ("***COBRA***") or any similar state medical insurance continuation coverage program, the Company will pay the employer portion of the premium (such that Employee will continue to pay the employee portion of the premium consistent with the amount Employee otherwise would be required to pay under the Company's health insurance program as a continuing employee) for family-covered group health insurance after the Separation Date through the earliest of (i) the end of the Severance Period, (ii) the date Employee becomes employed with benefits substantially comparable to the benefits under the corresponding Company plan, and (iii) the date Employee becomes ineligible for COBRA benefits (the "***Benefits Continuation***").

The Severance Payment and Benefits Continuation shall be subject to Employee's execution and delivery of a separation agreement containing a general release of claims and other standard terms in a form acceptable to the Company within thirty (30) days following the date of termination; *provided*, *that* Employee shall not have revoked such separation agreement within the allotted time of revocation, and Employee shall not have applied for unemployment compensation chargeable to the Company or its Affiliates during the Severance Period. Notwithstanding the foregoing, the Severance Payment will be directly reduced on a dollar-for-dollar basis by any income, fees, compensation or other remuneration that Employee receives from any Person in exchange for Employee's services to such Person or its Affiliates during the Severance Period. During the Severance Period, Employee agrees to provide monthly certifications of employment status and proof of income, fees, compensation or other remuneration (including Form 1099s, paystubs, Form W-2s and tax returns) requested by the Company.

(g) Notwithstanding any provision contained herein to the contrary, if following the termination of the Term Employee is entitled to any payments or other benefits pursuant to Section 4(f), but the Board later determines that Cause exists or existed on, prior to or after such termination (including any violations of Sections 5, 6, 7 or 8 hereof), all future payments Employee would otherwise receive and all future benefits for which Employee would otherwise be eligible pursuant to Section 4(f) shall cease and terminate as of the date of such determination.

(h) Upon the expiration of the Term and the corresponding termination of this Agreement, the terms and provisions of this Agreement shall be of no further force and effect; *provided*, *that*, notwithstanding the foregoing or any other provisions to the contrary in this Agreement, the provisions of Sections 5, 6, 7, 8, 10, 13 and 17 shall survive the expiration of the Term and the corresponding termination of this Agreement indefinitely in accordance with their terms.

5. **Confidential Information**. Employee acknowledges and agrees that all Confidential Information to which Employee shall have access and which shall be provided to Employee during the Term shall be the sole and exclusive property of the Company and its Affiliates. Therefore, Employee agrees that Employee shall not disclose to any unauthorized Person or use for Employee's own purposes any Confidential Information without the prior written consent of the Company's CEO, unless and to the extent that (a) the aforementioned matters become generally known to and available for use by the public other than as a result of Employee's acts or omissions, or (b) the disclosure of Confidential Information is made in response to a valid order of a court or other governmental body, or was otherwise required by law. Employee shall deliver to the Company at the termination of the Employment Period, or at any other time as the Company may reasonably request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential

Information, Work Product (as defined below) or the business of the Company or any Affiliate which Employee may then possess or have under Employee's reasonable control. Upon the termination of the Employment Period, Employee will use commercially reasonable efforts to delete, permanently remove or otherwise erase those copies of any Company-owned property that reside on Employee's personal hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems. The obligations of Employee with respect to any such Company-owned property shall survive until the same is deleted, removed or otherwise erased from such hard drives, file servers, computer backups, disaster recovery or electronic media continuity systems.

6. **Intellectual Property and Work Product**. Employee acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its Affiliates' actual or anticipated business, research and development or existing or future products or services and which were or are conceived, developed, contributed to or made or reduced to practice by Employee (whether alone or jointly with others) while employed by the Company or any of its predecessors, whether before or after the date of this Agreement ("***Work Product***"), shall belong to the Company and its Affiliates. Notwithstanding any of the foregoing, Work Product shall not include the trademarks, copyright, and any other proprietary or other information arising out of or related to Employee's Outside Activities (as hereafter defined), including without limitation, TED Ventures LLC, SONAR, Performance Medicine, and Sports Therapy. Employee shall promptly disclose such Work Product to the Company's CEO and shall perform all actions reasonably requested by the Company's CEO (whether during or after the Employment Period) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments). Employee acknowledges that all copyrightable Work Product shall be deemed to constitute "works made for hire" under the U.S. Copyright Act of 1976, as amended, and that the Company shall own all rights therein. To the extent that any such copyrightable work is not a "work made for hire," Employee hereby assigns and agrees to assign to the Company all right, title and interest, including a copyright, in and to such copyrightable work.

7. **Non-Compete, Non-Solicit and Non-Hire**. In consideration for the commitments made by the Company to Employee in this Agreement regarding the Company's employment of Employee and the Company's disclosure of its Confidential Information to Employee, Employee agrees to the restrictions set forth in this Section 7. Employee acknowledges that during the Employment Period, Employee will become familiar with the Company's trade secrets and other Confidential Information concerning the Company and its Affiliates and that Employee's services shall be of special, unique and extraordinary value to the Company and its Affiliates. Employee recognizes and agrees that these restrictions, which are separate and independent covenants from those set forth in the Purchase Agreement, are necessary to protect the Company's customer base, goodwill, Confidential Information and other legitimate business interests. Accordingly, Employee hereby covenants and agrees as follows:

(a) during the Employment Period and for a period of twelve (12) months thereafter (the "***Restrictive Period***"), Employee shall not, directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company as of the date of termination of the Employment Period. For the avoidance of doubt, nothing set forth in this Section 7 shall prohibit Employee from (i) being an equity holder in a mutual fund or a diversified investment company, (ii) being a passive owner of not more than three percent (3%) in the aggregate of an outstanding class of publicly traded securities, or (iii) being an equity holder in the Company or its Affiliates.

(b) during the Restrictive Period, Employee shall not, directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company.

Notwithstanding anything to the contrary herein, the restrictions set forth in this Section 7 shall not apply in the event (i) Company terminates this Agreement without Cause; or (ii) Employee terminates this Agreement with Good Reason.

Notwithstanding anything to the contrary herein, the restrictions set forth in this Section 7 shall not apply to the following (collectively, the "**Outside Activities**"): (i) performance medicine, sports therapy, and physical therapy services; (ii) pharmacy services, including without limitation, the operation and business of Southern Star Pharmacy 002, LLC and U&Me Pharmacy LLC; (iii) healthcare management services, including without limitation, the operation and business of TED Ventures, LLC and its affiliates; (iv) medical distribution services, including without limitation, the operation and business of Tritin Medical Distribution, LLC; and (v) laboratory services.

8. **Non-Access**. Commencing on the date of termination of the Employment Period and continuing thereafter, Employee shall not access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

9. **Enforcement**. If, at the time of enforcement of Sections 5, 6, 7 or 8 of this Agreement, a court of competent jurisdiction holds that the restrictions stated therein are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Because Employee's services are unique and because Employee has access to Confidential Information and Work Product, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event of a breach or threatened breach of this Agreement, the Company or its successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security). In addition, in the event of an alleged breach or violation by Employee of Section 7, the Restrictive Period shall be tolled until such breach or violation has been duly cured to the reasonable satisfaction of the Board. Employee agrees that the restrictions contained in Sections 5, 6, 7 and 8 of this Agreement are reasonable and necessary for the protection of the Company's trade secrets and Confidential Information.

10. **Whistleblower Protection**. Employee shall not be held criminally or civilly liable under any federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a federal, State or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. Employee shall not be held criminally or civilly liable under

any federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If Employee files a lawsuit for retaliation for reporting a suspected violation of law, then he may disclose the trade secret to his attorney and use the trade secret information in the court proceeding, if he files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

11. **Withholding**. The Company and its Affiliates shall be entitled to deduct or withhold from any amounts owing from the Company or any of its Affiliates to Employee under this Agreement between the Company and any Affiliates of the Company, on the one hand, and Employee and any Affiliates of Employee, on the other hand, any United States federal, state or local or non-United States withholding taxes, excise taxes or employment taxes (collectively, "***Taxes***") imposed with respect to Employee's compensation or other payments from the Company under this Agreement (including wages). In the event that Employee fails to (a) return to the Company all documents and data (and copies thereof) relating to the Confidential Information, Work Product or the business of the Company or its Affiliates or (b) pay all outstanding charges or other expenses owed by Employee to the Company or its Affiliates as of the date of termination of the Employment Period, Employee authorizes the Company to deduct from Employee's final paycheck an amount equal to the fair market value of such Company property or the amount of such outstanding charges or expenses owed by Employee to the Company or its Affiliates as of the date of termination of the Employment Period.

12. **Corporate Opportunities**. During the Employment Period, Employee shall submit to the Company's CEO all business, commercial and investment opportunities or offers presented to Employee or of which Employee becomes aware which relate to the business of the Company or any of its Affiliates at any time during the Employment Period ("***Corporate Opportunities***"). Unless specifically approved in writing by the Company's CEO, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Employee's own behalf. Notwithstanding anything to the contrary herein, the obligations set forth in this Section 12 shall not apply to the extent business, commercial and investment opportunities or offers relate to or arise out of Outside Activities.

13. **Employee's Cooperation**. During the Employment Period and at any time thereafter, Employee shall, at reasonable times and with due regard for Employee's other obligations, cooperate with the Company and its Affiliates in any internal investigation, any administrative, regulatory or judicial proceeding or any dispute with a third Person as reasonably requested by the Company or any of its Affiliates (including Employee being available to the Company and its Affiliates upon reasonable notice for interviews and factual investigations, appearing at the Company's or any of its Affiliates' request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company and its Affiliates all pertinent information and turning over to the Company and its Affiliates all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments). Following the Employment Period, if the Company or any of its Affiliates requires Employee's cooperation in accordance with this Section 13, the Company or such Affiliate shall reimburse Employee for all reasonable out-of-pocket travel expenses (including lodging and meals) upon submission of receipts, subject to the policies and procedures of the Company in effect from time to time.

14. **Definitions**. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"***Affiliate***" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person. For purposes of this Agreement, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with" as used with respect to any Person) means the possession, directly or indirectly, of the power to

direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, by contract or otherwise.

"***Business***" means the business of providing certain management, administrative and related business services to physicians and certain medical practices.

"***Business Day***" means any day that is not a Saturday, Sunday or national holiday.

"***Cause***" means, with respect to Employee, one or more of the following, in each case as determined by the Board in good faith: (i) Employee is formally indicted or charged by a governmental agency or authority with a felony or other crime involving moral turpitude; (ii) the commission by Employee of an act of fraud or embezzlement with respect to the Company or any of its Affiliates or any of their respective clients, customers, vendors or suppliers, (iii) the deliberate disregard of the material policies or practices of the Company (including but not limited to employment discrimination or harassment), which results in loss, damage or injury to the Company or its Affiliates, or otherwise adversely affects the business activities, reputation, goodwill or image of the Company or its Affiliates; (iv) repeated failure to perform material duties as lawfully directed by the Board and/or the CEO which is not cured to the reasonable satisfaction of the Board or the CEO, as applicable, within ten (10) days after written notice thereof to Employee; (v) any act or omission aiding or abetting a competitor, client, customer, vendor or supplier of the Company or any of its Affiliates to the material disadvantage or detriment of the Company and/or its Affiliates; (vi) breach of fiduciary duty or duty of loyalty owed to the Company and/or its Affiliates that adversely affects the business activities, reputation, goodwill or image of the Company or its Affiliates; (vii) gross negligence or willful misconduct with respect to the Company or any of its Affiliates (which, in the case of gross negligence, results in material harm to the Company or any of its Affiliates); (viii) continued or repeated absence from the workplace, unless such absence is (A) in compliance with this Agreement, the Company's policies then in effect or otherwise approved or excused by the Board, or (B) the result of Employee's illness or Disability; (ix) continued abuse of alcohol or illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or its Affiliates substantial public disgrace or disrepute or substantial economic harm; or (x) any other material breach of this Agreement which is not cured (if capable of being cured) to the Board's reasonable satisfaction within ten (10) days after written notice thereof to Employee.

"***Confidential Information***" means all operating manuals, policies and procedures, symbols, trademarks, trade names, service marks, designs, contracts, education program materials, promotional materials, quality assurance and compliance guidelines, procedures, protocols, processes, systems, records and files, customer lists and fee schedules, vendor price lists, documentation, trade secrets relating to the Business and other copyrighted, patented, trademarked or legally protectable information that is confidential and proprietary to the Company and its Affiliates. Confidential Information does not include information which (i) generally available in the public domain other than as a result of a breach of this Agreement; (ii) information already in recipient's lawful possession or lawfully disclosed to recipient by a third party; or (iii) any Confidential Information required to be disclosed by a recipient under applicable law, provided that, consistent with such applicable law, the recipient agrees, prior to such disclosure, to provide the other party with sufficient notice of the intended disclosure to permit the other party to obtain protective orders or other appropriate relief.

"***Disability***" means Employee's inability, due to illness, accident, injury, physical or mental incapacity or other disability, to carry out effectively Employee's duties and obligations to the Company and/or its Affiliates or to participate effectively and actively in the management of the

Company and/or its Affiliates for a period of at least ninety (90) consecutive days or for shorter periods aggregating thirty (30) Business Days (whether or not consecutive) during consecutive three (3) month periods, as determined by an independent physician selected by agreement of the Employee or his personal representatives and the Company.

"***Employment Period***" means the period during which Employee is employed by the Company or any of its Affiliates, including the Term and any period of at-will employment following the expiration of the Term.

"***Good Reason***" means the occurrence of any of the following events without Employee's express written consent: (i) a material diminution in the Employee's duties and responsibilities, or a change in the Employee's position within the Company which constitutes a demotion; (ii) a reduction in the Employee's Base Salary to an amount below the amount set forth in Section 3(a), except in circumstances when the Employee's Base Salary is reduced in connection with a pay reduction plan generally applicable to the Company's management and employees; (iii) a change in the principal workplace of the Employee to a location outside of a 50-mile radius from Dallas, Texas; or (iv) any material breach by the Company of any provision of this Agreement, which is not cured to Employee's reasonable satisfaction within thirty (30) days after written notice thereof has been provided to the Board. For the avoidance of doubt, the expiration of the Term or the Company's delivery to Employee of a notice terminating this Agreement shall preclude Employee's resignation with Good Reason. In order for Employee's resignation for Good Reason to be effective: (x) Employee must deliver to the Company written notice detailing the specific circumstances alleged to constitute Good Reason within thirty (30) days after the first occurrence of any such event, (y) the Company shall have thirty (30) days after receipt of such notice during which the Company may remedy the occurrence giving rise to the claim for "Good Reason" termination, and if the Company cures such occurrence within such 30-day period, there shall be no "Good Reason," and (z) Employee must actually resign if the Company does not cure such Good Reason event by the end of the 30-day cure period.

"***Paid Time Off***" means any days or half-days used by Employee for vacation, sick time, medical appointments or personal business.

"***Person***" means any natural person, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

"***Restricted Area***" means the State of Texas.

15. **Representations and Warranties**. Employee hereby represents and warrants to the Company that Employee is not a party to or bound by any other agreement or commitment, or subject to any restriction or agreement related to previous employment or consultation containing confidentiality or non-compete covenants or other relevant restrictions which may have a possible present or future adverse effect on the Company or its Affiliates in the performance of Employee's duties under this Agreement. Employee hereby acknowledges and represents that Employee has had the opportunity to consult with independent legal counsel regarding Employee's rights and obligations under this Agreement and that Employee fully understands the terms and conditions contained herein. Employee shall immediately notify the Company's **[CEO]** of any act or circumstance which occurs or is discovered during the Term, which in itself or with the passage of time and/or the combination with other reasonably anticipated factors renders would render any of the foregoing representations and warranties to be untrue.

16. **Notices**. Any notice provided for in this Agreement must be in writing (including portable document format) and must be either personally delivered, mailed by first class mail (postage prepaid and

return receipt requested), sent by email transmission or sent by reputable overnight courier service (charges prepaid) to the addresses indicated below:

If to Employee:

Trey Austin
6450 Caliche Circle
Midlothian, TX 76065
Email: enrique@groupted.com

If to the Company:

**AD Dallas Clinics, LLC**
Address:
City, State, Zip:
Attention:
Email:

with a copy (which shall not constitute notice to the Company) to:

Hallett & Perrin, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
Attention: William W. Meier, III
E-mail: wmeier@hallettperrin.com

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.

All such notices, requests and other communications shall be deemed to have been received (i) on the date of delivery thereof, if delivered by hand, (ii) on the fifth day after the mailing thereof, if mailed, (iii) on the next Business Day after the sending thereof, if sent by overnight courier, (iv) on the day of sending, if sent by email transmission prior to 5:00 p.m. (Central Time) on any Business Day, or (v) on the next Business Day, if sent by email transmission after 5:00 p.m. (Central Time) on any Business Day or on any day other than a Business Day.

17. **General Provisions**.

(a) Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(b) Complete Agreement. This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding between the parties and supersede and preempt any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

(c) Counterparts. This Agreement may be signed in one or more counterparts, each of which once signed shall be deemed to be an original. All such counterparts together shall constitute one and the same instrument. Notwithstanding the date of execution of any counterpart, each counterpart shall be deemed to bear the date first above written. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

(d) Successors and Assigns. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of Employee, the Company and their respective successors and assigns; *provided*, *that*, neither Employee nor the Company may assign any of its rights or obligations under this Agreement without the prior written consent of the other party, except that the Company may assign this Agreement and all of the provisions hereof without the consent of Employee to an Affiliate of the Company or to any successor to all or substantially all of its assets, by merger or otherwise.

(e) Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement will be governed by the laws of the State of Texas applicable to contracts made and to be performed entirely within the State of Texas without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.

(f) Jurisdiction and Venue. If any party to this Agreement commences a lawsuit or other proceeding relating to or arising from this Agreement, the parties hereto agree that the state or federal courts located in Dallas, Texas shall have sole and exclusive jurisdiction over any such proceeding. The parties hereto consent to and agree to submit to the jurisdiction of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in these courts. Process in any action or proceeding referred to in the preceding sentence may be served on any party hereto anywhere in the world.

(g) Waiver of Jury Trial. BECAUSE (A) DISPUTES ARISING IN CONNECTION WITH ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT ARE LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, (B) SUCH DISPUTES WILL BE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON, AND (C) THE PARTIES HERETO WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM, AND UNDERSTANDING THEY ARE WAIVING A CONSTITUTIONAL RIGHT, THE PARTIES HERETO (BY ACCEPTANCE HEREOF) WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT.

(h) Remedies. Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys' fees) caused by any breach of any provision of this Agreement and to exercise all other

rights existing in its favor. Notwithstanding anything contained in this Agreement to the contrary, the parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that either party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

(i) Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee.

(j) Expenses. Each of the parties to this Agreement shall pay its own expenses incurred in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby.

(k) No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

(l) Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or its severance from this Agreement; and such provision shall be interpreted, modified or rewritten to include as much of the duration, scope and geographic area identified in such provision as will render such restrictions valid and enforceable.

(m) No Third Party Beneficiaries. Nothing contained herein, express or implied, is intended to confer upon any Person other than the parties hereto and their respective successors in interest and permitted assigns any rights or remedies under or by reason of this Agreement.

18. **Change In Law**. Notwithstanding any other provision of this Agreement, if any governmental agency (or its representatives) or any payor passes, issues or promulgates any law, rule, regulation, standard or interpretation at any time while this Agreement is in effect which prohibits, restricts, limits or in any way changes the Services to be rendered under this Agreement, method or amount of reimbursement or payment for services rendered by any party to this Agreement, or which otherwise materially and adversely affects another party's rights or obligations hereunder, the affected party shall give the other parties notice of its intent to amend this Agreement to the satisfaction of the affected party to avoid such prohibition, restriction, limitation or change, and the other parties agree to negotiate in good faith in an attempt to so amend this Agreement. If this Agreement is not so amended in writing within thirty (30) days after said notice was given, this Agreement may be terminated by any party upon an additional thirty (30) days written notice and the restrictions set forth in Section 7 shall not be applicable.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

**COMPANY:**

**AD DALLAS CLINICS, LLC**,
a Texas limited liability company

By: ______________________________

Name:

Title:

**EMPLOYEE:**

**TREY AUSTIN,**

______________________________

**EXHIBIT A**

**EMPLOYEE FUNCTION DESCRIPTION**

- Develop business strategies and plans ensuring their alignment with short-term and long-term objectives;
- Lead and motivate to advance employee engagement and develop a high performing managerial team;
- Oversee all operations and business activities to ensure they produce the desired results and are consistent with the overall strategy and mission;
- Propose investing decisions to advance the business and increase profits;
- Enforce adherence to legal guidelines and in-house policies to maintain the team's legality and business ethics at the direction of the CEO and the Board;
- Review financial and non-financial reports to devise solutions or improvements;
- Build trust relations with key partners and stakeholders; and
- All other functions consistent with executive leadership.

**EXHIBIT B**

**INITIAL PERFORMANCE TARGETS**

**[TO COME]**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kasia Olkowski on behalf of Douglas Daniels
Bar No. 793579
kasia@DTlawyers.com
Envelope ID: 100789822
Filing Code Description: Amended Answer - Amended General Denial
Filing Description: DEFENDANTS' FIRST AMENDED ANSWER, COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION
Status as of 5/13/2025 4:41 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 5/13/2025 4:29:10 PM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 5/13/2025 4:29:10 PM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 5/13/2025 4:29:10 PM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 5/13/2025 4:29:10 PM | SENT |
| camp staff | | campstaff@camplaw.com | 5/13/2025 4:29:10 PM | SENT |
| Timothy EBond | | tim@dtlawyers.com | 5/13/2025 4:29:10 PM | SENT |

FILED
6/20/2025 10:21 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
John Bailey DEPUTY

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs*,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | |
| ***Defendants*.** | § | **162nd JUDICIAL DISTRICT** |

**DEFENDANTS' SECOND AMENDED ANSWER, COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Defendants, Lucky Chopra, AD Dallas Clinics, LLC, Trend Physicians Group, Inc., and Zoo Capital Holdings, LLC ("Defendants"), file this Second Amended Answer, Counterclaim, and Application for Temporary Injunction, and Permanent Injunction, related to the claims asserted by Ted Ventures, LLC, Trend Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs") as follows.

## I.
## GENERAL DENIAL

1. Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally and categorically deny the allegations contained in Plaintiffs' Original Petition and demand strict proof thereof in accordance with the laws and Constitution of the State of Texas.

## II.
## AFFIRMATIVE DEFENSES

2. To the extent that any defenses, other than the General Denial, pled in this Answer are in conflict, they are pled in the alternative.

a. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of discharge or excused performance.

b. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of prior material breach.

c. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of unclean hands.

d. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of offset.

e. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of fraud.

## III.
## ORIGINAL COUNTERCLAIM

### A. Discovery Control Plan

3. Pursuant to TEX. R. CIV. P. 190.1, Defendants intend to conduct discovery by rule under Texas Rule of Civil Procedure 190.3 ("Level 2").

### B. Claims for Relief

4. Pursuant to Texas Rule of Civil Procedure 47(c), Defendants seek monetary relief from Plaintiffs as pleaded herein, of over $1,000,000.00, as well as non-monetary relief.

### C. Parties

5. Plaintiff TED Ventures, LLC ("TED Ventures") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

6. Plaintiff Trend Medical Management, LLC ("Trend Medical") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

7. Plaintiff Derek Gove is a citizen and resident of the state of Texas.

8. Plaintiff Trey Austin is a citizen and resident of the state of Texas.

9. Plaintiff Enrique Stowhas is a citizen and resident of the state of Texas.

10. Defendant Luck Chopra is a citizen and resident of the state of Texas.

11. Defendant Ryan Reneau is a citizen and resident of the state of Texas.

12. Defendant Trend Physicians Group, LLC ("Trend Physicians") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

13. Defendant Advanced Dallas Clinics, LLC ("AD") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Dallas County, Texas.

14. Defendant Zoo Capital Holdings, LLC is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Harris County, Texas.

**D. Jurisdiction and Venue**

15. This Court has subject matter jurisdiction over this dispute because Defendants seek monetary relief in excess of $1,000,000.

16. This Court has personal jurisdiction over Plaintiffs TED Ventures and Trend Medical in this dispute because TED Ventures and Trend Medical are entities doing business in Texas as the term "doing business" is understood in law. TED Ventures and Trend Medical have

purposefully availed themselves of the laws of the State of Texas and have sufficient minimum contacts in the State of Texas for this Court to exercise personal jurisdiction over it. This matter arises out of TED Ventures' and Trend Medical's contacts within the State of Texas and exercising personal jurisdiction over them comports with traditional notions of fair play and substantial justice.

17. This Court has personal jurisdiction over Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas because they are residents and citizens of the State of Texas.

18. Venue is proper in this Court pursuant to TEX. CIV. PRAC. & REM. CODE ¶ 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.

## E. Factual Allegations

### i. <u>The Asset and Purchase and Contribution Agreement.</u>

19. Plaintiffs, either directly or indirectly, own and manage medical clinics, physical rehabilitation clinics, and pharmacies throughout the Dallas area. Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas are direct or indirect owners of TED Ventures and Trend Medical.

20. Defendants, either directly or indirectly, own and manage several hospitals and medical facilities around Texas.

21. Plaintiffs and Defendants met in mid-2023.

22. Based on representations by Plaintiffs, Defendants were interested in acquiring several of Plaintiffs' medical clinics and medical management entities.

23. On December 12, 2023, AD, Zoo Capital, and Plaintiffs entered into a contract for Defendants to acquire substantially all the assets of Trend Medical Management, LLC ("Trend Medical"), including Trend Medical's ownership of Trend Physicians (the "Agreement").

Defendant Zoo Capital then contributed, transferred, and conveyed the assets to AD. Plaintiffs and Defendants agreed on a purchase price of twelve million dollars ($12,000,000) based on Plaintiffs' representations about TED Ventures and Trend Medical. That amount was to be paid over time. To date, Plaintiffs have been paid approximately two million dollars ($2,000,000).

24. Almost immediately after the Agreement was signed, Defendants began uncovering facts and circumstances that contradicted the representations made by Plaintiffs during negotiations for the Agreement. For example, despite representations by Plaintiffs prior to entering into the deal, Defendants had to start paying out sums of money to keep the clinics running because the clinics and businesses were not cashflow positive, and payroll could not be covered without help and intervention from Defendants. The clinics made just enough money to pay for rent, but not payroll, and there certainly was no profit, as promised under the representations by Plaintiffs. When AD tried doing an audit, Plaintiffs stopped AD at every turn. Plaintiffs would occasionally produce PDF spreadsheets, but nothing in Excel format and no QuickBooks or the actual data behind the inputs.

25. Based on the information the auditor was finally able to uncover from Plaintiffs, significant discrepancies were uncovered. First, the revenue that Plaintiffs had reported before the agreement was signed was $2.3 million less than they had represented. Second, the payroll expenses were hundreds of thousands of dollars higher than Plaintiffs had represented to Defendants. Third, the professional fees were likewise hundreds of thousands of dollars greater than Plaintiffs had originally reported. These discrepancies were not minor, but significant, and Defendants would not have ever entered into the deal with Plaintiffs had Plaintiffs been forthright from the beginning.

26. Plaintiffs had sorely misrepresented the value in their clinics. Additionally, the management team's performance was unsatisfactory across the board, which caused even more financial strain on the clinics. As detailed further below, the concealed management issues led to the for-cause termination of several AD officers.

27. Plaintiffs also misrepresented their collections. In the medical field, what medical clinics charge versus what they collect can vary widely based on insurance companies' and government entities' actual payments for the rendered medical services. Plaintiffs purposefully conflated their charges with their actual collections to entice Defendants to enter into the deal. Only the smallest fraction of what Plaintiffs represented actually materialized.

28. Defendants have also been made aware that Plaintiffs were having patients and owing-entities pay Plaintiffs directly for services that the clinics provided. Defendants' diversion of funds continued even after Defendants entered the deal to purchase the clinics. For example, Defendants have uncovered evidence that from 2024 to 2025, certain receivables owed to Defendants were accounted for as if paid, but the related payments were deposited to non-affiliated third parties. Defendants' investigation is ongoing, but an initial investigation has uncovered that thousands of dollars of Defendants' receivables have been diverted. Plaintiffs cut Defendants out and stole the money that was due to Plaintiffs.

29. Further, the deal between Defendants and Plaintiffs encompassed certain pharmacies originally owned by Plaintiffs. Defendants agreed to use Plaintiffs' pharmacies to obtain the medications needed for their patients at the clinics, and AD also entered into a purchase agreement for Southern Star Pharmacy. Plaintiffs' pharmacies then charged the medications at exorbitant profits, which resulted in issues for many of Defendants patients. Additionally, with respect to Southern Star Pharmacy, AD has evidence that Plaintiffs took receivables that AD

bought under the Agreement and had payments sent directly to Plaintiffs. Southern Star Pharmacy has since engaged in harassing conduct towards Defendants' clinics and affiliates.

30. Additionally, as part of the Agreement, Plaintiffs represented that they would release underlying encumbrances. Specifically, Plaintiffs failed to perform their release obligations related to a loan for over $9,600,000 from Enterprise Bank, that encompassed Trend Physician Group, Inc., which is an entity that Defendants purchased in the deal. In March 2025, Enterprise Bank sued entities associated with Defendants, including Trend Physician Group, Inc., for defaulting on the $9.6 million loan.

31. The circumstances surrounding the Agreement show Plaintiffs' disregard for their contractual obligations and their willingness to engage in fraud.

**ii. Employment Agreement Breaches and Unlawful Competition.**

32. On November 1, 2023, Defendants entered into employment agreements with Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs' Officers"). The employment agreements provided that Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

33. While uncovering Plaintiffs' above-referenced misconduct concerning the Agreement, Defendants also identified that Plaintiffs' officers were contributing to the fraud by breaching their respective employment agreements. Accordingly, On April 10, 2025, AD terminated Plaintiffs' Officers for cause.

34. Leading up to the terminations, Defendants were made aware of statements made and messages sent by Plaintiffs' Officers in an effort to divert Defendants' business while Plaintiffs' Officers were actively directing and managing the operations of Defendants' business.

Specifically, Defendants received evidence that Plaintiffs' Officers were contacting clinics, patients, and physicians affiliated with Defendants, and directing those affiliates to direct payment to entities or individual not affiliated with AD for services rendered by AD. Essentially, Plaintiffs' Officers took or diverted monies owed to AD and directed that money to themselves or other entities in which they had some economic interest. That is embezzlement and theft, not to mention a breach of Plaintiffs' Officers' contractual and fiduciary obligations to AD. AD therefore terminated Plaintiffs' Officers, and did so in accordance with the terms of the employment agreements.

35. Additionally, after Plaintiffs' Officers termination, Plaintiffs' Officers violated their non-competition and non-solicitation agreements by: (1) soliciting AD's physicians to work for entities unaffiliated with Plaintiff but affiliated with Plaintiffs; (2) soliciting AD's patients to receive treatment at entities unaffiliated with AD but affiliated with Plaintiffs; and (3) continuing to steal money from AD by directing parties owing monies to AD to pay entities affiliated with Plaintiffs instead.

36. According to each employment agreement, Plaintiffs' Officers were prohibited from competing with AD in Texas, soliciting AD's business in Texas, and accessing AD's records for a twelve-month period following termination (the "Restrictive Period"), except for certain unrelated business functions. Each agreement provided the Plaintiffs' Officers shall not:

- Directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company;
- Directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any

Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company;

- Access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify, or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

The employment agreements offered clear and reasonable limitations on Plaintiffs' Officers' post-termination conduct. The employment agreements also included cooperation provisions, requiring Plaintiffs' Officers to cooperate with AD, during and after their employment period, to help resolve any disputes with third parties.

37. After their lawful termination, Plaintiffs' Officers continue to violate their obligations to AD by immediately and continually violating their non-competition and non-solicitation clauses, among other provisions of the employment agreements. Plaintiffs' Officers continued to contact AD's patients and physicians to entice them to become patients at and doctors of other clinics and hospitals that Plaintiffs are affiliated with. Specifically, Plaintiffs' and/or Plaintiffs' Officers attempted to gain or access to Defendants valuable patient data and communications after Plaintiffs' Officers were terminated and lost lawful access to such data. Plaintiffs' Officers accessed Defendants' confidential information in an effort to use that information to usurp or divert AD's business opportunities for themselves. Plaintiffs' Officers did so as soon as the day after their termination, demonstrating their malicious intent and furthering their illegal conduct. Moreover, Plaintiffs have recently sent text messages, or directed text

messages to be sent, to current patients of Defendants' clinics, offering to provide the patients services at clinics not affiliated with Defendants. Plaintiffs have unlawfully accessed, used, or otherwise misappropriated Defendants' confidential information—such as patient lists and patient contact information—to further their scheme.

38. Plaintiffs' Officers have also refused to cooperate with AD after termination, effectively preventing AD access to certain medical databases and systems for which Defendants' consent is required. Plaintiffs' Officers' conduct shows their willingness to illegally compete with AD, including by soliciting AD's affiliates and accessing AD's records, all in contravention of the employment agreements.

39. In sum, Plaintiffs' statements and conduct surrounding the Agreement were fraudulent, considering evidence that the purchased facilities had overstated value and financials, shady underlying practices, and undisclosed debt. Plaintiffs' Officers' continued their misconduct by engaging in competitive practices that went against their employment agreements. The deal has resulted in Defendants holding the bag, a bag that was propped up by Plaintiffs' misrepresentations prior to the deal, but depleted by Plaintiffs prior to, during, and after transfer.

## F. Causes of Action

### i. <u>Count One: Breach of Contract (the Agreement) as to all Plaintiffs</u>

40. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs for breach of contract as to the Agreement.

41. Specifically, Defendants AD and Zoo Capital were parties to a valid, enforceable contract with Defendants—the Agreement—and are proper parties to bring suit for breach of that contract. AD and Zoo capital have at all times complied with its obligations under the Agreement.

42. The Agreement incorporates various representations and warranties made by Plaintiffs, concerning the clinics and assets to be purchased by Defendants. The Agreement also required Plaintiffs to make disclose information regarding their assets and liabilities on a good faith basis. Finally, the Agreement required Plaintiffs to act in good faith when performing various aspects of Agreement.

43. Plaintiffs breached the agreement. Plaintiffs' breaches included, but are not necessarily limited to, the following actions or omissions contrary to their obligations under the Agreement:

a. Overstating the value of the businesses and assets purchased pursuant to the Agreement;
b. Misrepresenting receivables value, debt, and other financial aspects underlying the assets purchased under the Agreement;
c. Misrepresenting the nature of the businesses underlying the Agreement; and,
d. Concealing unfavorable facts and circumstances during the negotiations for and commencement of the Agreement.

44. Plaintiffs' breach caused AD and Zoo Capital injury in the form of economic damages in an amount in excess of the minimum jurisdictional limits of this Court.

45. Defendants have incurred costs for attorneys in connection with pursuing remedies under the Agreement. Defendants are therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**ii. <u>Count Two: Breach of Contract (employment agreements) as to Plaintiffs' Officers</u>**

46. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate

that AD is entitled to recover monetary damages against Plaintiffs' Officers for breach of their employment agreements.

47. Specifically, the employment agreements provide that during the one year following Plaintiffs' Officers' termination, Plaintiffs' Officers shall not directly or indirectly own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business within Texas, that competes with the Business in any respect as conducted by AD. Further, the agreements provide that during the Restrictive Period, Plaintiffs' Officers shall not solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of AD, for Plaintiffs' Officers benefit or for any purpose related to or competitive with AD's business. Additionally, Plaintiffs' Officers shall not access, interfere with, disrupt, modify, or change AD's files or information during the Restrictive Period.

48. AD has at all times complied with its obligations under the employment agreements.

49. Plaintiffs' Officers breached their employment agreements. Specifically, and without limitation, Plaintiffs' Officers breached those agreements by:

a. Communicating with AD's patients, clinics, and physicians affiliated with AD for Plaintiffs' direct or indirect benefit and in a manner that competes with AD's business;
b. Competing with AD and profiting from AD's business relationships for Plaintiffs' direct or indirect benefit; and/or,
c. Using, accessing, disrupting, modifying, and/or changing AD's confidential information in a manner harmful to AD's access to such information and for Plaintiffs' benefit.

50. Each of the foregoing breaches, and all of them collectively, threaten to cause AD imminent and irreparable harm and/or monetary damages in an amount in excess of the minimum jurisdictional limits of this Court.

51. AD has incurred costs for attorneys in connection with pursuing AD's remedies under the parties' agreement. AD is therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**iii. <u>Count Three: Breach of Fiduciary Duty as to Plaintiffs' Officers</u>**

52. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that AD is entitled to recover against Plaintiffs' Officers for breach of fiduciary duty.

53. Plaintiffs' Officers owed a fiduciary duty to AD as officers of AD. Specifically, prior to termination, Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

54. Plaintiffs' Officers breached their fiduciary duties to AD. Specifically, Plaintiffs' Officers' conduct, as described above, directly contradicted the best interests of the company. In connection with and in furtherance of the conduct described above, Plaintiffs' Officers engaged in acts of self-dealing, usurpation of AD's business opportunities, misappropriation and improper use of AD's confidential information, and competition with AD.

55. Plaintiffs' Officers breaches of fiduciary duties proximately caused AD injury, including a loss of business in the form of lost patient, clinic, and physician relationships and opportunities, as well as damage to AD's reputation and anticipated future profits from the relationships with such persons/entities.

56. Plaintiffs' Officers' breaches of fiduciary duties resulted in a benefit to Plaintiffs, including (1) directly or indirectly profiting from the opportunities stolen from AD, as well as (2) securing and continuing access to AD's valuable and confidential business information and records.

57. Further and in the alternative, AD has suffered actual damages as a result of the breaches of fiduciary duties by Plaintiffs' Officers, in an amount in excess of the minimum jurisdictional limits of this Court. The harm suffered by AD is distinct and individual harm as a result of Plaintiffs' Officers' breaches of fiduciary duties and is separate and apart from damages for breach of their employment contracts.

**iv. <u>Count Four: Fraudulent Misrepresentation as to all Plaintiffs</u>**

58. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for fraud.

59. Specifically, Plaintiffs made misrepresentations to Defendants concerning the facts underlying the financial state, value, and general nature of the businesses and assets underlying the Agreement. Plaintiffs made promises to Defendants, concerning their obligations and representations under the Agreement and otherwise, with the present intention not to perform as promised. Those misrepresentations were material to Defendants' decisions to enter into the Agreement and continue with other related aspects of the deal.

60. The misrepresentations detailed above were false in that they were false statements of existing fact that Plaintiffs knew to be false, and/or were promises made by Plaintiffs with the present intention, when made, not to perform as promised. Plaintiffs made the misrepresentations

with the intent that Defendants would rely on them, and Defendants did in fact rely on the misrepresentations by moving forward with the Agreement and related deals.

61. Defendants have suffered actual economic injury as a result of Plaintiffs' fraud and their reliance on Plaintiffs' fraudulent misrepresentations in an amount in excess of the minimum jurisdictional limits of this Court. Further, because Defendants' injuries arise out of Plaintiffs' fraud, Defendants are entitled to exemplary damages up to the maximum amount allowed by law.

v. **Count Five: Conversion as to all Plaintiffs**

62. Plaintiffs incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for conversion.

63. Plaintiffs have wrongfully exercised dominion or control over Defendants property, in denial of or inconsistent with Defendants' rights. Specifically, Plaintiffs have caused the diversion of funds belonging to Defendants. Plaintiffs' conduct was wrongful in that it contradicted the terms of the Agreement which assigned the rights to certain receivables to Defendants. Plaintiffs exercised control by diverting the funds to themselves or to their affiliates.

64. Defendants have suffered actual economic injury as a result of Plaintiffs' conversion in excess of the minimum jurisdictional limits of this Court.

## IV.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

65. Defendant AD has requested temporary injunctive relief from the Court preventing Plaintiffs' Officers from (1) wrongfully communicating with patients, clinics, physicians, vendors, lenders, and other persons or entities associated with AD in an effort to divert their business and working relationships away from AD, (2) accessing, viewing, taking, using, copying, downloading, or modifying AD's confidential business information, including but not limited to

patient records, patient lists, and physician referral lists. Defendant AD's request for temporary injunctive relief has been previously verified by affidavit in the *First Amended Answer, Counterclaim, and Application for Temporary Injunction, and Permanent Injunction* (the "First Amended Answer"). No further verification of this answer is necessary in relation to Defendant AD's request for temporary restraining order. To the extent that further verification is required, Defendant AD hereby incorporates by reference the affidavit filed contemporaneously with and in support of the First Amended Answer.

66. AD is likely to recover from Plaintiffs' Officers after a trial on the merits because (1) Plaintiffs' Officers were subject to valid and enforceable employment agreements; (2) during their employment, Plaintiffs' Officers owed AD fiduciary duties as employees; and (3) during and after termination of their employment, Plaintiffs' Officers acted and continue to act in breach of those obligations by (1) communicating with patients, clinics, and physicians associated with AD to leave AD and go to other clinics associated with Plaintiffs, (2) stealing business opportunities from AD and otherwise cause damage, and (3) illegally accessing and misappropriating AD's confidential business information in furtherance of their efforts to interfere with and take AD's business opportunities. AD terminated Plaintiffs' Officers from their respective roles after discovering some of their activities, and Plaintiffs' Officers conduct both before and since that termination is clearly wrongful and has caused and threatens to continue causing irreparable harm to AD's business.

67. If this Court does not grant this request to restrain the Plaintiffs' Officers, AD will suffer imminent and irreparable harm in that Plaintiffs' Officers are utilizing information and records belonging to AD and using AD's established relationships to divert business from AD for Plaintiffs' benefit, and will likely continue such conduct, which Plaintiffs' Officers lack

authorization to do. Such conduct has interfered with AD's business and will ultimately lead to severe and likely irreparable damage to AD's business and reputation.

68. AD has no adequate remedy at law because allowing such unchecked conduct to continue while AD conducts discovery and proceeds to trial on the underlying causes of action will cause irreparable harm. The conduct must be halted immediately before more damage is done and cannot be undone. Any monetary award for the measurable damage to AD's business will not adequately compensate AD for the ongoing devaluation, loss of goodwill, and reputational damage, the potential disruption of AD's patients' needed medical care, the proper and timely payment of medical providers for that care, and the resulting reputational harm to AD. The cascade effect of Plaintiffs' Officers' conduct, if it is allowed to continue, cannot be adequately measured or compensated in damages, especially against individual plaintiffs with finite economic resources to pay a money judgment in AD's favor equal to the harm they have caused.

69. There is insufficient time to serve notice on Plaintiffs' Officers and to hold a hearing on this petition and application. Plaintiffs' Officers have been notified several times of their wrongful conduct since their April 10, 2025 termination, including an April 16, 2025 email demanding Plaintiffs' Officers cease and desist any activity in breach of the non-compete and non-solicitation clauses of the employment agreements. Nonetheless, Plaintiffs' Officers continue to wrongfully and illegally use AD's business information and communicate with patients, clinics, and physicians associated with AD in a manner which is completely detrimental to AD's business.

70. Based on the above, the Defendants request this Honorable Court to order the following:

1. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with the patients of Defendant AD DALLAS CLINICS, LLC in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates.

2. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with physicians and other medical and administrative staff, vendors, lenders, and clinics associated with Defendant AD DALLAS CLINICS, LLC, in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates, including but not limited to the following persons/entities:

    - Advanced Healthcare Clinics Plano;
    - Advanced Healthcare Clinics Hurst;
    - Advanced Healthcare Clinics Mesquite;
    - Advanced Healthcare Clinics Buckner;
    - Advanced Healthcare Clinics South Dallas; and
    - Advanced Healthcare Clinics Denton.

3. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, not use, interfere, disrupt, modify, or change the AD's confidential business information or any data owned by AD or its affiliates.

4. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, return all digital and tangible property of the AD including all data or access to data, and including but not limited to the following:

    - AD Records which contain contact information for patients, including records containing patient phone numbers, email addresses, or addresses.

5. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not disclose any of AD's data or confidential business information to any other person or entity.

6. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not compete with AD by gaining employment with, partnering with, engaging in business transactions with competitors of AD, aside from businesses outside of the geographical, temporal, and categorical scopes referenced in Plaintiffs' Officers' employment agreements.

71. AD is willing to post a reasonable bond for the temporary restraining order and requests the Court to set the reasonable bond.

## V.
## REQUEST FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

72. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below.

73. Defendant AD asks the Court to set this application for temporary injunction for hearing and to issue a temporary injunction against Plaintiffs' Officers after hearing.

74. Additionally, AD further requests that following a trial on the merits of this case, that the court enter a permanent injunction against Plaintiffs' Officers.

## VI.
## REQUEST FOR RELIEF

75. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs as follows:

a. Actual damages, including but not limited to the monetary damages suffered by Defendants as a result of Plaintiffs' conduct;

b. A temporary restraining order that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

c. A temporary and permanent injunction that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

d. Reasonable and necessary attorney's fees;

e. Costs of suit; and,

f. Pre- and post-judgment interest as allowed by law.

## VII.
## CONDITIONS PRECEDENT

76. To the extent necessary to do so, Defendants affirmatively plead that all conditions precedent to their recovery on the facts and theories set above have been satisfied, have occurred, or have been waived.

## VIII.
## NOTICE OF INTENT TO USE DISCOVERY

77. Pursuant to Texas Rule of Civil Procedure 193.7, Defendants hereby give notice that Defendants intend to use all discovery instruments and information produced in this case at trial. Such discovery instruments and information include, but are not limited to, all documents and discovery responses Defendants have produced or will produce in response to Defendants' discovery requests and/or any party's discovery requests.

## IX.
## DUTY TO PRESERVE EVIDENCE

78. Defendants demand that Plaintiffs as well as their agents, representatives, employees, officers, managers, affiliates, and attorneys preserve and maintain all evidence in any way related to the transactions, acts, events, and omissions described herein, or the damages resulting therefrom, including but not limited to photographs, videotapes, audiotapes, recordings, correspondence, memoranda, calendars, diaries, notes, drafts, files, facsimiles, email, voice mail, text messages, other electronically stored information, or cellular telephone records. Failure to maintain such items will constitute "spoliation" of the evidence and Defendants will seek sanctions or other available penalties or remedies against Plaintiffs for failure to comply with its duty to preserve evidence in connection with this matter.

## X.
## CONCLUSION AND PRAYER

WHEREFORE, Defendants respectfully pray that, upon final disposition of this case, Plaintiffs take nothing by reason of Plaintiffs' allegations against Defendants and that this Court grant Defendants such other relief to which they may be entitled, including but not limited to reimbursement for the costs incurred by Defendants in responding to and defending the allegations raised against them in Plaintiffs' Original Petition. Further, Defendants pray that judgment should

be entered against Plaintiff in favor of Defendants, that Defendants be awarded actual damages in an amount to be proven at trial in addition to pre- and post-judgment interest, that Defendants be awarded equitable relief as requested above, that Plaintiffs reimburse Defendants for all reasonable and necessary attorney's fees and expenses and all court costs, and for all such other relied to which Defendants may be entitled.

Dated: June 20, 2025

Respectfully submitted,

**DANIELS & TREDENNICK, PLLC**

By: /s/ Douglas A. Daniels
Douglas A. Daniels
State Bar No. 00793579
doug.daniels@dtlawyers.com
Sabrina R. Tour
State Bar No. 24093271
sabrina@dtlawyers.com
Timothy Bond
State Bar No. 24131860
tim@dtlawyers.com
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

***Attorneys for Defendants LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.***

## CERTIFICATE OF SERVICE

I hereby certify that I have complied with Tex. R. Civ. P. 21 and 21a. I further certify that a true and correct copy of the foregoing document has been served on all counsel of record by e-File electronic service on June 20, 2025.

*/s/ Douglas A. Daniels*________
Douglas A. Daniels

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kasia Olkowski on behalf of Douglas Daniels
Bar No. 793579
kasia@DTlawyers.com
Envelope ID: 102232357
Filing Code Description: Amended Answer - Amended General Denial
Filing Description: DEFENDANTS' SECOND - COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION
Status as of 6/20/2025 12:24 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 6/20/2025 10:21:37 AM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 6/20/2025 10:21:37 AM | SENT |
| Alejandro L. Padua | | ap@padualaw.com | 6/20/2025 10:21:37 AM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 6/20/2025 10:21:37 AM | SENT |
| Celenia Torres | | ct@padualaw.com | 6/20/2025 10:21:37 AM | SENT |
| camp staff | | campstaff@camplaw.com | 6/20/2025 10:21:37 AM | SENT |
| Lema Mousilli | | lema@mousillilaw.com | 6/20/2025 10:21:37 AM | SENT |
| Emily Cooper | | emily@dtlawyers.com | 6/20/2025 10:21:37 AM | SENT |
| Sara EPadua | | sp@padualaw.com | 6/20/2025 10:21:37 AM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 6/20/2025 10:21:37 AM | SENT |
| Timothy EBond | | tim@dtlawyers.com | 6/20/2025 10:21:37 AM | SENT |
| Kevi A.Ramirez | | kr@padualaw.com | 6/20/2025 10:21:37 AM | SENT |
| Griselda Guerrero | | gg@padualaw.com | 6/20/2025 10:21:37 AM | SENT |

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs*,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | |
| ***Defendants*.** | § | **162nd JUDICIAL DISTRICT** |

**AGREED SCHEDULING ORDER**

The Court enters the following Scheduling Order to control the schedule of trial and discovery in this case. Unless otherwise specified, the following items must be completed by the dates listed below. If no date is listed, the item is governed by the Texas Rules of Civil Procedure. The discovery limitations of Texas Rule of Civil Procedure 190.2, if applicable, or otherwise of Texas Rule of Civil Procedure 190.3 apply unless specifically changed herein.

| | | |
|---|---|---|
| **1.** | **October 21, 2025** | **JOINDER**. All parties must be added and served, whether by amendment or third-party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE. |
| **2.** | | **EXPERT WITNESS DESIGNATION**. Expert witness designations are required and must be served by the following dates. The designation must include the information listed in Rule 195.5. |
| | **November 21, 2025** | Experts for parties seeking affirmative relief. |
| | **December 22, 2025** | All other experts. |
| **3.** | **February 30, 2026** | **MEDIATION**. Parties must complete mediation. The parties' failure to mediate will not be grounds for continuance of trial. |
| **4.** | **February 20, 2026** | **DISCOVERY**. Parties must complete all discovery. Parties seeking discovery must serve requests sufficiently far in advance of the end |

of the discovery period so that the deadline for responding will be within the discovery period.

| | | |
|---|---|---|
| **5.** | | **DISPOSITIVE MOTIONS**. Parties must set for hearing all motions or pleas, that if granted by the Court would dispose of all or part of the case as follows: |
| | **February 2, 2026** | No-evidence motions for summary judgment may only be heard after this date. |
| | **February 20, 2026** | All dispositive motions or pleas must be heard. |
| **6.** | **February 20, 2026** | **CHALLENGES TO EXPERT TESTIMONY**. All motions to exclude expert testimony must be heard. This Order does not include exclusion based on Rule 193.6. |
| **7.** | **March 20, 2026** | **PLEADINGS**. Parties must file all amendments and supplements to pleadings. This Order does not preclude the prompt filing of pleadings directly responsive to any timely filed pleadings. |
| **9.** | **April 21, 2026** | **TRIAL**. This case is set for trial on this date. If not assigned by the second Friday following this date, the case will be reset. |

SIGNED on **6/23/2025 11:38:22 AM**, 2025.

[signature]
PRESIDING JUDGE

**AGREED:**

**DANIELS & TREDENNICK PLLC**

By: */s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
Sabrina R. Tour
State Bar No. 24093271
Timothy E. Bond
State Bar No. 24131860
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)
Email: doug.daniels@dtlawyers.com
Email: sabrina@dtlawyers.com
Email: tim@dtlawyers.com

**ATTORNEYS FOR DEFENDANTS LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.**

**CAMP TRIAL GROUP**

By: */s/ William W. Camp (by permission)*
William W. Camp
State Bar No. 00789196
Email: rule21a-service@camnlaw.com
12700 Hillcrest Rd., Suite 125
Dallas, TX 75230
Tel. (214) 638-8400
Fax. (214) 638-8884

**ATTORNEY FOR PLAINTIFF**

By:*/s/ Sara E. Padua (by permission)*
Sara E. Padua
State Bar No. 24079099
Alejandro L. Padua
State Bar No. 24060375
Kevi A. Ramirez
State Bar No. 24140278
5599 San Felipe, Suite 911
Houston, Texas 77056
(713) 840-1411
(281) 652-5872 fax

**ATTORNEYS FOR DEFENDANT STEVEN RYAN RENEAU**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kasia Olkowski on behalf of Douglas Daniels
Bar No. 793579
kasia@DTlawyers.com
Envelope ID: 102214672
Filing Code Description: Proposed Order/Judgment
Filing Description: PROPOSED AGREED SCHEDULING ORDER
Status as of 6/20/2025 12:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 6/19/2025 4:11:33 PM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 6/19/2025 4:11:33 PM | SENT |
| Alejandro L. Padua | | ap@padualaw.com | 6/19/2025 4:11:33 PM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 6/19/2025 4:11:33 PM | SENT |
| Celenia Torres | | ct@padualaw.com | 6/19/2025 4:11:33 PM | SENT |
| camp staff | | campstaff@camplaw.com | 6/19/2025 4:11:33 PM | SENT |
| Lema Mousilli | | lema@mousillilaw.com | 6/19/2025 4:11:33 PM | SENT |
| Emily Cooper | | emily@dtlawyers.com | 6/19/2025 4:11:33 PM | SENT |
| Sara EPadua | | sp@padualaw.com | 6/19/2025 4:11:33 PM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 6/19/2025 4:11:33 PM | SENT |
| Timothy EBond | | tim@dtlawyers.com | 6/19/2025 4:11:33 PM | SENT |
| Kevi A.Ramirez | | kr@padualaw.com | 6/19/2025 4:11:33 PM | SENT |
| Griselda Guerrero | | gg@padualaw.com | 6/19/2025 4:11:33 PM | SENT |

FILED
4/16/2026 5:43 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Treva Parker-Ayodele DEPUTY

**CAUSE NO. DC-25-05848**

| | | |
|---|---|---|
| TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS, | § | **IN THE DISTRICT COURT OF** |
| Plaintiffs, | § | |
| v. | § | **DALLAS COUNTY, TEXAS** |
| LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC. | § | **162nd JUDICIAL DISTRICT** |
| Defendants. | § | |

**AGREED MOTION FOR CONTINUANCE OF TRIAL SETTING AND TO ENTER AMENDED AGREED SCHEDULING ORDER**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs TED Ventures, LLC, TREND Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas (collectively, "Plaintiffs"), and Defendants Lucky Chopra, Zoo Capital Holdings, LLC, AD Dallas Clinics, LLC, Trend Physicians Group, Inc., and Steven Ryan Reneau (collectively, "Defendants"), file this Agreed Motion for Continuance of Trial Setting and to Enter Amended Agreed Scheduling Order, and respectfully show the Court as follows:

## I. BACKGROUND

1. This case is currently set for trial on April 21, 2026, pursuant to the Agreed Scheduling Order entered by the Court on June 19, 2025.

2. Since the entry of that Scheduling Order, the parties have engaged in extensive discovery, motion practice, and pretrial proceedings, including (without limitation) the negotiation and entry of an Agreed Protective Order on March 25, 2026, briefing and proceedings related to a pending Motion to Transfer Venue and for Consolidation, ongoing written discovery and document production, and the scheduling of additional depositions of fact and expert witnesses.

3. Counsel for the parties have conferred and have agreed that additional time is necessary to complete discovery, designate and depose experts, conduct meaningful mediation, and otherwise prepare this case for a final trial on the merits. The parties have further agreed upon a new trial setting and a corresponding amended scheduling order, a copy of which is attached hereto as Exhibit A and incorporated by reference (the "Amended Agreed Scheduling Order").

## II. GROUNDS FOR CONTINUANCE

4. This Motion is filed by agreement of all parties and is not sought for delay, but so that justice may be done. Good cause exists for the requested continuance for the following reasons:

a. The parties require additional time to complete written and deposition discovery, including the depositions of party representatives, third-party witnesses, and designated experts;

b. The parties wish to engage in a meaningful, good-faith mediation prior to trial, which cannot be reasonably accomplished within the existing scheduling deadlines;

c. A continuance will promote judicial economy by allowing the parties to fully develop and, if appropriate, narrow the issues for trial through completed expert discovery and dispositive motion practice; and

d. No party will be prejudiced by the requested continuance, as all parties have agreed to the new dates set forth in the Amended Agreed Scheduling Order.

5. This is the first agreed continuance of the trial setting requested by the parties in this case.

## III. PROPOSED AMENDED AGREED SCHEDULING ORDER

6. The parties have conferred and jointly propose the following deadlines, as more fully set forth in the Amended Agreed Scheduling Order attached as Exhibit A:

| **Deadline / Event** | **Proposed Date** |
|---|---|
| Joinder of Parties | May 11, 2026 |
| Expert Designations – Parties Seeking Affirmative Relief | June 11, 2026 |
| Expert Designations – All Other Experts | July 13, 2026 |
| Discovery Deadline | September 10, 2026 |
| No-Evidence MSJ – Earliest Hearing Date | August 24, 2026 |
| Dispositive Motions – Hearing Deadline | September 10, 2026 |
| Challenges to Expert Testimony – Hearing Deadline | September 10, 2026 |
| Pleadings – Final Amendments and Supplements | October 8, 2026 |
| Mediation | October 19, 2026 |
| Trial | November 9, 2026 |

## IV. COMPLIANCE WITH DALLAS COUNTY LOCAL RULES

7. This Motion is presented as an agreed motion in accordance with Dallas County Civil District Court Local Rule 1.07 and Local Rule 2.07. All parties, through their respective counsel of record, have conferred and are in agreement on both the requested continuance and the entry of the Amended Agreed Scheduling Order attached as Exhibit A. The signatures of all counsel of record appear below.

8. A proposed Order Granting Agreed Motion for Continuance is submitted contemporaneously herewith for the Court's consideration.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, the parties jointly and respectfully request that the Court grant this Agreed Motion for Continuance, continue the current April 21, 2026 trial setting, enter the Amended Agreed Scheduling Order attached as Exhibit A setting this case for trial on November 9, 2026, and grant the parties such other and further relief, at law or in equity, to which they may show themselves justly entitled.

Respectfully submitted,

**CAMP TRIAL GROUP**

By: /s/ William W. Camp
**ATTORNEYS FOR PLAINTIFFS**

**DANIELS & TREDENNICK PLLC**

By: /s/ Douglas A. Daniels
**ATTORNEYS FOR DEFENDANTS LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.**

## CERTIFICATE OF CONFERENCE

I hereby certify that, in compliance with Dallas County Civil District Court Local Rule 2.07, counsel for the parties have conferred regarding the relief requested in this Motion. All counsel of record agree to the relief requested herein, including the continuance of the current trial setting and the entry of the Amended Agreed Scheduling Order attached as Exhibit A. This Motion is therefore presented as agreed.

/s/ William W. Camp
William W. Camp

## CERTIFICATE OF SERVICE

I hereby certify that, on the date stamped on this filing, a true and correct copy of the foregoing Agreed Motion for Continuance was served on all counsel of record via the Court's electronic filing system in accordance with Texas Rule of Civil Procedure 21a.

/s/ William W. Camp
William W. Camp

## CLIENT APPROVAL OF AGREED CONTINUANCE

The undersigned parties, by their signatures below, acknowledge that they have reviewed the foregoing Agreed Motion for Continuance of Trial Setting and to Enter Amended Agreed Scheduling Order and the proposed Amended Agreed Scheduling Order attached as Exhibit A. The undersigned hereby consent to and approve the agreed continuance of the trial setting from April 21, 2026 to November 9, 2026, and the entry of the Amended Agreed Scheduling Order on the terms set forth therein.

**PLAINTIFFS:**

Derek Gove — Date: 4/16/26
TED VENTURES, LLC,
By: Derek Gove
Name: Derek Gove
Title: Authorized Representative

Derek Gove — Date: 4/16/26
TREND MEDICAL MANAGEMENT, LLC,
By: Derek Gove
Name: Derek Gove
Title: Authorized Representative

Derek Gove — Date: 4/16/26
DEREK GOVE

Trey Austin — Date: 4/16/2026
TREY AUSTIN

[signature] — Date: 04/16/2026
ENRIQUE STOWHAS

**DEFENDANTS:**

[signature] — Date: 4/16/26
LUCKY CHOPRA

[signature] — Date: 4/16/2[?]
ZOO CAPITAL HOLDINGS, LLC,
By: J. Curth
Name: J. Curth
Title: Authorized Representative

[signature] — Date: 4/16/26
AD DALLAS CLINICS, LLC,

By: J. Curth
Name: J. Curth
Title: Authorized Representative

Date: 4/16/26

TREND PHYSICIANS GROUP, INC.,
By: J. Curth
Name: J. Curth
Title: Authorized Representative

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| **LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | 162nd JUDICIAL DISTRICT |
| Defendants. | § | |

## AGREED SCHEDULING ORDER

The Court enters the following Scheduling Order to control the schedule of trial and discovery in this case. Unless otherwise specified, the following items must be completed by the dates listed below. If no date is listed, the item is governed by the Texas Rules of Civil Procedure. The discovery limitations of Texas Rule of Civil Procedure 190.2, if applicable, or otherwise of Texas Rule of Civil Procedure 190.3 apply unless specifically changed herein.

| | | |
|---|---|---|
| **1.** | **May 11, 2026** | **JOINDER.** All parties must be added and served, whether by amendment or third-party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE. |
| **2.** | | **EXPERT WITNESS DESIGNATION.** Expert witness designations are required and must be served by the following dates. The designation must include the information listed in Rule 195.5. |
| | **June 11, 2026** | Experts for parties seeking affirmative relief. |
| | **July 13, 2026** | All other experts. |
| **3.** | **October 19, 2026** | **MEDIATION.** Parties must complete mediation. The parties' failure to mediate will not be grounds for continuance of trial. |
| **4.** | **September 10, 2026** | **DISCOVERY.** Parties must complete all discovery. Parties seeking discovery must serve requests sufficiently far in advance of the end of the discovery period so that the deadline for responding will be within the discovery period. |
| **5.** | | **DISPOSITIVE MOTIONS.** Parties must set for hearing all motions or pleas, that if granted by the Court would dispose of all or part of the case as follows: |
| | **August 24, 2026** | No-evidence motions for summary judgment may only be heard after this date. |
| | **September 10, 2026** | All dispositive motions or pleas must be heard. |
| **6.** | **September 10, 2026** | **CHALLENGES TO EXPERT TESTIMONY.** All motions to exclude expert testimony must be heard. This Order does not include exclusion based on Rule 193.6. |
| **7.** | **October 8, 2026** | **PLEADINGS.** Parties must file all amendments and supplements to pleadings. This Order does not preclude the prompt filing of pleadings directly responsive to any timely filed pleadings. |

**EXHIBIT-A**

9. **November 9, 2026** **TRIAL.** This case is set for trial on this date. If not assigned by the second Friday following this date, the case will be reset.

SIGNED on ______________________, 2026.

______________________________
PRESIDING JUDGE

**AGREED:**

**DANIELS & TREDENNICK PLLC**

*By: /s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
Sabrina R. Tour
State Bar No. 24093271
Timothy E. Bond
State Bar No. 24131860
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)
Email: doug.daniels@dtlawyers.com
Email: sabrina@dtlawyers.com
Email: tim@dtlawyers.com

**ATTORNEYS FOR DEFENDANTS LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.**

**CAMP TRIAL GROUP**

*By: /s/ William W. Camp (by permission)*
William W. Camp
State Bar No. 00789196
Email: rule21a-service@camplaw.com
12700 Hillcrest Rd., Suite 125
Dallas, TX 75230
Tel. (214) 638-8400
Fax. (214) 638-8884

**ATTORNEY FOR PLAINTIFF**

*By: /s/ Sara E. Padua (by permission)*
Sara E. Padua
State Bar No. 24079099
Alejandro L. Padua
State Bar No. 24060375
Kevi A. Ramirez
State Bar No. 24140278
5599 San Felipe, Suite 911
Houston, Texas 77056
(713) 840-1411
(281) 652-5872 fax

**ATTORNEYS FOR DEFENDANT STEVEN RYAN RENEAU**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

John Kellogg on behalf of William Camp
Bar No. 789196
campstaff@camplaw.com
Envelope ID: 113768477
Filing Code Description: Motion - Continuance
Filing Description: AGREED CONTINUANCE/ENTER AMD AGREED SCHEDULING ORDER/EXHIBIT-A ATTACHED
Status as of 4/17/2026 8:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 4/16/2026 5:43:36 PM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 4/16/2026 5:43:36 PM | SENT |
| Alejandro L. Padua | | ap@padualaw.com | 4/16/2026 5:43:36 PM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 4/16/2026 5:43:36 PM | SENT |
| Celenia Torres | | ct@padualaw.com | 4/16/2026 5:43:36 PM | SENT |
| camp staff | | campstaff@camplaw.com | 4/16/2026 5:43:36 PM | SENT |
| Lema Mousilli | | lema@mousillilaw.com | 4/16/2026 5:43:36 PM | SENT |
| Sara EPadua | | sp@padualaw.com | 4/16/2026 5:43:36 PM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 4/16/2026 5:43:36 PM | SENT |
| Mary Rodman Crawford | | crawford@dtlawyers.com | 4/16/2026 5:43:36 PM | SENT |
| Kevi A.Ramirez | | kr@padualaw.com | 4/16/2026 5:43:36 PM | SENT |
| Griselda Guerrero | | gg@padualaw.com | 4/16/2026 5:43:36 PM | SENT |
| Deborah Charme | | deborah.charme@dtlawyers.com | 4/16/2026 5:43:36 PM | SENT |
| Sarah BBeck | | sarah.beck@dtlawyers.com | 4/16/2026 5:43:36 PM | SENT |

FILED
7/29/2026 10:52 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Elizabeth Ferguson DEPUTY

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs*,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **LUCKY CHOPRA, RYAN RENEAU, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | |
| ***Defendants*.** | § | **162nd JUDICIAL DISTRICT** |

**DEFENDANTS' THIRD AMENDED ANSWER, COUNTERCLAIM, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Defendants, Lucky Chopra, AD Dallas Clinics, LLC, Trend Physicians Group, Inc., and Zoo Capital Holdings, LLC ("Defendants"), file this Third Amended Answer, Counterclaim, and Application for Temporary Injunction, and Permanent Injunction, related to the claims asserted by Ted Ventures, LLC, Trend Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs") as follows:

**I.**
**GENERAL & SPECIFIC DENIAL**

1. Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally and categorically deny the allegations contained in Plaintiffs' Original Petition and demand strict proof thereof in accordance with the laws and Constitution of the State of Texas.

2. Additionally, pursuant to Rule 54 of the Texas Rules of Civil Procedure, Defendants specifically deny that Plaintiffs satisfied all contractual conditions precedent necessary for

recovery by Plaintiffs. Under the Agreement (as defined herein in Section III: Counterclaim), Plaintiffs failed to satisfy one or more conditions precedent to Defendants' obligation to perform, including but not limited to: providing Payoff Letters, failure to satisfy the $9,600,000 loan from Enterprise Bank & Trust and thus convey Trend Physician Group, Inc. unencumbered, and failure to ensure Defendants' paid off all senior debt before the Subordinated Promissory Note can become due and owing.

## II.
## AFFIRMATIVE DEFENSES

3. To the extent that any defenses, other than the General Denial, pled in this Answer are in conflict, they are pled in the alternative.

a. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of discharge or excused performance.

b. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of prior material breach.

c. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of unclean hands.

d. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of offset.

e. Plaintiffs' claims may be barred, in whole or in part, by the doctrine of fraud.

f. Plaintiffs' claims may be barred, in whole or in part, because provisions in the underlying agreement(s) or the underlying agreement(s) are unenforceable, unconscionable, or void.

## III.
## COUNTERCLAIM

### A. Discovery Control Plan

4. Pursuant to TEX. R. CIV. P. 190.1, Defendants intend to conduct discovery by rule under Texas Rule of Civil Procedure 190.3 ("Level 2").

**B. Claims for Relief**

5. Pursuant to Texas Rule of Civil Procedure 47(c), Defendants seek monetary relief from Plaintiffs as pleaded herein, of over $1,000,000.00, as well as non-monetary relief.

**C. Parties**

6. Plaintiff TED Ventures, LLC ("TED Ventures") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

7. Plaintiff Trend Medical Management, LLC ("Trend Medical") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

8. Plaintiff Derek Gove is a citizen and resident of the state of Texas.

9. Plaintiff Trey Austin is a citizen and resident of the state of Texas.

10. Plaintiff Enrique Stowhas is a citizen and resident of the state of Texas.

11. Defendant Luck Chopra is a citizen and resident of the state of Texas.

12. Defendant Ryan Reneau is a citizen and resident of the state of Texas.

13. Defendant Trend Physicians Group, LLC ("Trend Physicians") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Texas.

14. Defendant Advanced Dallas Clinics, LLC ("AD") is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located in Dallas County, Texas.

15. Defendant Zoo Capital Holdings, LLC is a limited liability company duly organized and existing under the laws of the State of Texas, and having its principal place of business located

in Harris County, Texas.

**D. Jurisdiction and Venue**

16. This Court has subject matter jurisdiction over this dispute because Defendants seek monetary relief in excess of $1,000,000.

17. This Court has personal jurisdiction over Plaintiffs TED Ventures and Trend Medical in this dispute because TED Ventures and Trend Medical are entities doing business in Texas as the term "doing business" is understood in law. TED Ventures and Trend Medical have purposefully availed themselves of the laws of the State of Texas and have sufficient minimum contacts in the State of Texas for this Court to exercise personal jurisdiction over it. This matter arises out of TED Ventures' and Trend Medical's contacts within the State of Texas and exercising personal jurisdiction over them comports with traditional notions of fair play and substantial justice.

18. This Court has personal jurisdiction over Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas because they are residents and citizens of the State of Texas.

19. Venue is proper in this Court pursuant to TEX. CIV. PRAC. & REM. CODE ¶ 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Dallas County, Texas.

**E. Factual Allegations**

**i. <u>The Asset and Purchase and Contribution Agreement.</u>**

20. Plaintiffs, either directly or indirectly, own and manage medical clinics, physical rehabilitation clinics, and pharmacies throughout the Dallas area. Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas are direct or indirect owners of TED Ventures and Trend Medical.

21. Defendants, either directly or indirectly, own and manage several hospitals and medical facilities around Texas.

22. Plaintiffs and Defendants met in mid-2023.

23. Based on representations by Plaintiffs, Defendants were interested in acquiring several of Plaintiffs' medical clinics and medical management entities.

24. On December 12, 2023, AD, Zoo Capital, and Plaintiffs entered into a contract for Defendants to acquire substantially all the assets of Trend Medical Management, LLC ("Trend Medical"), including Trend Medical's ownership of Trend Physicians (the "Agreement"). Defendant Zoo Capital then contributed, transferred, and conveyed the assets to AD. Plaintiffs and Defendants agreed on a purchase price of twelve million dollars ($12,000,000) based on Plaintiffs' representations about TED Ventures and Trend Medical. That amount was to be paid over time. To date, Plaintiffs have been paid approximately two million dollars ($2,000,000).

25. Almost immediately after the Agreement was signed, Defendants began uncovering facts and circumstances that contradicted the representations made by Plaintiffs during negotiations for the Agreement. For example, despite representations by Plaintiffs prior to entering into the deal, Defendants had to start paying out sums of money to keep the clinics running because the clinics and businesses were not cashflow positive, and payroll could not be covered without help and intervention from Defendants. The clinics made just enough money to pay for rent, but not payroll, and there certainly was no profit, as promised under the representations by Plaintiffs. When AD tried doing an audit, Plaintiffs stopped AD at every turn. Plaintiffs would occasionally produce PDF spreadsheets, but nothing in Excel format and no QuickBooks or the actual data behind the inputs.

26. Based on the information the auditor was finally able to uncover from Plaintiffs, significant discrepancies were uncovered. First, the revenue that Plaintiffs had reported before the agreement was signed was $2.3 million less than they had represented. Second, the payroll expenses were hundreds of thousands of dollars higher than Plaintiffs had represented to Defendants. Third, the professional fees were likewise hundreds of thousands of dollars greater than Plaintiffs had originally reported. These discrepancies were not minor, but significant, and Defendants would not have ever entered into the deal with Plaintiffs had Plaintiffs been forthright from the beginning.

27. Plaintiffs had sorely misrepresented the value in their clinics. Additionally, the management team's performance was unsatisfactory across the board, which caused even more financial strain on the clinics. As detailed further below, the concealed management issues led to the for-cause termination of several AD officers.

28. Plaintiffs also misrepresented their collections. In the medical field, what medical clinics charge versus what they collect can vary widely based on insurance companies' and government entities' actual payments for the rendered medical services. Plaintiffs purposefully conflated their charges with their actual collections to entice Defendants to enter into the deal. Only the smallest fraction of what Plaintiffs represented actually materialized.

29. Defendants have also been made aware that Plaintiffs were having patients and owing-entities pay Plaintiffs directly for services that the clinics provided. Defendants' diversion of funds continued even after Defendants entered the deal to purchase the clinics. For example, Defendants have uncovered evidence that from 2024 to 2025, certain receivables owed to Defendants were accounted for as if paid, but the related payments were deposited to non-affiliated third parties. Defendants' investigation is ongoing, but an initial investigation has uncovered that

thousands of dollars of Defendants' receivables have been diverted. Plaintiffs cut Defendants out and stole the money that was due to Plaintiffs.

30. Further, the deal between Defendants and Plaintiffs encompassed certain pharmacies originally owned by Plaintiffs. Defendants agreed to use Plaintiffs' pharmacies to obtain the medications needed for their patients at the clinics, and AD also entered into a purchase agreement for Southern Star Pharmacy. Plaintiffs' pharmacies then charged the medications at exorbitant profits, which resulted in issues for many of Defendants patients. Additionally, with respect to Southern Star Pharmacy, AD has evidence that Plaintiffs took receivables that AD bought under the Agreement and had payments sent directly to Plaintiffs. Southern Star Pharmacy has since engaged in harassing conduct towards Defendants' clinics and affiliates.

31. Additionally, as part of the Agreement, Plaintiffs represented that they would release underlying encumbrances. Specifically, Plaintiffs failed to perform their release obligations related to a loan for over $9,600,000 from Enterprise Bank, that encompassed Trend Physician Group, Inc., which is an entity that Defendants purchased in the deal. In March 2025, Enterprise Bank sued entities associated with Defendants, including Trend Physician Group, Inc., for defaulting on the $9.6 million loan.

32. The circumstances surrounding the Agreement show Plaintiffs' disregard for their contractual obligations and their willingness to engage in fraud.

**ii. <u>Employment Agreement Breaches and Unlawful Competition.</u>**

33. On November 1, 2023, Defendants entered into employment agreements with Plaintiffs Derek Gove, Trey Austin, and Enrique Stowhas ("Plaintiffs' Officers"). The employment agreements provided that Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief

Marketing Officer of AD.

34. While uncovering Plaintiffs' above-referenced misconduct concerning the Agreement, Defendants also identified that Plaintiffs' officers were contributing to the fraud by breaching their respective employment agreements. Accordingly, On April 10, 2025, AD terminated Plaintiffs' Officers for cause.

35. Leading up to the terminations, Defendants were made aware of statements made and messages sent by Plaintiffs' Officers in an effort to divert Defendants' business while Plaintiffs' Officers were actively directing and managing the operations of Defendants' business. Specifically, Defendants received evidence that Plaintiffs' Officers were contacting clinics, patients, and physicians affiliated with Defendants, and directing those affiliates to direct payment to entities or individual not affiliated with AD for services rendered by AD. Essentially, Plaintiffs' Officers took or diverted monies owed to AD and directed that money to themselves or other entities in which they had some economic interest. That is embezzlement and theft, not to mention a breach of Plaintiffs' Officers' contractual and fiduciary obligations to AD. AD therefore terminated Plaintiffs' Officers, and did so in accordance with the terms of the employment agreements.

36. Additionally, after Plaintiffs' Officers termination, Plaintiffs' Officers violated their non-competition and non-solicitation agreements by: (1) soliciting AD's physicians to work for entities unaffiliated with Plaintiff but affiliated with Plaintiffs; (2) soliciting AD's patients to receive treatment at entities unaffiliated with AD but affiliated with Plaintiffs; and (3) continuing to steal money from AD by directing parties owing monies to AD to pay entities affiliated with Plaintiffs instead.

37. According to each employment agreement, Plaintiffs' Officers were prohibited

from competing with AD in Texas, soliciting AD's business in Texas, and accessing AD's records for a twelve-month period following termination (the "Restrictive Period"), except for certain unrelated business functions. Each agreement provided the Plaintiffs' Officers shall not:

- Directly or indirectly (other than through the Company), own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business anywhere within the Restricted Area that competes with the Business in any respect as conducted by the Company;

- Directly or indirectly, (i) except in the course of performing his duties under this Agreement, solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company for himself or on behalf of any Person for any purpose related to, or competitive with, the Business, (ii) cause, induce or attempt to cause or induce any consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of the Company to cease doing business with the Company, (iii) except in the course of performing his duties under this Agreement, deal with any customer, Affiliate of any customer, supplier or competitor of the Company, or in any way interfere with its relationship with the Company, or (iv) solicit for employment, employ or retain the services of (whether as an employee, independent contractor or otherwise) or otherwise interfere with or damage the Company's business relationship with, any employee or independent contractor of the Company;

- Access the computer systems for the Company or its Affiliates, download files or any information from the computer systems or in any way interfere, disrupt, modify, or change any computer program used by the Company or its Affiliates or any data stored on the computer systems of the Company or its Affiliates.

The employment agreements offered clear and reasonable limitations on Plaintiffs' Officers' post-termination conduct. The employment agreements also included cooperation provisions, requiring Plaintiffs' Officers to cooperate with AD, during and after their employment period, to help resolve any disputes with third parties.

38. After their lawful termination, Plaintiffs' Officers continue to violate their obligations to AD by immediately and continually violating their non-competition and non-solicitation clauses, among other provisions of the employment agreements. Plaintiffs' Officers

continued to contact AD's patients and physicians to entice them to become patients at and doctors of other clinics and hospitals that Plaintiffs are affiliated with. Specifically, Plaintiffs' and/or Plaintiffs' Officers attempted to gain or access to Defendants valuable patient data and communications after Plaintiffs' Officers were terminated and lost lawful access to such data. Plaintiffs' Officers accessed Defendants' confidential information in an effort to use that information to usurp or divert AD's business opportunities for themselves. Plaintiffs' Officers did so as soon as the day after their termination, demonstrating their malicious intent and furthering their illegal conduct. Moreover, Plaintiffs have recently sent text messages, or directed text messages to be sent, to current patients of Defendants' clinics, offering to provide the patients services at clinics not affiliated with Defendants. Plaintiffs have unlawfully accessed, used, or otherwise misappropriated Defendants' confidential information—such as patient lists and patient contact information—to further their scheme.

39. Plaintiffs' Officers have also refused to cooperate with AD after termination, effectively preventing AD access to certain medical databases and systems for which Defendants' consent is required. Plaintiffs' Officers' conduct shows their willingness to illegally compete with AD, including by soliciting AD's affiliates and accessing AD's records, all in contravention of the employment agreements.

40. In sum, Plaintiffs' statements and conduct surrounding the Agreement were fraudulent, considering evidence that the purchased facilities had overstated value and financials, shady underlying practices, and undisclosed debt. Plaintiffs' Officers continued their misconduct by engaging in competitive practices that went against their employment agreements. The deal has resulted in Defendants holding the bag, a bag that was propped up by Plaintiffs' misrepresentations prior to the deal, but depleted by Plaintiffs prior to, during, and after transfer.

### F. Causes of Action

#### i. <u>Count One: Breach of Contract (the Agreement) as to all Plaintiffs</u>

41. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs for breach of contract as to the Agreement.

42. Specifically, Defendants AD and Zoo Capital were parties to a valid, enforceable contract with Defendants—the Agreement—and are proper parties to bring suit for breach of that contract. AD and Zoo capital have at all times complied with its obligations under the Agreement.

43. The Agreement incorporates various representations and warranties made by Plaintiffs, concerning the clinics and assets to be purchased by Defendants. The Agreement also required Plaintiffs to make disclose information regarding their assets and liabilities on a good faith basis. Finally, the Agreement required Plaintiffs to act in good faith when performing various aspects of Agreement.

44. Plaintiffs breached the agreement. Plaintiffs' breaches included, but are not necessarily limited to, the following actions or omissions contrary to their obligations under the Agreement:

a. Overstating the value of the businesses and assets purchased pursuant to the Agreement;
b. Misrepresenting receivables value, debt, and other financial aspects underlying the assets purchased under the Agreement;
c. Misrepresenting the nature of the businesses underlying the Agreement; and,
d. Concealing unfavorable facts and circumstances during the negotiations for and commencement of the Agreement.

45. Plaintiffs' breach caused AD and Zoo Capital injury in the form of economic damages in an amount in excess of the minimum jurisdictional limits of this Court.

46. Defendants have incurred costs for attorneys in connection with pursuing remedies under the Agreement. Defendants are therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**ii. <u>Count Two: Breach of Contract (employment agreements) as to Plaintiffs' Officers</u>**

47. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that AD is entitled to recover monetary damages against Plaintiffs' Officers for breach of their employment agreements.

48. Specifically, the employment agreements provide that during the one year following Plaintiffs' Officers' termination, Plaintiffs' Officers shall not directly or indirectly own, control, manage, operate, conduct, engage in, participate in, consult with, perform services for, guarantee the debts or obligations of, permit his name to be used by or in connection with, or otherwise carry on, a business within Texas, that competes with the Business in any respect as conducted by AD. Further, the agreements provide that during the Restrictive Period, Plaintiffs' Officers shall not solicit the business of any Person who is or was a consultant, agent, supplier, vendor, customer, Affiliate of any customer, licensee, licensor, prospect, referral source or business relation of AD, for Plaintiffs' Officers benefit or for any purpose related to or competitive with AD's business. Additionally, Plaintiffs' Officers shall not access, interfere with, disrupt, modify, or change AD's files or information during the Restrictive Period.

49. AD has at all times complied with its obligations under the employment agreements.

50. Plaintiffs' Officers breached their employment agreements. Specifically, and

without limitation, Plaintiffs' Officers breached those agreements by:

a. Communicating with AD's patients, clinics, and physicians affiliated with AD for Plaintiffs' direct or indirect benefit and in a manner that competes with AD's business;
b. Competing with AD and profiting from AD's business relationships for Plaintiffs' direct or indirect benefit; and/or,
c. Using, accessing, disrupting, modifying, and/or changing AD's confidential information in a manner harmful to AD's access to such information and for Plaintiffs' benefit.

51. Each of the foregoing breaches, and all of them collectively, threaten to cause AD imminent and irreparable harm and/or monetary damages in an amount in excess of the minimum jurisdictional limits of this Court.

52. AD has incurred costs for attorneys in connection with pursuing AD's remedies under the parties' agreement. AD is therefore entitled to recover attorney's fees and costs under section 38.001 of the Texas Civil Practices and Remedies Code.

**iii. <u>Count Three: Breach of Fiduciary Duty as to Plaintiffs' Officers</u>**

53. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that AD is entitled to recover against Plaintiffs' Officers for breach of fiduciary duty.

54. Plaintiffs' Officers owed a fiduciary duty to AD as officers of AD. Specifically, prior to termination, Plaintiff Derek Gove was the Chief Executive Officer of AD, Plaintiff Trey Austin was the Chief Financial Officer of AD, and Plaintiff Enrique Stowhas was Chief Marketing Officer of AD.

55. Plaintiffs' Officers breached their fiduciary duties to AD. Specifically, Plaintiffs' Officers' conduct, as described above, directly contradicted the best interests of the company. In connection with and in furtherance of the conduct described above, Plaintiffs' Officers engaged in acts of self-dealing, usurpation of AD's business opportunities, misappropriation and improper use

of AD's confidential information, and competition with AD.

56. Plaintiffs' Officers breaches of fiduciary duties proximately caused AD injury, including a loss of business in the form of lost patient, clinic, and physician relationships and opportunities, as well as damage to AD's reputation and anticipated future profits from the relationships with such persons/entities.

57. Plaintiffs' Officers' breaches of fiduciary duties resulted in a benefit to Plaintiffs, including (1) directly or indirectly profiting from the opportunities stolen from AD, as well as (2) securing and continuing access to AD's valuable and confidential business information and records.

58. Further and in the alternative, AD has suffered actual damages as a result of the breaches of fiduciary duties by Plaintiffs' Officers, in an amount in excess of the minimum jurisdictional limits of this Court. The harm suffered by AD is distinct and individual harm as a result of Plaintiffs' Officers' breaches of fiduciary duties and is separate and apart from damages for breach of their employment contracts.

**iv. Count Four: Fraudulent Misrepresentation as to all Plaintiffs**

59. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for fraud.

60. Specifically, Plaintiffs made misrepresentations to Defendants concerning the facts underlying the financial state, value, and general nature of the businesses and assets underlying the Agreement. Plaintiffs made promises to Defendants, concerning their obligations and representations under the Agreement and otherwise, with the present intention not to perform as promised. Those misrepresentations were material to Defendants' decisions to enter into the

Agreement and continue with other related aspects of the deal.

61. The misrepresentations detailed above were false in that they were false statements of existing fact that Plaintiffs knew to be false, and/or were promises made by Plaintiffs with the present intention, when made, not to perform as promised. Plaintiffs made the misrepresentations with the intent that Defendants would rely on them, and Defendants did in fact rely on the misrepresentations by moving forward with the Agreement and related deals.

62. Defendants have suffered actual economic injury as a result of Plaintiffs' fraud and their reliance on Plaintiffs' fraudulent misrepresentations in an amount in excess of the minimum jurisdictional limits of this Court. Further, because Defendants' injuries arise out of Plaintiffs' fraud, Defendants are entitled to exemplary damages up to the maximum amount allowed by law.

**v. <u>Count Five: Conversion as to all Plaintiffs</u>**

63. Plaintiffs incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The facts alleged above demonstrate that Plaintiffs are liable to Defendants, jointly and severally, for conversion.

64. Plaintiffs have wrongfully exercised dominion or control over Defendants property, in denial of or inconsistent with Defendants' rights. Specifically, Plaintiffs have caused the diversion of funds belonging to Defendants. Plaintiffs' conduct was wrongful in that it contradicted the terms of the Agreement which assigned the rights to certain receivables to Defendants. Plaintiffs exercised control by diverting the funds to themselves or to their affiliates.

65. Defendants have suffered actual economic injury as a result of Plaintiffs' conversion in excess of the minimum jurisdictional limits of this Court.

## IV.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

66. Defendant AD has requested temporary injunctive relief from the Court preventing Plaintiffs' Officers from (1) wrongfully communicating with patients, clinics, physicians, vendors, lenders, and other persons or entities associated with AD in an effort to divert their business and working relationships away from AD, (2) accessing, viewing, taking, using, copying, downloading, or modifying AD's confidential business information, including but not limited to patient records, patient lists, and physician referral lists. Defendant AD's request for temporary injunctive relief has been previously verified by affidavit in the *First Amended Answer, Counterclaim, and Application for Temporary Injunction, and Permanent Injunction* (the "First Amended Answer"). No further verification of this answer is necessary in relation to Defendant AD's request for temporary restraining order. To the extent that further verification is required, Defendant AD hereby incorporates by reference the affidavit filed contemporaneously with and in support of the First Amended Answer.

67. AD is likely to recover from Plaintiffs' Officers after a trial on the merits because (1) Plaintiffs' Officers were subject to valid and enforceable employment agreements; (2) during their employment, Plaintiffs' Officers owed AD fiduciary duties as employees; and (3) during and after termination of their employment, Plaintiffs' Officers acted and continue to act in breach of those obligations by (1) communicating with patients, clinics, and physicians associated with AD to leave AD and go to other clinics associated with Plaintiffs, (2) stealing business opportunities from AD and otherwise cause damage, and (3) illegally accessing and misappropriating AD's confidential business information in furtherance of their efforts to interfere with and take AD's business opportunities. AD terminated Plaintiffs' Officers from their respective roles after discovering some of their activities, and Plaintiffs' Officers conduct both before and since that

termination is clearly wrongful and has caused and threatens to continue causing irreparable harm to AD's business.

68. If this Court does not grant this request to restrain the Plaintiffs' Officers, AD will suffer imminent and irreparable harm in that Plaintiffs' Officers are utilizing information and records belonging to AD and using AD's established relationships to divert business from AD for Plaintiffs' benefit, and will likely continue such conduct, which Plaintiffs' Officers lack authorization to do. Such conduct has interfered with AD's business and will ultimately lead to severe and likely irreparable damage to AD's business and reputation.

69. AD has no adequate remedy at law because allowing such unchecked conduct to continue while AD conducts discovery and proceeds to trial on the underlying causes of action will cause irreparable harm. The conduct must be halted immediately before more damage is done and cannot be undone. Any monetary award for the measurable damage to AD's business will not adequately compensate AD for the ongoing devaluation, loss of goodwill, and reputational damage, the potential disruption of AD's patients' needed medical care, the proper and timely payment of medical providers for that care, and the resulting reputational harm to AD. The cascade effect of Plaintiffs' Officers' conduct, if it is allowed to continue, cannot be adequately measured or compensated in damages, especially against individual plaintiffs with finite economic resources to pay a money judgment in AD's favor equal to the harm they have caused.

70. There is insufficient time to serve notice on Plaintiffs' Officers and to hold a hearing on this petition and application. Plaintiffs' Officers have been notified several times of their wrongful conduct since their April 10, 2025 termination, including an April 16, 2025 email demanding Plaintiffs' Officers cease and desist any activity in breach of the non-compete and non-solicitation clauses of the employment agreements. Nonetheless, Plaintiffs' Officers continue to

wrongfully and illegally use AD's business information and communicate with patients, clinics, and physicians associated with AD in a manner which is completely detrimental to AD's business.

71. Based on the above, the Defendants request this Honorable Court to order the following:

1. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with the patients of Defendant AD DALLAS CLINICS, LLC in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates.

2. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, cease all communications with physicians and other medical and administrative staff, vendors, lenders, and clinics associated with Defendant AD DALLAS CLINICS, LLC, in an effort to compete with AD's business in any respect or to solicit the business of AD's affiliates, including but not limited to the following persons/entities:

    - Advanced Healthcare Clinics Plano;
    - Advanced Healthcare Clinics Hurst;
    - Advanced Healthcare Clinics Mesquite;
    - Advanced Healthcare Clinics Buckner;
    - Advanced Healthcare Clinics South Dallas; and
    - Advanced Healthcare Clinics Denton.

3. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, not use, interfere, disrupt, modify, or change the AD's confidential business information or any data owned by AD or its affiliates.

4. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, return all digital and tangible property of the AD including all data or access to data, and including but not limited to the following:

    - AD Records which contain contact information for patients, including records containing patient phone numbers, email addresses, or addresses.

5. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not disclose any of AD's data or confidential business information to any other person or entity.

6. Plaintiffs, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, individually and in any combination, individually and in any combination, not compete with AD by gaining employment with, partnering with, engaging in business transactions with competitors of AD, aside from businesses outside of the geographical, temporal, and categorical scopes referenced in Plaintiffs' Officers' employment agreements.

72. AD is willing to post a reasonable bond for the temporary restraining order and requests the Court to set the reasonable bond.

## V.
## REQUEST FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

73. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below.

74. Defendant AD asks the Court to set this application for temporary injunction for hearing and to issue a temporary injunction against Plaintiffs' Officers after hearing.

75. Additionally, AD further requests that following a trial on the merits of this case, that the court enter a permanent injunction against Plaintiffs' Officers.

## VI.
## REQUEST FOR RELIEF

76. Defendants incorporate the allegations set out in the foregoing paragraphs as if fully set forth below. The allegations above and the evidence to be introduced in this matter demonstrate that Defendants are entitled to recover monetary damages against Plaintiffs as follows:

a. Actual damages, including but not limited to the monetary damages suffered by Defendants as a result of Plaintiffs' conduct;

b. A temporary restraining order that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

c. A temporary and permanent injunction that enjoins Plaintiffs' Officers' wrongful continuing conduct as described above;

d. Reasonable and necessary attorney's fees;

e. Costs of suit; and,

f. Pre- and post-judgment interest as allowed by law.

## VII.
## CONDITIONS PRECEDENT

77. To the extent necessary to do so, Defendants affirmatively plead that all conditions precedent to their recovery on the facts and theories set above have been satisfied, have occurred, or have been waived.

## VIII.
## NOTICE OF INTENT TO USE DISCOVERY

78. Pursuant to Texas Rule of Civil Procedure 193.7, Defendants hereby give notice that Defendants intend to use all discovery instruments and information produced in this case at trial. Such discovery instruments and information include, but are not limited to, all documents and discovery responses Defendants have produced or will produce in response to Defendants' discovery requests and/or any party's discovery requests.

## IX.
## DUTY TO PRESERVE EVIDENCE

79. Defendants demand that Plaintiffs as well as their agents, representatives, employees, officers, managers, affiliates, and attorneys preserve and maintain all evidence in any way related to the transactions, acts, events, and omissions described herein, or the damages resulting therefrom, including but not limited to photographs, videotapes, audiotapes, recordings, correspondence, memoranda, calendars, diaries, notes, drafts, files, facsimiles, email, voice mail, text messages, other electronically stored information, or cellular telephone records. Failure to maintain such items will constitute "spoliation" of the evidence and Defendants will seek sanctions or other available penalties or remedies against Plaintiffs for failure to comply with its duty to preserve evidence in connection with this matter.

## X.
## CONCLUSION AND PRAYER

WHEREFORE, Defendants respectfully pray that, upon final disposition of this case, Plaintiffs take nothing by reason of Plaintiffs' allegations against Defendants and that this Court grant Defendants such other relief to which they may be entitled, including but not limited to reimbursement for the costs incurred by Defendants in responding to and defending the allegations raised against them in Plaintiffs' Original Petition. Further, Defendants pray that judgment should be entered against Plaintiff in favor of Defendants, that Defendants be awarded actual damages in an amount to be proven at trial in addition to pre- and post-judgment interest, that Defendants be awarded equitable relief as requested above, that Plaintiffs reimburse Defendants for all reasonable and necessary attorney's fees and expenses and all court costs, and for all such other relied to which Defendants may be entitled.

Dated: July 29, 2026

Respectfully submitted,

DANIELS & TREDENNICK, PLLC

By: */s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
doug.daniels@dtlawyers.com
Sabrina R. Tour
State Bar No. 24093271
sabrina@dtlawyers.com
Timothy Bond
State Bar No. 24131860
tim@dtlawyers.com
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

***Attorneys for Defendants LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.***

**CERTIFICATE OF SERVICE**

I hereby certify that I have complied with Tex. R. Civ. P. 21 and 21a. I further certify that a true and correct copy of the foregoing document has been served on all counsel of record by e-File electronic service on July 29, 2026.

*/s/ Douglas A. Daniels*________
Douglas A. Daniels

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 117949862
Filing Code Description: Amended Answer - Amended General Denial
Filing Description: 3RD AMENDED, COUNTERCLAIM & APPLICATION FOR T.R.O.
Status as of 7/29/2026 2:10 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 7/29/2026 10:52:04 AM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |
| Alejandro L. Padua | | ap@padualaw.com | 7/29/2026 10:52:04 AM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |
| Celenia Torres | | ct@padualaw.com | 7/29/2026 10:52:04 AM | SENT |
| camp staff | | campstaff@camplaw.com | 7/29/2026 10:52:04 AM | SENT |
| Lema Mousilli | | lema@mousillilaw.com | 7/29/2026 10:52:04 AM | SENT |
| Bryan Yu | | service@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |
| Sara EPadua | | sp@padualaw.com | 7/29/2026 10:52:04 AM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |
| Mary Rodman Crawford | | crawford@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |
| Kevi A.Ramirez | | kr@padualaw.com | 7/29/2026 10:52:04 AM | SENT |
| Griselda Guerrero | | gg@padualaw.com | 7/29/2026 10:52:04 AM | SENT |
| Sarah BBeck | | sarah.beck@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |
| Sebastian Campos | | sebastian.campos@dtlawyers.com | 7/29/2026 10:52:04 AM | SENT |

FILED
8/17/2026 12:00 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
John Bailey DEPUTY

**CAUSE NO. DC-25-05848**

| | | |
|---|---|---|
| TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, and ENRIQUE STOWHAS, *Plaintiffs,* | § | IN THE DISTRICT COURT OF |
| v. | § | DALLAS COUNTY, TEXAS |
| LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, and TREND PHYSICIANS GROUP, INC., *Defendants.* | § | 162nd JUDICIAL DISTRICT |

## PLAINTIFFS' SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW TED Ventures, LLC ("TED Ventures"), Trend Medical Management, LLC ("TMM"), Derek Gove ("Gove"), Trey Austin ("Austin"), and Enrique Stowhas ("Stowhas") (collectively, "Plaintiffs"), and file this their Second Amended Petition, and would respectfully show the Court the following:

## PRELIMINARY STATEMENT REGARDING THE AUTOMATIC STAY

1. On August 14, 2026, Defendant AD Dallas Clinics, LLC (now identifying itself as DET Dallas Clinics, LLC) and Defendant Trend Physicians Group, Inc. (together, the "Debtor Defendants") each filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, in Case Nos. 26-35975 and 26-35976, respectively.

2. Plaintiffs acknowledge the automatic stay of 11 U.S.C. § 362(a). By filing this pleading Plaintiffs neither commence nor continue any action or proceeding against either Debtor Defendant in this cause. The allegations and claims stated below as against the Debtor Defendants are set out solely to preserve them and to maintain the completeness of Plaintiffs' pleading. They

are neither waived, abandoned, released, nor dismissed, and Plaintiffs will pursue them in the severed cause and through the claims process in the bankruptcy proceedings.

3. This pleading is prosecuted in this cause only against Defendants Lucky Chopra and Zoo Capital Holdings, LLC, neither of whom is a debtor in bankruptcy and neither of whom is protected by the automatic stay.

## DISCOVERY CONTROL PLAN AND RELATED CASE

4. Plaintiffs request that discovery be conducted under Level 2. This matter is a related case under Rules 1.06–1.08 to a case previously filed in the 134th District Court bearing similar or identical facts and issues.

## RULE 47 STATEMENT

5. Plaintiffs seek monetary relief over $1,000,000, including actual damages of not less than $9,522,858.83, excluding interest, statutory and exemplary damages and penalties, and attorney's fees and costs.

## PARTIES

6. Plaintiffs TED Ventures, LLC and Trend Medical Management, LLC are limited liability companies formed under the laws of Texas with their principal places of business in Texas.

7. Plaintiff Derek Gove is a resident of Texas.

8. Plaintiff Trey Austin is a resident of Texas.

9. Plaintiff Enrique Stowhas is a resident of Texas.

10. Defendant Atul Lucky Chopra, also known as "Lucky" Chopra, is a resident of Texas and has appeared herein through counsel.

11. Defendant Zoo Capital Holdings, LLC is a limited liability company formed under the laws of Texas with a principal place of business in Texas, and has appeared herein through counsel.

12. Defendant AD Dallas Clinics, LLC is a limited liability company formed under the laws of Texas and has appeared herein through counsel. It is a Debtor Defendant. Claims against it are stayed.

13. Defendant Trend Physicians Group, Inc. is a corporation formed under the laws of Texas and has appeared herein through counsel. It is a Debtor Defendant. Claims against it are stayed.

14. Steven Ryan Reneau was previously named as a defendant. All claims against him were nonsuited on June 27, 2025, and he is no longer a party.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

16. This Court has personal jurisdiction over each Defendant because each is a resident of, conducts business in, or has sufficient connections with Texas such that it is fair and just to require it to defend this suit in this Court.

17. Venue is proper under Tex. Civ. Prac. & Rem. Code § 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims occurred in Dallas County, Texas. Venue is also proper under ¶ 8.12 of the Asset Purchase and Contribution Agreement, in which the parties agreed to venue in Dallas County, Texas.

## STATEMENT OF FACTS

18. TMM provides management, administrative, and related business services to physicians and medical practices. In December 2023 this included Trend Physicians Group, Inc. ("TPG").

19. TPG is a nonprofit corporation organized under the Texas Nonprofit Corporation Act, certified as a health organization by the Texas Medical Board, rendering professional medical services through licensed employees and independent contractors.

20. TED Ventures is the sole legal and beneficial owner of all issued and outstanding membership interests of TMM. In December 2023, TMM was the sole member of TPG.

21. On December 12, 2023, Plaintiffs and Defendants Zoo Capital and AD Dallas entered into an Asset Purchase and Contribution Agreement (the "Agreement"). TMM contributed, assigned, transferred, and conveyed to Zoo Capital substantially all of the assets of TMM, including TMM's ownership interest in TPG (the "Contributed Assets"), excluding certain Excluded Assets. Zoo Capital subsequently contributed, assigned, transferred, and conveyed the Contributed Assets to AD Dallas.

22. The Contributed Assets were valued by the parties and by Defendants' own third-party consultant, VMG, at over $13,000,000.00.

23. The parties agreed to a purchase price of $12,000,000.00, composed of Base Cash Consideration of $3,000,000.00 due at closing; a Seller Note of $3,000,000.00 payable quarterly; and Rollover Securities of $6,000,000.00.

24. Contemporaneously with the Agreement, AD Dallas, as maker, executed a Subordinated Promissory Note in favor of TMM, as payee, in the original principal amount of $3,000,000.00, bearing interest at the Applicable Federal Rate of 5.16% (the "Note").

25. AD Dallas, as Debtor, also executed a Security Agreement in favor of TMM, as Secured Party, securing payment and performance of the Note.

26. TMM and Zoo Capital executed a Bill of Sale, Assignment, and Assumption Agreement transferring the Contributed Assets and Transferred Contracts to Zoo Capital.

27. Defendants failed to make the agreed payments of Base Cash Consideration, stating they would pay one million dollars each in January, February, and March 2024.

28. Defendants delivered checks that were dishonored for insufficient funds, causing further damage to Plaintiffs' banking relations.

29. Defendants defaulted on the Note, causing it to be accelerated.

30. Defendants failed to deliver the promised Rollover Securities.

31. Defendants breached every material facet of the Agreement.

**CLAIMS FOR RELIEF**

***Count I — Breach of Contract***

32. Plaintiffs incorporate the foregoing paragraphs. This claim is asserted against Zoo Capital and, subject to the automatic stay and solely for preservation, against AD Dallas.

33. The Agreement, together with the Security Agreement, the Note, and the Bill of Sale, Assignment, and Assumption Agreement, constitute valid and binding contracts. Plaintiffs performed all of their obligations, selling their medical care businesses, clinics, employees, and business of medical care as agreed.

34. Defendants breached: they failed to pay the $3,000,000.00 Base Cash Consideration; they delivered checks dishonored for insufficient funds; they defaulted on the $3,000,000.00 Seller Note; and they failed to deliver the $6,000,000.00 in Rollover Securities.

35. As a direct and proximate result, Plaintiffs suffered damages of not less than $9,208,849.00, representing $708,849.00 of unpaid Base Cash Consideration (after all credits for partial payments and accounting for $750,000.00 in returned items), $2,500,000.00 in accelerated principal on the Note, and $6,000,000.00 in Rollover Securities never issued or delivered, plus interest. Plaintiffs also suffered consequential damages arising from harm to their banking relations caused by Defendants' dishonored checks.

***Count II — Liability on Dishonored Instruments, Tex. Bus. & Com. Code § 3.414(b)***

36. Plaintiffs incorporate the foregoing paragraphs. This claim is asserted against Zoo Capital and, subject to the automatic stay and solely for preservation, against AD Dallas.

37. Defendants tendered checks in ostensible payment of portions of the Base Cash Consideration and the Note. The checks were dishonored by the drawee bank, and Defendants failed to pay the amounts of the checks to the Plaintiff holders according to their terms. Defendants are liable to the Plaintiff holders for the full amount of the checks under Tex. Bus. & Com. Code § 3.414(b).

***Count III — Common-Law Fraud***

38. Plaintiffs incorporate the foregoing paragraphs. This claim is asserted against Chopra and Zoo Capital and, subject to the automatic stay and solely for preservation, against the Debtor Defendants.

**A. Affirmative Misrepresentation**

39. Chopra made material representations to Plaintiffs, directly and at times through the entities' Chief Financial Officer. The representations were made on behalf of Zoo Capital and AD Dallas, of which Chopra was the principal and controlling person, rendering those entities legally responsible for them.

40. Defendants represented that they had the intent and the ability to pay the agreed purchase price of $12,000,000.00. Those representations were false. Defendants' subsequent conduct — failure to pay, delivery of dishonored checks, and default on the Note — demonstrates their falsity.

41. At the time the representations were made, Defendants knew they were false or made them recklessly without knowledge of their truth. Information from Defendants themselves and from officers of the entities after execution confirmed that Chopra commonly enters into agreements with no intention of fulfilling them and converts the acquired assets to his own benefit.

42. Defendants made the representations intending that Plaintiffs act upon them and in order to induce Plaintiffs to enter into the Agreement and the related contracts.

43. Plaintiffs acted in reliance on the representations and entered into the Agreement and the related contracts in that reliance.

44. Plaintiffs suffered injury of not less than $9,208,849.00, representing the unpaid balance of the contract Defendants fraudulently induced them to enter, together with consequential damages arising from harm to their banking relations.

**B. Fraud by Nondisclosure**

45. Chopra concealed and failed to disclose material facts to Plaintiffs, on behalf of Zoo Capital and AD Dallas, of which he was the principal and controlling person.

46. Defendants concealed and failed to disclose that they had neither the intent nor the ability to pay the agreed purchase price of $12,000,000.00. Defendants had a duty to disclose because they partially disclosed information that created a substantially false impression.

47. Defendants knew Plaintiffs were ignorant of the concealed facts and had no equal opportunity to discover the truth; deliberately remained silent; and intended by that silence that Plaintiffs act without the information.

48. Plaintiffs justifiably relied on Defendants' deliberate silence, and Defendants thereby proximately caused Plaintiffs injury of not less than $9,208,849.00, together with consequential damages arising from harm to their banking relations.

***Count IV — Statutory Fraud in a Stock Transaction, Tex. Bus. & Com. Code § 27.01***

49. Plaintiffs incorporate the foregoing paragraphs. This claim is asserted against Chopra and Zoo Capital and, subject to the automatic stay and solely for preservation, against the Debtor Defendants.

50. The conduct of Chopra described above constitutes fraud in a transaction involving stock in a corporation under Tex. Bus. & Com. Code § 27.01, and resulted in direct and consequential injury and damages to Plaintiffs.

51. Chopra had actual awareness of the falsity of the representations and promises described above and failed to disclose that falsity to Plaintiffs. He is accordingly liable under § 27.01(c) and (d), and Plaintiffs are entitled to recover fees and costs under § 27.01(e).

***Count V — Alter Ego and Veil Piercing: Personal Liability of Atul "Lucky" Chopra, Tex. Bus. Orgs. Code §§ 21.223(b), 101.002***

52. Plaintiffs incorporate the foregoing paragraphs. This claim is asserted against Chopra.

53. Chopra is personally liable for the contractual and other obligations of Zoo Capital, AD Dallas, and TPG because he caused those entities to be used for the purpose of perpetrating, and did perpetrate, an actual fraud on Plaintiffs primarily for his own direct personal benefit. Tex. Bus. Orgs. Code §§ 21.223(b), 101.002; Castleberry v. Branscum, 721 S.W.2d 270 (Tex. 1986).

54. Specifically: (a) Chopra exercised sole and final authority over every payment made or withheld by every Defendant entity — he decided what was paid and what was not, directed treasury personnel to pull funds from whichever entity had them, and permitted no cash-control system; (b) AD Dallas, the maker of the $3,000,000.00 Note, was purely an acquisition entity with no employees, no bank account, no billing, and no revenue, to which no cash was ever transferred,

and Zoo Capital, which had no bank account of its own, held no assets sufficient to meet the $12,000,000.00 obligation it undertook — the obligor entities were never capitalized to perform the obligations they signed; (c) throughout the relevant period the Defendant entities maintained an investment account at Merrill Lynch, account no. 23V-02863, titled in the names of Cognizant Management Solutions, LLC and Advanced Diagnostics Health System, LLC at 1911 Bagby Street, Houston, Texas — the same address used by every entity in the Chopra group — which held $11,271,198.61 at September 29, 2023 and $9,849,621.74 at December 29, 2023; Chopra alone controlled that account, and the group's own Chief Financial Officer had no access to it and was required to ask Chopra to have Merrill Lynch furnish a statement so that the auditors could close the audit; the operating accounts of the Defendant entities were meanwhile kept poor; and the audited financial statements of the group report cash and cash equivalents of $5,659,475.00 at December 31, 2023, a sum ample to pay the Base Cash Consideration, which Chopra chose not to pay; (d) company funds were moved among and out of the Defendant entities with no documentation beyond journal entries — no notes, no intercompany agreements, no interest, and no repayment — and were applied to Chopra's private ventures unrelated to this transaction, including his restaurant entities and his real-estate entities; as of fiscal year end 2023 the operating entities' own books recorded $29,142,894.89 in intercompany payables to entities Chopra controls outside the operating group, including $15,798,654.68 owed by Cognizant Management Solutions, LLC — the entity that issued the Plaintiffs' paychecks — to Chopra Imaging Centers, Inc., whose own bank account reflected a single transaction of $25.00 across December 2023 and January 2024; none of those balances is evidenced by any note, maturity, interest rate, or intercompany agreement; (e) the Defendant entities functioned as a single pot of money deployed for Chopra's personal business and benefit, with unity of ownership and control such that their separateness ceased; and (f) checks for the Base Cash Consideration were written and delivered at a time when Chopra alone controlled whether funds were available to honor them, and he withheld those funds.

55. In further support of Counts III and IV and of this Count: (i) as to the $3,000,000.00 closing payment, the funds existed — the group's audited financial statements report cash and cash equivalents of $5,659,475.00 at December 31, 2023, and the Merrill Lynch investment account within Chopra's sole control held $9,849,621.74 at December 29, 2023 — and while the funds were available Chopra chose not to pay, delivering closing checks whose honor depended on him alone; (ii) as to the $250,000.00 quarterly Note payments, after two payments the payment account

was left without funds by reason of other payments and transfers Chopra authorized, and payment ceased at his election, evidencing an intent not to perform when the promise was made; and (iii) as to the $15,000,000.00 in accounts receivable promised as security, Chopra personally negotiated the Agreement and the security was evidenced by an executed UCC-1; the receivables existed, yet on or about December 28, 2023 — sixteen days after closing — Chopra personally signed documents factoring approximately $47,000,000.00 of receivables to a third party for approximately $6,100,000.00 rather than pledging the promised collateral, and at each subsequent factoring date the receivables were again factored elsewhere rather than pledged. Intent not to perform at the time of the promise may be inferred from that conduct. Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432 (Tex. 1986).

56. Chopra's use of the Defendant entities as instruments continued through the eve of trial. On August 14, 2026 — the last business day before the trial setting — AD Dallas Clinics, LLC changed its name to DET Dallas Clinics, LLC and filed a petition under Chapter 11, and Trend Physicians Group, Inc. filed the same day. Those petitions confirm the allegations above. DET Dallas Clinics, LLC, the maker of the $3,000,000.00 Note, reports assets of less than $50,000.00 against liabilities exceeding $10,000,000.00 and lists no creditor of any kind other than these Plaintiffs — an entity that undertook a $12,000,000.00 obligation and was never funded to perform it. Both debtors scheduled Plaintiffs' claims, in the amounts of $10,200,000.00 and $10,800,000.00 respectively, without designating any of them contingent, unliquidated, or disputed.

57. Chopra's conduct constitutes actual fraud — dishonesty of purpose and intent to deceive — perpetrated through the Defendant entities primarily for his direct personal benefit. Holding only the entities liable would work an injustice.

58. In this cause Plaintiffs seek judgment holding Chopra personally, jointly, and severally liable for the obligations of Zoo Capital Holdings, LLC arising from the transaction. Plaintiffs do not in this cause seek to impose upon Chopra the obligations of AD Dallas Clinics, LLC or Trend Physicians Group, Inc. To the extent any alter-ego claim reaching the obligations of those entities constitutes property of their bankruptcy estates, that claim is expressly reserved and will be pursued, if at all, in the bankruptcy proceedings or after the automatic stay has terminated or been lifted. It is not waived, abandoned, released, or dismissed.

***Count VI — Management and Billing Services; in the Alternative, Quantum Meruit***

59. Plaintiffs incorporate the foregoing paragraphs. Separate from the Agreement, TED Ventures and TMM provided management services to TPG and workers' compensation billing services to Defendants' affiliated facilities following the closing, invoiced monthly in the ordinary course of business. Defendants and their affiliated account debtors accepted the services and the invoices without contemporaneous dispute and failed and refused to pay.

60. The unpaid balances are management fees of $205,894.45 and workers' compensation billing services of $70,450.30, $23,295.33, $13,112.22, and $1,257.53, totaling $314,009.83, exclusive of interest. Plaintiffs seek these amounts as damages for breach of contract; in the alternative, Plaintiffs seek recovery in quantum meruit for the reasonable value of services rendered and knowingly accepted; and attorney's fees under Tex. Civ. Prac. & Rem. Code § 38.001.

61. Plaintiffs do not seek judgment in this cause on the management-fee component billed to Trend Physicians Group, Inc., which is a Debtor Defendant and as to which this claim is stayed. Plaintiffs likewise do not seek judgment in this cause against Advanced Dallas Hospital and Clinics, River Oaks Hospitals and Clinics, East Houston Hospitals and Clinics, or Advanced Surgeons & Physicians Network, none of which is a party to this action. Those claims are expressly reserved and are neither waived, abandoned, released, nor dismissed. In this cause Plaintiffs seek the services amounts only from Defendants Chopra and Zoo Capital Holdings, LLC, and only to the extent established through the findings sought in Count V.

***Count VII — Exemplary Damages***

62. Plaintiffs' injuries and damages resulted from Chopra's fraud and malice, committed while he was the principal and controlling person of Zoo Capital and AD Dallas. Plaintiffs are entitled to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a) and Tex. Bus. & Com. Code § 27.01(c) and (d).

## ONE SATISFACTION AND CREDIT

63. Plaintiffs are entitled to one satisfaction of their loss and no more. Plaintiffs hold claims arising from the same underlying loss in the pending bankruptcy proceedings of the Debtor

Defendants. Any amount Plaintiffs actually recover on account of those claims shall be credited, dollar for dollar, against any judgment entered in this cause.

## CONDITIONS PRECEDENT

64. Plaintiffs have fully performed all of their duties and obligations under the Agreement. All conditions precedent to Plaintiffs' claims and to their right of recovery have been performed or have occurred.

## ATTORNEY'S FEES

65. Defendants are obligated to pay Plaintiffs all fees, costs, and expenses incurred herein, including reasonable attorney's fees and court costs, under ¶ 8.15 of the Agreement.

66. Plaintiffs are entitled to recover reasonable and necessary attorney's fees, expert witness fees, costs for deposition copies, and costs of court under Tex. Bus. & Com. Code § 27.01(e).

67. Plaintiffs are entitled to recover reasonable and necessary attorney's fees under Tex. Civ. Prac. & Rem. Code § 38.001(b)(8).

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon final hearing the Court enter judgment against Defendants Lucky Chopra and Zoo Capital Holdings, LLC, jointly and severally, for:

a. Actual damages of not less than $9,208,849.00;

b. Damages of $314,009.83 for unpaid management and billing services, or in the alternative the reasonable value of those services in quantum meruit;

c. Consequential damages in an amount to be proven at trial;

d. Judgment holding Defendant Atul "Lucky" Chopra personally, jointly, and severally liable for all sums awarded against Zoo Capital Holdings, LLC, Plaintiffs' alter-ego claims as to AD Dallas Clinics, LLC and Trend Physicians Group, Inc. being expressly reserved;

e. Exemplary damages against Defendant Chopra in an amount determined by the Court;

f. Pre-judgment and post-judgment interest as allowed by law;

g. Reasonable and necessary attorney's fees, expert fees, and costs of suit, including conditional appellate fees; and

h. Such other and further relief, at law or in equity, general or special, to which Plaintiffs may show themselves entitled.

Plaintiffs' claims against Defendants AD Dallas Clinics, LLC and Trend Physicians Group, Inc., and Plaintiffs' claims for services rendered to the non-party affiliated facilities identified above, are preserved and are not waived, abandoned, released, or dismissed. They will be pursued in the severed cause, in the pending bankruptcy proceedings, or in a separate action, as appropriate. Plaintiffs are entitled to one satisfaction, and any amount actually recovered on those claims shall be credited against any judgment entered in this cause.

Respectfully submitted,

**/s/ William W. Camp**
William W. Camp
State Bar No. 00789196
WILLIAM W. CAMP, P.C.
12700 Hillcrest Rd., Suite 125
Dallas, Texas 75230
Tel: (214) 638-8400 · Fax: (214) 638-8884
Rule21a-Service@camplaw.com
ATTORNEY FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on all counsel of record in accordance with Texas Rule of Civil Procedure 21a on August 16, 2026.

**/s/ William W. Camp**
William W. Camp

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

William Camp
Bar No. 789196
rule21a-service@camplaw.com
Envelope ID: 118684648
Filing Code Description: Amended Petition
Filing Description: SECOND
Status as of 8/17/2026 8:22 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William WCamp | | rule21a-service@camplaw.com | 8/16/2026 9:30:48 PM | SENT |
| Douglas A.Daniels | | doug.daniels@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |
| Alejandro L. Padua | | ap@padualaw.com | 8/16/2026 9:30:48 PM | SENT |
| Kasia Olkowski | | kasia@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |
| Celenia Torres | | ct@padualaw.com | 8/16/2026 9:30:48 PM | SENT |
| camp staff | | campstaff@camplaw.com | 8/16/2026 9:30:48 PM | SENT |
| Lema Mousilli | | lema@mousillilaw.com | 8/16/2026 9:30:48 PM | SENT |
| Bryan Yu | | service@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |
| Sebastian Campos | | sebastian.campos@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |
| Sara EPadua | | sp@padualaw.com | 8/16/2026 9:30:48 PM | SENT |
| Sabrina R.Tour | | sabrina@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |
| Mary Rodman Crawford | | crawford@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |
| Kevi A.Ramirez | | kr@padualaw.com | 8/16/2026 9:30:48 PM | SENT |
| Griselda Guerrero | | gg@padualaw.com | 8/16/2026 9:30:48 PM | SENT |
| Sarah BBeck | | sarah.beck@dtlawyers.com | 8/16/2026 9:30:48 PM | SENT |

162nd JUDICIAL DISTRICT COURT
GEORGE L. ALLEN, SR. COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202-4631

July 20, 2026

DOUGLAS A. DANIELS
DANIELS & TREDENNICK PLLC
6363 WOODWAY DRIVE
SUITE 700
HOUSTON TX 77057

Re: DC-25-05848 TED VENTURES, LLC, et al
vs.
LUCKY CHOPRA, et al

To All Counsel of Record and/or Pro Se Litigants:

The above referenced cause is hereby set for Non-Jury trial on 08/17/2026 at 9:00 a.m. ("Trial Setting"). The docket is a two-week docket and the case may be called up with 24 hours notice during the two weeks following the Trial Setting.

Counsel or self-represented litigants are required to announce their readiness for trial no later than 10:30 AM on the Friday preceding the trial setting. Please ensure that your email to court coordinator Denise E. Alvarez at denise.e.alvarez@dallascounty.org includes the following information:

- Ready or Not Ready
- Length of trial
- Number of witnesses
- Whether an interpreter will be utilized

Trial announcements must be made in accordance with the Policies and Procedures for the 162nd District Court, which are available on the Court's website, where a link to the "Virtual Courtroom" may also be found, at:

**https://www.dallascounty.org/government/courts/civil_district/162nd/**

All remaining provisions of the scheduling order previously issued in this case remains in effect, unless otherwise ordered by the Court.

Sincerely,
Hon. Kim Bailey Phipps
Presiding Judge

162nd JUDICIAL DISTRICT COURT
GEORGE L. ALLEN, SR. COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202-4631

July 17, 2026

DOUGLAS A. DANIELS
DANIELS & TREDENNICK PLLC
6363 WOODWAY DRIVE
SUITE 700
HOUSTON TX 77057

Re: DC-25-05848 TED VENTURES, LLC, et al
vs.
LUCKY CHOPRA, et al

To All Counsel of Record and/or Pro Se Litigants:

The above referenced cause is hereby set for Non-Jury trial on 07/21/2026 at 9:00 a.m. ("Trial Setting"). The docket is a two-week docket and the case may be called up with 24 hours notice during the two weeks following the Trial Setting.

Counsel or self-represented litigants are required to announce their readiness for trial no later than 10:30 AM on the Friday preceding the trial setting. Please ensure that your email to court coordinator Denise E. Alvarez at denise.e.alvarez@dallascounty.org includes the following information:

- Ready or Not Ready
- Length of trial
- Number of witnesses
- Whether an interpreter will be utilized

Trial announcements must be made in accordance with the Policies and Procedures for the 162nd District Court, which are available on the Court's website, where a link to the "Virtual Courtroom" may also be found, at:

**https://www.dallascounty.org/government/courts/civil_district/162nd/**

All remaining provisions of the scheduling order previously issued in this case remains in effect, unless otherwise ordered by the Court.

Sincerely,
Hon. Kim Bailey Phipps
Presiding Judge

**No. DC-25-05848**

| | | |
|---|---|---|
| **TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,** | § | **IN THE DISTRICT COURT OF** |
| ***Plaintiffs/ Counter-Defendants*,** | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| **LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, AD DALLAS CLINICS, LLC, AND TREND PHYSICIANS GROUP, INC.** | § | **162nd JUDICIAL DISTRICT** |
| ***Defendants/ Counter-Plaintiffs*.** | § | |

**SUGGESTION OF BANKRUPTCY FOR DEFENDANTS TREND PHYSICIANS GROUP, INC. AND AD DALLAS CLINICS, LLC**

PLEASE TAKE NOTICE that TREND Physicians Group, Inc. and DET Dallas Clinics, LLC formerly AD Dallas Clinics, LLC filed for Chapter 11 Bankruptcy on August 14, 2026. The cases are *In re DET Dallas Clinics, LLC,* case number 26-35975, and *In re TREND Physicians Group, Inc.*, case number 26-35976, in the United States Bankruptcy Court for the Southern District of Texas. Please take notice that the filing of a voluntary petitions in bankruptcy constitutes an order of relief that stays those acts set forth in 11 U.S.C. § 362(a), including, but not limited to:

1. the commencement, including the issuance or employment of process, *of a judicial, administrative, or other action or proceeding against the debtor* that was, or could have been commenced, before the commencement of the bankruptcy case;

2. any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

3. any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; and

4. any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the bankruptcy case.

Relief from the automatic stay may only be granted by order of the United States Bankruptcy Court. Unless relief from the automatic stay is granted, it remains in effect until the earliest of: (a) the closure of the bankruptcy case, (b) the dismissal of the bankruptcy case, or (c) the time a discharge is granted or denied.

Dated: August 14, 2026

Respectfully submitted,

**DANIELS & TREDENNICK, PLLC**

By: */s/ Douglas A. Daniels*

Douglas A. Daniels
State Bar No. 00793579
doug.daniels@dtlawyers.com
Sabrina R. Tour
State Bar No. 24093271
sabrina@dtlawyers.com
Timothy Bond
State Bar No. 24131860
tim@dtlawyers.com
Sarah B. Beck
State Bar No. 24148754
sarah.beck@dtlawyers.com
6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

***Attorneys for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that I have complied with Tex. R. Civ. P. 21 and 21a. I further certify that a true and correct copy of the foregoing document has been served on all counsel of record by e-File electronic service on August 14, 2026.

*/s/ Timothy E. Bond*_______
Timothy E. Bond

**Fill in this information to identify the case:**

United States Bankruptcy Court for the: **Southern District of Texas**

Case number (if known): ____________ Chapter **11**

❑ Check if this is an amended filing

# Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy

**04/25**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

**1. Debtor's name**

**DET Dallas Clinics, LLC**

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as names*

**AD Dallas Clinics, LLC**

**3. Debtor's federal Employer Identification Number (EIN)**

**93 – 4882390**

**4. Debtor's address**

**Principal place of business**

**1911 Bagby Street**
Number Street

**Houston, TX 77002**
City State ZIP Code

**Harris**
County

**Mailing address, if different from principal place of business**

Number Street

City State ZIP Code

**Location of principal assets, if different from principal place of business**

Number Street

City State ZIP Code

**5. Debtor's website (URL)**

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

❑ Partnership (excluding LLP)

❑ Other. Specify: ____________

Debtor **DET Dallas Clinics, LLC** Case number *(if known)* ______
Name

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. §101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. §781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. §501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check all that apply:*
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
  - ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District ______ When ______ (MM / DD / YYYY) Case number ______

  District ______ When ______ (MM / DD / YYYY) Case number ______

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☐ No
- ☑ Yes. Debtor **TREND Physicians Group, Inc.** Relationship **Affiliate**

  District **Southern District of Texas** When **8/14/2026** (MM / DD / YYYY)

  Case number, if known ______

Debtor **DET Dallas Clinics, LLC** Case number *(if known)* ______
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
What is the hazard? ______

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ______

**Where is the property?** ______
Number Street
______
City State ZIP Code

**Is the property insured?**

☐ No
☐ Yes. Insurance agency ______
Contact name ______
Phone ______

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.
☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | | | | |
|---|---|---|---|---|---|
| ☑ 1-49 | ☐ 50-99 | ☐ 1,000-5,000 | ☐ 5,001-10,000 | ☐ 25,001-50,000 | ☐ 50,000-100,000 |
| ☐ 100-199 | ☐ 200-999 | ☐ 10,001-25,000 | | ☐ More than 100,000 | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☑ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor **DET Dallas Clinics, LLC** Case number *(if known)* ____________
Name

**16. Estimated liabilities**

- ❑ $0-$50,000
- ❑ $50,001-$100,000
- ❑ $100,001-$500,000
- ❑ $500,001-$1 million
- ❑ $1,000,001-$10 million
- ☑ $10,000,001-$50 million
- ❑ $50,000,001-$100 million
- ❑ $100,000,001-$500 million
- ❑ $500,000,001-$1 billion
- ❑ $1,000,000,001-$10 billion
- ❑ $10,000,000,001-$50 billion
- ❑ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **08/14/2026**
MM/ DD/ YYYY

✗ **/s/ Walker Robertson**
Signature of authorized representative of debtor

**Walker Robertson**
Printed name

Title **Vice President of Finance**

**18. Signature of attorney**

✗ **/s/ Susan Tran Adams**
Signature of attorney for debtor

Date **08/14/2026**
MM/ DD/ YYYY

**Susan Tran Adams**
Printed name

**TRAN SINGH, LLP**
Firm name

**2502 La Branch St.**
Number Street

**Houston** **TX** **77004**
City State ZIP Code

____________
Contact phone

**stran@ts-llp.com**
Email address

**24075648** **TX**
Bar number State

Fill in this information to identify the case:

Debtor name **DET Dallas Clinics, LLC**

United States Bankruptcy Court for the: **Southern District of Texas**

Case number (if known): ______

❑ Check if this is an amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| | **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and email address of creditor contact** | **Nature of the claim** (for example, trade debts, bank loans, professional services, and government contracts) | **Indicate if claim is contingent, unliquidated, or disputed** | **Amount of unsecured claim** If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| 1 | TED Ventures, LLC<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $3,400,000.00 |
| 2 | Trend Medical Management, LLC<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $3,400,000.00 |
| 3 | Derek Gove<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $1,133,333.33 |
| 4 | Enrique Stowhas<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $1,133,333.33 |
| 5 | Trey Austin<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $1,133,333.33 |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |

Debtor **DET Dallas Clinics, LLC** Case number *(if known)* ______
Name

| | **Name of creditor and complete mailing address, including zip code** | **Name, telephone number, and email address of creditor contact** | **Nature of the claim** (for example, trade debts, bank loans, professional services, and government contracts) | **Indicate if claim is contingent, unliquidated, or disputed** | **Amount of unsecured claim** If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE: **DET Dallas Clinics, LLC**

CASE NO

CHAPTER **11**

## VERIFICATION OF CREDITOR MATRIX

The above named Debtor hereby verifies that the attached list of creditors is true and correct to the best of his/her knowledge.

Date **08/14/2026** Signature **/s/ Walker Robertson**

Walker Robertson, Vice President of Finance

Derek Gove
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

Enrique Stowhas
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

TED Ventures, LLC
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

TREND Medical Management LLC
c/o William W. Camp, P.C.
12700 Hillcrest Road Suite 125
Dallas, TX 75230

Trend Medical Management, LLC
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

Trey Austin
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

William W. Camp, P.C.
c/o William W. Camp
12700 Hillcrest Rd. Suite 125
Dallas, TX 75230

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE:
**DET Dallas Clinics, LLC**

CHAPTER **11**

DEBTOR(S)

CASE NO

**LIST OF EQUITY SECURITY HOLDERS**

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| **Zoo Capital Holdings, LLC**<br>1911 Bagby Street<br>Houston, TX 77002 | | | 100% equity interest |

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the **Vice President of Finance** of the **Public Corporation** named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: **08/14/2026**

Signature: **/s/ Walker Robertson**
*Walker Robertson, Vice President of Finance*

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:
**Southern District of Texas**

Case number (if known): ____________ Chapter 11

❑ Check if this is an amended filing

# Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy

**04/25**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

**1. Debtor's name**

**TREND Physicians Group, Inc.**

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as names*

**3. Debtor's federal Employer Identification Number (EIN)**

8 4 – 2 0 4 9 5 2 0

**4. Debtor's address**

**Principal place of business**

**1911 Bagby Street**
Number Street

**Houston, TX 77002**
City State ZIP Code

**Harris**
County

**Mailing address, if different from principal place of business**

Number Street

City State ZIP Code

**Location of principal assets, if different from principal place of business**

Number Street

City State ZIP Code

**5. Debtor's website (URL)**

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

❑ Partnership (excluding LLP)

❑ Other. Specify: ____________

Debtor **TREND Physicians Group, Inc.** Case number *(if known)* ____________
Name

**7. Describe debtor's business**

A. *Check one:*

- ☑ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. §101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. §781(3))
- ☐ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. §501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check all that apply:*
  - ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).
  - ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District ____________ When ____________ (MM / DD / YYYY) Case number ____________

  District ____________ When ____________ (MM / DD / YYYY) Case number ____________

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☐ No
- ☑ Yes. Debtor **DET Dallas Clinics, LLC** Relationship **Affiliate**

  District **Southern District of Texas** When **8/14/2026** (MM / DD / YYYY)

  Case number, if known ____________

Debtor **TREND Physicians Group, Inc.** Case number *(if known)* ______
Name

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? ______

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ______

**Where is the property?** ______
Number Street

______

______ ______ ______
City State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency ______

Contact name ______

Phone ______

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | | |
|---|---|---|---|
| ☑ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 | |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,000-100,000 | |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 | |
| ☐ 200-999 | | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☑ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

Debtor **TREND Physicians Group, Inc.** Case number *(if known)* ______
Name

**16. Estimated liabilities**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☐ $100,001-$500,000
- ☐ $500,001-$1 million
- ☐ $1,000,001-$10 million
- ☑ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million
- ☐ $500,000,001-$1 billion
- ☐ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- I have been authorized to file this petition on behalf of the debtor.
- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **08/14/2026**
MM/ DD/ YYYY

✗ **/s/ Rebecca Warfield**
Signature of authorized representative of debtor

**Rebecca Warfield**
Printed name

Title **Secretary**

**18. Signature of attorney**

✗ **/s/ Susan Tran Adams**
Signature of attorney for debtor

Date **08/14/2026**
MM/ DD/ YYYY

**Susan Tran Adams**
Printed name

**TRAN SINGH, LLP**
Firm name

**2502 La Branch St.**
Number Street

**Houston** **TX** **77004**
City State ZIP Code

______
Contact phone

**stran@ts-llp.com**
Email address

**24075648** **TX**
Bar number State

Fill in this information to identify the case:

Debtor name TREND Physicians Group, Inc.

United States Bankruptcy Court for the: Southern District of Texas

Case number (if known): ____________

❑ Check if this is an amended filing

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | TED Ventures<br>621 Highlander Ave<br>Midlothian, TX 76065 | | | | | | $3,400,000.00 |
| 2 | Trend Medical Management, LLC<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $3,400,000.00 |
| 3 | Derek Gove<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $1,333,333.33 |
| 4 | Enrique Stowhas<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $1,333,333.33 |
| 5 | Trey Austin<br>c/o Camp Trial Group<br>8445 Freeport Parkway Suite 150<br>Irving, TX 75063 | | | | | | $1,333,333.33 |
| 6 | Southridge Village Shopping Center, L.P.<br>5428 Lake Victoria Ct Suite 100<br>Lewisville, TX 75022 | | | | | | $142,624.49 |
| 7 | Hurst Office Investments, LLC<br>216 Centerview Drive Suite 325<br>Brentwood, TN 37027 | | | | | | $54,531.74 |
| 8 | AdvanceMd<br>PO Box 35143<br>Seattle, WA 98124 | | | | | | $35,820.91 |

Debtor **TREND Physicians Group, Inc.** Case number *(if known)*

Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | OnPoint Allergy Service, LLC<br>13617 Hercules Lane<br>Universal City, TX 78148 | | | | | | $19,341.42 |
| 10 | Wol+Med SW Dallas, L.P.<br>5428 Lake Victoria CT<br>Lewisville, TX 75022 | | | | | | $19,301.06 |
| 11 | McKesson Speciality Care Dist - Plano<br>15212 Collections Center Dr<br>Chicago, IL 60693 | | | | | | $9,309.16 |
| 12 | Allergan USA, Inc.<br>12975 Collections Center Dr<br>Chicago, IL 60693 | | | | | | $5,248.00 |
| 13 | Biomedix<br>860 Blue Gentian Road #180<br>Eagan, MN 55121 | | | | | | $5,196.00 |
| 14 | Stericycle- 1000796771<br>28883 Network Place<br>Chicago, IL 60673 | | | | | | $3,091.30 |
| 15 | Jan-Pro - Denton<br>Pentacrown LLC, dba Jan-Pro<br>3000 Keller Springs Rd Suite 200<br>Carrollton, TX 75006 | | | | | | $3,041.66 |
| 16 | Old American Construction<br>110 Rose Lane Suite 209<br>Frisco, TX 75036 | | | | | | $2,325.00 |
| 17 | Office Machines - Denton<br>PO Box 795699<br>Dallas, TX 75379 | | | | | | $2,187.86 |
| 18 | Ves International Texas<br>11050 Plano Road #200<br>Dallas, TX 75238 | | | | | | $2,186.96 |
| 19 | Medline Industries, Inc Dept 1080<br>Po Box 121080<br>Dallas, TX 75312 | | | | | | $2,084.76 |
| 20 | Caregenix Management Inc.<br>9400 West Higgins Rd<br>Rosemont, IL 60018 | | | | | | $1,692.36 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE: **TREND Physicians Group, Inc.**

CASE NO

CHAPTER **11**

**VERIFICATION OF CREDITOR MATRIX**

The above named Debtor hereby verifies that the attached list of creditors is true and correct to the best of his/her knowledge.

Date **08/14/2026** Signature **/s/ Rebecca Warfield**
Rebecca Warfield, Secretary

AdvanceMd
PO Box 35143
Seattle, WA 98124

Air Supply of North Texas
2829 Fort Worth Ave
Dallas, TX 75211

Allergan USA, Inc.
12975 Collections Center Dr
Chicago, IL 60693

A-Sign Company
2410 W. Brooklyn Ave
Dallas, TX 75211

Atmos Energy
PO Box 740353
Cincinnati, OH 45274

Atomic Energy Industrial Lab
9315 Kirby Drive
Houston, TX 77054

Biomedix
860 Blue Gentian Road #180
Eagan, MN 55121

BoardCertified
PO Box 26322
Trappe, PA 19426

Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

Caregenix Management Inc.
9400 West Higgins Rd
Rosemont, IL 60018

Clinical Pathology Laboratories - Dallas
PO Box 141669
Austin, TX 78714

Clinical Pathology Laboratories - Denton
PO Box 141669
Austin, TX 78714

Clinical Pathology Laboratories - Hurst
PO Box 141669
Austin, TX 78714

Clinical Pathology Laboratories - Plano
PO Box 141669
Austin, TX 78714

Dallas County Tax Payment
James R Ames, CTA
PO Box 139066
Dallas, TX 75313

Derek Gove
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

Enrique Stowhas
8445 Freeport Parkway Suite 150
Irving, TX 75063

Epionce
10211 W Emerald St
Boise, ID 83704

Hired Hands Inc.
PO Box 55275
Hurst, TX 76054

Hurst Office Investments, LLC
216 Centerview Drive Suite 325
Brentwood, TN 37027

Jan-Pro - Denton
Pentacrown LLC, dba Jan-Pro
3000 Keller Springs Rd Suite 200
Carrollton, TX 75006

Last Name Roth Media, LLC
7830 Woodstream Rd
Midlothian, TX 76065

McKesson Speciality Care Dist - Plano
15212 Collections Center Dr
Chicago, IL 60693

Medline Industries, Inc Dept 1080
Po Box 121080
Dallas, TX 75312

Office Machines - Dallas
PO Box 795699
Dallas, TX 75379

Office Machines - Denton
PO Box 795699
Dallas, TX 75379

Old American Construction
110 Rose Lane Suite 209
Frisco, TX 75036

OnPoint Allergy Service, LLC
13617 Hercules Lane
Universal City, TX 78148

Southridge Village Shopping Center, L.P.
5428 Lake Victoria Ct Suite 100
Lewisville, TX 75022

Spectrum Business - DalFax

SpectrumVoIP
PO Box 733619
Dallas, TX 75373

Stericycle - 1000471188
28883 Network Place
Chicago, IL 60673

Stericycle- 1000796771
28883 Network Place
Chicago, IL 60673

TED Ventures
621 Highlander Ave
Midlothian, TX 76065

Texas Medical Board MC-232
PO Box 2029
Austin, TX 78768

Trend Medical Management, LLC
8445 Freeport Parkway Suite 150
Irving, TX 75063

Trey Austin
c/o Camp Trial Group
8445 Freeport Parkway Suite 150
Irving, TX 75063

Ves International Texas
11050 Plano Road #200
Dallas, TX 75238

Wol+Med SW Dallas, L.P.
5428 Lake Victoria CT
Lewisville, TX 75022

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE:
**TREND Physicians Group, Inc.**

CHAPTER **11**

DEBTOR(S)

CASE NO

**LIST OF EQUITY SECURITY HOLDERS**

| Registered Name of Holder of Security<br>Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| **DET Dallas Clinics, LLC** | | | 100% |

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the **Secretary** of the **Public Corporation** named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: **08/14/2026**

Signature: **/s/ Rebecca Warfield**
*Rebecca Warfield, Secretary*

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
September 15, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 26-35975** |
| **DET DALLAS CLINICS, LLC** | § | |
| **and** | § | |
| **TREND PHYSICIANS GROUP, INC.,** | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

**ORDER LIFTING STAY (ECF NO. 13)**

Hearing was held on September 15, 2026. The Court made an oral ruling on the record. For the reasons so stated the automatic stay is lifted to allow the Movants, TED Ventures LLC and Trend Medical Management, LLC to liquidate all claims in the removed state court litigation, originally pending in the 162 Judicial District Court of Dallas County[1] before a court of competent jurisdiction.

The stay is lifted only to liquidate claim amounts between the movants, the debtors and non-debtor third parties in the litigation by trial. Further actions against the debtor shall require further order from this Court.

**SO ORDERED**.

SIGNED 09/15/2026

Jeffrey Norman
United States Bankruptcy Judge

[1] This litigation has been removed to Federal Court in the Northern District of Texas and may be subject to remand.

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 21, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 26-35975** |
| **DET DALLAS CLINICS, LLC** | § | |
| **and** | § | |
| **TREND PHYSICIANS GROUP, INC.,** | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

**ORDER GRANTING MOTION TO TRANSFER VENUE**

Before the Court is the Motion to Transfer Venue filed by TED Ventures, LLC and Trend Medical Management, LLC, and the Response filed by the Debtors (ECF No. 44). For the following reasons, the Court transfers venue to the United States Bankruptcy Court for the Northern District of Texas.

Venue for a Chapter 11 case is proper in either the district where the debtor has had its principal place of business or its principal assets for the preceding (six) months or for a longer portion thereof than in any other district.[1] In the case of a business entity, the state where it was organized is generally its domicile or residence.[2] Section 1412 of the United States Code allows this Court to "transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."[3]

There is no indication that the interest of justice would be best served by leaving the case in the Southern District, or that the Southern District is more convenient. To the contrary, the Northern District is much more convenient for all the parties as there is related litigation pending

[1] 28 U.S.C. § 1408. The Debtors' Response states that the debtors' principal place of business is in Houston, Texas.
[2] *In re Perry*, 425 B.R. 323 (Bankr. S.D. Tex 2010) (holding that a corporation is a resident of the state of its incorporation).
[3] 28 U.S.C. § 1412.

before Judge Ada Brown in the Northern District of Texas.[4] Further, this Court has entered an Order Lifting Stay on September 15, 2026[5] to liquidate claim amounts in that litigation by trial.

Therefore, the Court finds that there is no rational basis for venue in the Southern District of Texas, and that this case should be transferred to the Northern District of Texas.

**IT IS ORDERED** that the jointly administered case under Case No. 26-35975 for debtors DET Dallas Clinics, LLC and TREND Physicians Group, Inc. shall be transferred to the United States Bankruptcy Court for the Northern District of Texas.

SIGNED 09/21/2026

Jeffrey Norman
United States Bankruptcy Judge

[4] Case No. 3:26-cv-02783-E; *TED Ventures LLC, et al v. DET Dallas Clinics LLC, et al.* There is currently pending a motion to transfer that litigation to the Southern District of Texas (ECF No. 4), and a motion to remand, which was filed on September 10, 2026 at ECF No. 8.
[5] ECF No. 37.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| DET DALLAS CLINICS, LLC and TREND PHYSICIANS GROUP, INC., | § § | Case No. 26-35975 (Jointly Administered) |
| | § | |
| Debtors. | § | **Jeffrey P. Norman** |
| | § | |

**DECLARATION OF DEREK GOVE IN SUPPORT OF CREDITORS' MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND RELATED MOTIONS**

I, Derek Gove, pursuant to 28 U.S.C. § 1746, declare as follows:

## I. INTRODUCTION AND QUALIFICATIONS

1. My name is Derek Gove. I am over the age of eighteen and am competent to make this declaration. I reside at 4351 Stonewood Circle, Midlothian, Texas 76065, in the Dallas–Fort Worth Metroplex area.

2. I am the Managing Partner of TED Ventures, LLC ("TED Ventures"). TED Ventures is owned by me and my partners, Trey Austin and Enrique Stowhas. TED Ventures is the sole legal and beneficial owner of all issued and outstanding membership interests in Trend Medical Management, LLC ("TMM").

3. I am a healthcare executive with approximately fifteen years of experience in consulting, distribution, team building, turnarounds, mergers and acquisitions, and operational excellence in the healthcare industry.

4. I have personal knowledge of the facts stated in this declaration and am competent to testify to them. If called as a witness, I would testify consistently with the statements made herein. Where noted, certain facts are stated upon information and belief based

on documents and testimony obtained through discovery in the state-court litigation described below.

5. I submit this declaration in support of the following motions filed by TED Ventures, LLC and Trend Medical Management, LLC ("Creditors") in these jointly administered bankruptcy cases:

a. Motion to Transfer Venue Under 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 1014;

b. Motion for Appointment of a Chapter 11 Trustee Under 11 U.S.C. § 1104(a) or in the Alternative, Conversion to Chapter 7;

c. Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362(d) to Continue the State-Court Litigation;

d. Motion for Examination Under Federal Rule of Bankruptcy Procedure 2004; and

e. Motion for Expedited Consideration and Consolidated Hearing.

## II.
## THE MEDICAL MANAGEMENT BUSINESSES

6. TMM provided management, administrative, and related business services to physicians and medical practices. TMM was the vehicle through which my partners and I built and operated our healthcare businesses in the Dallas–Fort Worth area.

7. In December 2023, TMM was the sole member of Trend Physicians Group, Inc. ("TPG"). TPG is a Texas nonprofit corporation, certified as a health organization by the Texas Medical Board, rendering professional medical services through licensed employees and independent contractors.

8. The businesses operated six clinics in the Dallas–Fort Worth Metroplex under the name Advanced Healthcare Clinics, located in Plano, Hurst, Mesquite, Buckner, South Dallas,

and Denton, Texas. All operations were concentrated in the DFW area. None of the clinics or operations were located in Houston.

## III. THE APCA TRANSACTION — DECEMBER 12, 2023

9. On December 12, 2023, TMM, Zoo Capital Holdings, LLC ("Zoo Capital"), and AD Dallas Clinics, LLC ("AD Dallas," now known as DET Dallas Clinics, LLC) entered into an Asset Purchase and Contribution Agreement (the "APCA").

10. Under the APCA, TMM contributed, assigned, transferred, and conveyed to Zoo Capital substantially all of TMM's assets, including TMM's ownership interest in TPG (the "Contributed Assets"). Zoo Capital subsequently contributed the Contributed Assets down to AD Dallas.

11. The Contributed Assets were valued at over $13 million by the parties and by VMG, the buyer's own third-party valuation consultant.

12. The agreed purchase price under the APCA was $12 million, payable in three components:

a. Base Cash Consideration of $3,000,000, due at closing;

b. A Subordinated Promissory Note in the principal amount of $3,000,000, payable quarterly, with AD Dallas as maker and TMM as payee, bearing interest at the applicable federal rate of 5.16%; and

c. Rollover Securities valued at $6,000,000, to be issued to Creditors by Zoo Capital Holdings, LLC, defined in the APCA as "Parent," and not by AD Dallas.

13. Contemporaneously with the APCA, the parties executed a Security Agreement (with AD Dallas as debtor and TMM as secured party), granting TMM a security interest in accounts receivable with a $15 million collateral cap, evidenced by an executed UCC-1 financing statement. The parties also executed a Bill of Sale, Assignment, and Assumption Agreement.

14. Section 8.12 of the APCA provides that venue for any dispute arising under the agreement is fixed in Dallas County, Texas.

15. In connection with the transaction, I, along with Trey Austin and Enrique Stowhas, also entered into employment agreements dated November 1, 2023 with AD Dallas, which were later assigned to Cognizant Management Solutions, LLC, the entity that issued our paychecks. Under those agreements, I was employed as Chief Executive Officer, Austin as Chief Financial Officer, and Stowhas as Chief Marketing Officer. Our employment was terminated in April 2025 when the litigation began, and none of us holds any officer, director, or management position with either debtor. Each employment agreement also contained a venue provision fixing jurisdiction in Dallas County, Texas.

**IV.**
**DEFENDANTS' FAILURE TO PAY**

16. Creditors performed their obligations under the APCA in full. We contributed our medical care businesses, clinics, employees, patient relationships, and operations exactly as agreed.

17. The $3 million Base Cash Consideration was not paid at closing. Defendants represented that they would pay $1 million each in January, February, and March 2024.

18. Checks delivered by defendants were dishonored for insufficient funds, resulting in approximately $750,000 in returned items. The bounced checks damaged Creditors' banking relationships.

19. After making two quarterly payments on the Subordinated Promissory Note, the payment account was left without funds by reason of other payments and transfers authorized by Atul "Lucky" Chopra, and payment ceased. As a result, the full Note balance was accelerated in accordance with its terms.

20. The $6 million in Rollover Securities was never issued or delivered to Creditors. Under Section 2.05 of the APCA, that obligation was Zoo Capital's, not the debtors'.

21. In sum, Creditors contributed assets worth more than $13 million and received virtually nothing of the agreed $12 million purchase price.

22. Transaction damages total not less than $9,208,849, consisting of: $708,849 in unpaid Base Cash Consideration (after credits for amounts actually received), $2,500,000 in accelerated Note principal, and $6,000,000 in undelivered Rollover Securities, plus accrued interest and consequential damages.

## V.
## CHOPRA'S CONTROL AND CORPORATE STRUCTURE

23. Atul "Lucky" Chopra personally owns and controls Zoo Capital Holdings, LLC, a non-debtor entity.

24. The corporate chain is as follows: Chopra owns Zoo Capital (non-debtor), which holds 100% of the equity of DET Dallas Clinics, LLC (f/k/a AD Dallas Clinics, LLC) (debtor), which in turn owns 100% of TPG (debtor). The two solvent links in the chain — Chopra and Zoo Capital — did not file for bankruptcy.

25. Based upon my personal knowledge as former CEO of AD Dallas and upon information obtained through the state-court litigation, including the deposition testimony of Steven Ryan Reneau (former Executive Vice President and Chief Financial Officer of the Advanced Diagnostics group), Chopra exercised sole and final payment authority over every entity in the corporate group. He decided what was paid and what was not, directed treasury personnel to pull funds from whichever entity had them, and permitted no cash-control system.

26. AD Dallas (now DET), the maker of the $3 million Subordinated Promissory Note, was purely an acquisition entity. It had no employees, no bank account, no billing

operations, and no revenue of its own. It was never capitalized to perform any of the obligations it undertook under the APCA.

27. Zoo Capital had no bank account of its own and held assets insufficient to satisfy the obligations it undertook.

28. Upon information and belief based on discovery in the state-court litigation, company funds were moved among and out of the entities with no documentation beyond journal entries — no promissory notes, no intercompany agreements, no interest, and no repayment terms — and were applied to Chopra's private ventures, including restaurant and real-estate entities having no connection to the medical practice operations.

## VI. THE MERRILL LYNCH ACCOUNT AND AVAILABLE FUNDS

29. Upon information and belief, based on documents produced in the state-court litigation and the deposition testimony of Steven Ryan Reneau, the Chopra group maintained a Merrill Lynch investment account (No. 23V-02863), titled in the names of Cognizant Management Solutions, LLC and Advanced Diagnostics Health System, LLC, at 1911 Bagby Street, Houston, Texas.

30. That account held approximately $11.27 million as of September 29, 2023 and approximately $9.85 million as of December 29, 2023.

31. Chopra alone controlled that account. The group's own Chief Financial Officer, Steven Ryan Reneau — the former CFO of the Zoo Capital entities — had no access to it and was required to ask Chopra to have Merrill Lynch furnish a statement so the auditors could close the audit. This testimony was given by Mr. Reneau in his deposition taken on July 7, 2026 in the state-court action, and is corroborated by business records produced in that litigation.

32. The audited financial statements of the group report cash and cash equivalents of $5,659,475 as of December 31, 2023 — more than sufficient to pay the $3 million Base Cash Consideration, which Chopra chose not to pay.

**VII.**
**FACTORING OF RECEIVABLES AND STRIPPING OF COLLATERAL**

33. Under the Security Agreement executed contemporaneously with the APCA, $15 million of accounts receivable were to serve as collateral securing the obligations owed to Creditors, as evidenced by an executed UCC-1 financing statement. In November 2023, Chopra personally showed me approximately $47 million in available receivables from which he stated the $15 million of collateral would be reserved.

34. Upon information and belief, based on documents produced in the state-court litigation, on or about December 28, 2023 — only sixteen days after the APCA closing — Chopra personally signed documents factoring approximately $47 million in receivables to a third party for approximately $6.1 million in immediate cash.

35. Instead of preserving the collateral pledged to Creditors, Chopra converted the receivables to cash at a steep discount and diverted the proceeds to other uses.

36. At each subsequent factoring date, the receivables were again factored elsewhere rather than preserved as the collateral pledged to Creditors under the Security Agreement.

**VIII.**
**UNDOCUMENTED INTERCOMPANY TRANSFERS**

37. Upon information and belief, based on documents produced in the state-court litigation, as of fiscal year-end 2023, the operating entities' own books recorded $29,142,894.89 in intercompany payables to entities Chopra controls outside the operating group.

38. These transfers were largely undocumented — no loan agreements, no promissory notes, no board resolutions, no interest, and no repayment terms.

39. Among these, $15,798,654.68 flowed from Cognizant Management Solutions, LLC (the entity that issued Creditors' paychecks) to Chopra Imaging Centers, Inc. — an entity whose own bank account reflected a single transaction of $25.00 across December 2023 and January 2024.

40. Funds were further diverted to Chopra's personal restaurant ventures and real-estate entities, none of which have any connection to the medical practice operations.

## IX.
## POST-CLOSING SERVICES OWED

41. Separate from the APCA, TED Ventures and TMM continued to provide management services to TPG and workers' compensation billing services to defendants' affiliated facilities after the closing of the APCA transaction.

42. These services were invoiced monthly in the ordinary course of business.

43. Defendants accepted the services and invoices without contemporaneous dispute and failed and refused to pay.

44. The unpaid balance for post-closing services is $314,009.83, consisting of management fees of $205,894.45 and workers' compensation billing services of $70,450.30, $23,295.33, $13,112.22, and $1,257.53.

## X.
## THE STATE-COURT LITIGATION AND EVE-OF-TRIAL BANKRUPTCY FILING

45. In April 2025, Creditors filed suit in the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848.

46. The litigation spanned over sixteen months, including depositions, extensive discovery, multiple trial settings, and continuances. A related action is also pending in Ellis County, Texas, Cause No. 120138, in the 40th Judicial District Court.

47. Trial was set for August 17, 2026 — the third trial setting in the case.

48. On August 14, 2026 — the last business day before trial — AD Dallas Clinics, LLC changed its name to DET Dallas Clinics, LLC and filed a Chapter 11 petition in this Court (Case No. 26-35975). On the same day, TPG also filed a Chapter 11 petition (Case No. 26-35976). Both petitions were filed by Susan Tran Adams of Tran Singh, LLP, Houston, Texas.

49. The filings triggered the automatic stay under 11 U.S.C. § 362(a) and halted the state-court proceedings on the eve of trial.

50. The name change from "AD Dallas Clinics" to "DET Dallas Clinics" on the very day of the bankruptcy filing appears to have been intended to obscure the entity's connection to the state-court litigation and make it more difficult for Creditors to locate the bankruptcy case.

51. Both debtors initially elected Subchapter V treatment despite sworn liabilities of $10 million to $50 million, and both left the debt-limit certification box unchecked on Official Form 201. The debtors have since amended their petitions to remove the Subchapter V election.

52. DET's Official Form 204 schedules $10,200,000 in claims held by five creditors: TED Ventures ($3,400,000), TMM ($3,400,000), Gove ($1,133,333), Austin ($1,133,333), and Stowhas ($1,133,333). DET lists no other creditors.

53. TPG's Official Form 204 schedules approximately $10,800,000 in claims. The five Creditors' claims total approximately $10,500,000, plus approximately $308,000 in trade debt.

54. None of the Creditors' claims is marked as contingent, unliquidated, or disputed on Official Form 204 — despite the fact that defendants contested these very claims for sixteen months in state court.

55. On August 20, 2026, the state court entered a severance and abatement order addressing the claims against the debtor entities and the claims against Chopra and Zoo Capital, as described in Section XII below.

## XI.
## THE STATE-COURT LITIGATION WAS FULLY DEVELOPED AND TRIAL-READY

56. Creditors filed suit in April 2025 in the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848, and actively prosecuted that case for more than sixteen months.

57. Discovery in that case closed on February 20, 2026. Discovery is fully complete, and no further discovery is required for trial.

58. Depositions were taken of me, Trey Austin, and Enrique Stowhas in October 2025; of Atul "Lucky" Chopra and Steven Ryan Reneau in July 2026; of Mark Lipman on June 11, 2026; and of Turner, Creswick, and Craig King. I was personally deposed, and I either attended the remaining depositions or was informed of their substance by counsel.

59. Upon information and belief, based on counsel's records of the state-court proceedings, the parties exchanged expert designations, and defendants designated JTaylor & Associates as their expert in November 2025.

60. Upon information and belief, based on counsel's records of the state-court proceedings, trial briefs were filed; witness and exhibit lists were exchanged; proposed findings

of fact and conclusions of law were filed; a joint proposed pretrial order was completed; premarked trial exhibits were prepared; and trial subpoenas were issued.

61. Upon information and belief, based on counsel's records of the state-court proceedings, the only witnesses the defendants disclosed in discovery in the state-court action, and the only witnesses they could therefore have called at the August 2026 trial setting, were Atul "Lucky" Chopra, Turner, me, Trey Austin, and Enrique Stowhas. The witness list the Debtors have submitted in these bankruptcy cases identifies additional persons who were never disclosed in discovery in the state-court action.

62. The case had three trial settings and was set for its third setting on August 17, 2026. As of that date, the case was trial-ready.

63. The Debtors filed their bankruptcy petitions on August 14, 2026, the last business day before that trial setting.

64. On the same day it filed its petition, AD Dallas Clinics, LLC changed its name to DET Dallas Clinics, LLC.

## XII.
## THE AUGUST 20, 2026 SEVERANCE AND ABATEMENT ORDER

65. Upon information and belief, based on the order itself and counsel's records, on August 20, 2026 the state court entered an order that: (a) determined the defendants' notice of removal was void; (b) severed all claims against DET and TPG, and their counterclaims, into a separate cause; (c) abated the severed cause pending termination of or relief from the automatic stay; (d) allowed the original cause to proceed against Chopra and Zoo Capital; and (e) provided that any amounts recovered in the bankruptcy cases are credited dollar-for-dollar against any state-court judgment.

66. The severed cause is ready to proceed immediately upon relief from the automatic stay. No additional pleadings, discovery, or pretrial preparation would be required.

## XIII.
## RELIEF FROM THE STAY WOULD NOT PREJUDICE THE ESTATES

67. Creditors seek only to liquidate their claims in the state-court forum. Creditors do not seek to execute against property of the estates, and any judgment obtained would be presented to this Court for allowance and distribution.

68. DET has no scheduled creditors other than the five creditors represented by Creditors' counsel. No other creditor of DET could be affected by continuation of the state-court case.

69. TPG's other creditors hold approximately $308,000 in trade debt against approximately $10.8 million in scheduled claims. Creditors' claims comprise substantially all of the scheduled debt in both cases.

70. DET reports estimated assets of $0 to $50,000 against liabilities exceeding $10 million, and it has no employees, no bank account, and no operations. There is no reorganization effort that continuation of the state-court case could disrupt.

## XIV.
## DET IS A NON-OPERATING SHELL

71. DET's own amended petition reports estimated assets of $0 to $50,000 against liabilities exceeding $10 million.

72. DET has no employees, no bank account, no billing operations, no revenue, no patients, and no business operations of any kind. It was created solely as an acquisition entity to hold downstream assets in the APCA transaction and was never capitalized.

73. There is no going concern to reorganize.

## XV.
## VENUE BELONGS IN THE NORTHERN DISTRICT OF TEXAS

74. The APCA transaction closed in Dallas County, Texas. Section 8.12 of the APCA expressly fixes venue for any dispute arising under the agreement in Dallas County.

75. The employment agreements between Creditors and AD Dallas also fix jurisdiction in Dallas County, Texas.

76. All six clinics operated by TPG are located in the DFW Metroplex: Plano, Hurst, Mesquite, Buckner, South Dallas, and Denton. None is in Houston.

77. I recently relocated to East Texas and continue to maintain offices in Midlothian, Texas (Ellis County, in the DFW area). Trey Austin resides in Irving, Texas. Enrique Stowhas resides in Dallas, Texas.

78. The state-court litigation was pending in Dallas County, Texas. The related removed federal case is now pending in the Northern District of Texas, Case No. 3:26-cv-02783-E, before Judge Ada Brown.

79. TPG's trade creditors are concentrated in the DFW Metroplex.

80. The only Houston connections are the 1911 Bagby Street address — which is Zoo Capital's office, not a clinic — and Tran Singh LLP, debtors' counsel.

81. Defendants' own state-court pleadings described AD Dallas Clinics' principal place of business as Dallas County, Texas, directly contradicting the Houston bankruptcy petition.

## XVI.
## THE DIP HAS AN IRRECONCILABLE CONFLICT OF INTEREST

82. The debtor-in-possession is controlled by Chopra, the very person whose conduct gives rise to Creditors' claims and the potential estate causes of action.

83. Chopra cannot and will not cause DET or TPG to sue Chopra or pursue alter-ego claims against his own affiliates, including Zoo Capital.

84. The estates hold potential avoidance claims under 11 U.S.C. §§ 544, 547, and 548 arising from the $29 million in undocumented intercompany transfers, the $47 million receivables factoring, and diversions to Chopra's personal ventures.

85. These claims will never be pursued under current DIP management because Chopra controls both debtors.

86. A demand letter has been sent to the debtors through their counsel, Susan Tran Adams, demanding investigation and pursuit of these estate causes of action. To date, no response has been received.

## XVII.
## NEED FOR RULE 2004 EXAMINATION

87. Creditors seek to examine Walker Robertson (DET's Vice President of Finance), Rebecca Warfield (TPG's Secretary), Atul "Lucky" Chopra, Steven Ryan Reneau (former Executive Vice President and Chief Financial Officer of the Zoo Capital entities, including Cognizant Management Solutions, LLC and Advanced Diagnostics Health System, LLC), and a Zoo Capital Holdings, LLC corporate representative designated under Federal Rule of Civil Procedure 30(b)(6). Mr. Reneau has direct knowledge of the intercompany transfers, the control of the group's bank and investment accounts, the factoring of receivables, and the capitalization of DET.

88. The examination is needed to investigate pre- and post-petition financial transactions, intercompany transfers, capitalization, control of bank accounts, factoring transactions, use of funds, and DIP compliance with the Bankruptcy Code.

89. The debtors have not yet filed schedules or statements of financial affairs, which are due August 28, 2026. The Rule 2004 examination is necessary to enable Creditors to evaluate the debtors' financial affairs independently of the debtors' self-reporting.

## XVIII. EXHIBITS

90. Attached to this declaration are the following documents, each of which is a true and correct copy of the original: Exhibit A, the state court's August 20, 2026 severance and abatement order entered in Cause No. DC-25-05848; and Exhibit B, the docket sheet for Cause No. DC-25-05848 in the 162nd Judicial District Court of Dallas County, Texas.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 25, 2026.

Signed by:
/s/ Derek Gove
Derek Gove 8/25/2026

Dated: August 25, 2026

Respectfully Submitted,

CM LAW, LLP

By: /s/ Richard Grant
Richard G. Grant
Tex. Bar No. 08302650

National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

ATTORNEYS FOR TED VENTURES, LLC and TREND MEDICAL MANAGEMENT, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has transmitted a true and correct copy of the foregoing (a) via the Court's Electronic Case Filing system to all persons participating therein on August 25, 2026; and (b) via United States First Class Mail, postage prepaid, on August 25, 2026 to each of the mailing addresses indicated on the service list attached hereto.

/s/ Richard Grant
Richard G. Grant

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| TED VENTURES, LLC, TREND MEDICAL MANAGEMENT, LLC, DEREK GOVE, TREY AUSTIN, AND ENRIQUE STOWHAS,<br>*Plaintiffs/Counter-Defendants,*<br>v.<br>LUCKY CHOPRA, ZOO CAPITAL HOLDINGS, LLC, and AD DALLAS CLINICS, LLC,<br>*Defendants/Counter-Plaintiffs.* | Civil Action No. 3:26-cv-02783-E<br><br>Removed from the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848 (Hon. Kim Bailey Phipps, Presiding). |

**DECLARATION OF WILLIAM W. CAMP**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND**

I, William W. Camp, declare as follows:

1. I am an attorney licensed to practice law in the State of Texas and am counsel of record for Plaintiffs TED Ventures, LLC, TREND Medical Management, LLC, Derek Gove, Trey Austin, and Enrique Stowhas (collectively, "Plaintiffs") in the action styled *TED Ventures, LLC, et al. v. Lucky Chopra, et al.*, Cause No. DC-25-05848, filed in the 162nd Judicial District Court of Dallas County, Texas (the "TED Litigation"), and in the above-captioned removed action. I have personal knowledge of the facts

stated in this declaration by virtue of my role as counsel of record throughout the TED Litigation, and if called as a witness, I could and would testify competently to these facts. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2. On April 14, 2025, Plaintiffs filed their Original Petition in the 162nd Judicial District Court of Dallas County, Texas, Cause No. DC-25-05848, against Lucky Chopra, Zoo Capital Holdings, LLC, AD Dallas Clinics, LLC, and TREND Physicians Group, Inc., asserting claims arising from Defendants' failure to pay the purchase price under the Agreement and related misrepresentations in the sale. *See* ECF 1-5.

3. Defendants answered, counterclaimed, and litigated the TED Litigation in Dallas County for the following sixteen months. *See* ECF 1-6, ECF 1-11 & ECF 1-19. The state court entered an agreed scheduling order on June 23, 2025 — the only scheduling order ever entered in the case. Discovery closed February 20, 2026. The case was set for trial three times: April 21, 2026; July 14, 2026; and August 17, 2026. By the time Plaintiffs filed their Second Amended Petition (ECF 1-24), the parties had completed fact discovery, expert discovery, all depositions, and a full mediation of the dispute.

4. Leading up to the third trial setting, the parties had pre-marked exhibits, served deposition designations, tendered pretrial order under Texas Rule of Civil Procedure 166, issued trial subpoenas, and printed trial books. Both sides announced ready for trial on August 13, 2026.

5. On August 14, 2026 — the last business day before the scheduled trial date, and in the last hour of that business day — AD Dallas Clinics, LLC and TREND Physicians Group, Inc. each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, styled *In re DET Dallas Clinics, LLC*, Case No. 26-35975, and *In re TREND Physicians Group, Inc.*, Case No. 26-35976 (together, the "Chapter 11 Cases"). *See* ECF 3-2. That same week, AD Dallas Clinics, LLC changed its name to DET Dallas Clinics, LLC.

6. On August 19, 2026, DET Dallas Clinics, LLC and TREND Physicians Group, Inc. (the "Debtor Defendants"), joined by Lucky Chopra and Zoo Capital Holdings, LLC (the "Non-Debtor Defendants"), filed a Notice of Removal purporting to remove the entire TED Litigation — including Plaintiffs' claims against the Non-Debtor Defendants, neither of whom is a debtor in any bankruptcy case — to this Court. Defendants filed the Notice

of Removal the afternoon before a hearing scheduled in the state court on Plaintiffs' then-pending motion to sever the claims against the Non-Debtor Defendants.

7. On August 20, 2026, the Debtor Defendants moved to transfer the removed action to the Southern District of Texas. *See* ECF-4.

8. As of the date of this declaration, no trial date has been set in this Court. Plaintiffs' claims against the Non-Debtor Defendants — who are not before the bankruptcy court in any capacity and against whom no automatic stay applies — remain ready for the trial the parties had already prepared for in Dallas County.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 10, 2026, in Dallas County, Texas.

***/s/William W. Camp***
William W. Camp

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

| | |
|---|---|
| IN RE: | Case No. 26-35975 |
| | Chapter 11 |
| DET DALLAS CLINICS, LLC and TREND PHYSICIANS GROUP, INC., | |
| | 515 Rusk Street |
| | Houston, TX 77002 |
| Debtors. | |
| | Tuesday, September 15, 2026 |
| | 9:36 a.m. |

TRANSCRIPT OF MOTION FOR RELIEF FROM STAY
BEFORE THE HONORABLE JEFFREY P. NORMAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors: Tran Singh, LLP
By: BRENDON SINGH, ESQ.
2502 La Branch Street
Houston, TX 77004
(832) 975-7300

For TED Ventures, LLC: CM Law PLLC
By: RICHARD G. GRANT, ESQ.
13101 Preston Road, Suite 110-1510
Dallas, TX 75240
(214) 210-2929

Audio Operator: Shannon Holden, ECR

Transcription Company: Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46048
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X
9/15/26

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE MOVANT: | | | | |
| Derek Gove | 13 | 23 | 52 | 53 |
| Jonathan Curth | 57/82 | 78 | 80 | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Movant's Exhibits 30-1 through 30-5 | 16 |
| Movant's Exhibit 30-6 | 17 |
| Movant's Exhibit 30-31 | 22 |
| Movant's Exhibit 44 | 23 |
| Movant's Exhibit 42 | 70 |

(Proceedings commence at 9:36 a.m.)

THE COURT: The next case is DET Dallas Clinics, LLC, 26-35975. Appearances, please.

MR. GRANT: Good afternoon, Your Honor. Richard Grant on behalf of TED Ventures, LLC, and TREND Medical Management, LLC, the movants.

THE COURT: Thank you, sir.

MR. SINGH: Good morning, Your Honor. Brendon Singh on behalf of the debtors.

THE COURT: All right. Mr. Grant, it's your motion. I'll ask you the same question I ask everyone else. What's the status? Are you ready to move forward? Where do we -- where are we?

MR. GRANT: Yes, Your Honor. We're ready to move forward.

THE COURT: Okay. Then do you want to make an opening statement?

MR. GRANT: I can.

THE COURT: Okay. Go ahead.

MR. GRANT: I'm going to set up for a second, if you don't mind?

THE COURT: Sure, take your time.

MR. GRANT: Well, I managed to make it in without glasses. Okay. Thank you, Your Honor.

May it please the Court. Your Honor, the movants are

TED Ventures and TREND Medical Management. One of the debtors is TREND Physicians Group, Inc. TREND Physicians Group, Inc. is a physician's practice group that was created by three individuals: Derek Gove, who's in the courtroom with me today, as well as Trey Austin and Enrique Stonehall [sic].

Back in 2023, they had built this business. It was worth about $13 million. They entered into an agreement with Atul Lucky Chopra to sell this business to his entity group. The debtor, TREND Physicians Group, Inc., was sold to -- primarily to DET, and then there were also two obligors on this, which was both Mr. Chopra himself individually and another intermediate holding group called Zoo. Zoo owns other medical practices.

After the closing, the assets of the debtor -- or of TREND Physicians Group were immediately stripped out of the company, factored, and transferred over into Mr. Chopra's other entities. As a result -- and on top of that, the buyers never paid the purchase price of $13 million. They bounced about $750,000 worth of checks and frankly just never paid for it.

So the debtors -- or the movants, among with others, filed the two debtor entities, the Zoo entity and Mr. Chopra, in Dallas State Court. After 16 months of litigation and three trial settings, on the very eve of trial, these two debtors filed for Chapter 7.

The state court judge was willing to go forward with

respect to the plaintiff's claims against the two non-debtor entities, and so as a result, the debtors then filed a notice of removal, removing the entire cause of action to the Dallas Federal Court.

Now this is a delay tactic that is commonly done. It usually buys you about two or three months, but that's what it is. In the current -- and at the current time, what the debtors -- what the movants want is to have the stay lift so they can go forward with their litigation.

Now granted, it's currently pending in the Federal District Court in Dallas. There are pending motions to transfers filed by the debtors to this Court. And then the movants also filed a motion to remand to send it back down to state court.

Once you hash through all the procedural things, at the end of the day, it's up to whether or not this Court wants to hear the trial on the claims of my clients against the two debtor entities and the two non-debtor entities, or if they should go to trial in the Court where this has been pending for 16 months.

And of course, our answer to that is that the stay should lift to allow that litigation to go forward. There might be a little stop in federal court to need to get the case remanded back down, but that is certainly kind of where we're headed with this.

THE COURT: So here, let me ask you the question, what is the status of both the motion to remand and the motion to transfer?

MR. GRANT: The motion to transfer was filed about three weeks ago, and we filed our response two or three days ago, last -- late last week, and then we filed our motion to remand late last week.

THE COURT: Okay. Could you have the district court case number for the Northern District?

MR. GRANT: Yes, Your Honor.

THE COURT: We can find it later if you can't find it. I know I can. That's fine.

MR. GRANT: It's our Exhibit 24, the Notice of Removal. So it's Case Number 26-cv-02783.

THE COURT: Okay. Thank you, sir.

MR. GRANT: The movants have filed several other motions, which are set for hearing next week. They're not on for trial today, but our exhibits will probably be very similar. We -- one of the things we did was, as we indicated, the lawsuit that's currently pending is just about recovery of the purchase price from the obligors on that purchase agreement.

But in addition, you've heard that we've alleged that all the assets out of these debtors were transferred into other companies of Mr. Chopra. We sent a Louisiana World Exposition

letter to counsel for the debtor requesting that they look into recovering those assets from the other affiliated entities for the benefit of the creditors in this case.

And on that note, I mean, the only real creditors in this case are my clients or their affiliated entities. I think there's a small number maybe of unpaid trade vendors of the operational entity, which was TREND Physicians Group, as well as Mr. Chopra wasn't paying his 940s and 941s. So there's about $1.5 million worth of 941 obligations of the TREND Physicians Group.

In any event, we filed the -- we sent over the Louisiana World Exposition letter. We have not -- we put about a 10-day clock on that. They have not responded in any way. And we have not yet filed our motion to seek authority to bring those claims. But I raised this because one of the defenses raised in the response to the motion to lift stay is that we've asked for more discovery.

We filed a motion for 2004 exam, which is set for hearing next week, and the only discovery on that is on these causes of action by the debtor against the affiliated entities to recover back the assets that were transferred over. So that has nothing to do with the current status of the state court litigation.

We've also filed a motion to appoint a Chapter 11 trustee because we believe all of the management of these

debtors is being controlled by Mr. Chopra for his own personal benefit. That's the second issue.

The third is this case was filed in Houston when everybody involved -- these were -- this was a Dallas-based physicians group with six different locations. They have filed it in Houston. Nobody's down here, in our opinion, and we would respectfully request the Court send it back up to Dallas if we're going to go forward with this bankruptcy.

And I will say we don't want the case to be dismissed. We think this is an appropriate thing to happen to help litigate and collect monies for the creditors of these debtors, but we don't believe that there's really any real operations here, and right now it's just being used for a procedural advantage of Mr. Chopra personally.

So with that, you know, the ending of my opening is we'd request that the Court lift the stay and allow that litigation to proceed and conclude in the court in which it was originally brought.

THE COURT: All right. Thank you.

Mr. Singh?

MR. SINGH: Thank you, Your Honor. I somewhat agree with some of the statements of Mr. Grant. This issue, these debtors, in fact, all of the issues with these debtors sort of teeter out of the sales of the original purchase. The -- where I think our stories diverge, sort of what happened after the

sale. The value of this company and what the amount of the sale price was based on a number of factors, all evidence and documents from the original seller.

When the debtor bought these assets, it turned out that those documents and at least our allegation is that those numbers and basis for the purchase weren't true. In fact, when these items were -- when this system was bought, the same doctors who operated it before the purchase continued to operate it. There's a claim -- so there's a claim by the debtor counterclaim in that lawsuit, so I'm going to separate these out a little bit.

There is a lawsuit pending in Dallas for basically breach of contract and to collect funds from the sales price. There's a counterclaim, which is property of the estate, that there were material misrepresentations in that purchase agreement and things that came on about that is property of the estate. That's what was moved. That's what the removal from state court to Dallas federal court, ideally then to bankruptcy court, and then a motion to transfer to this court for prosecution of that claim. So that's removals on its way here.

Secondarily, I think apart from the bid receiver we're losing on a world letter and we have started the process of investigating those claims. Those claims or potential claims or allegations that the debtor is investigating has nothing to do with the Dallas case. The Dallas case is only

collection on the breach of contract. I guess arguably, if they get a judgment, then they can go use state court remedies to potentially go after those states, but at this time, they don't have a judgment. It's a claim. This counterclaim is owned by the debtor.

The -- our standpoint is that I think their evidence will show that the debtor has valid claims against the movant, and those claims are property of the estate, and by that virtue, they have to be held in bankruptcy court.

Today, whether it's transferred or not and whether it's remanded or not isn't in front of us. What's in front of us today is whether they're going to go back to liquidate a claim against the debtor where we believe the appropriate place to do that would be in bankruptcy court as part of the bankruptcy estate to collect those funds.

I think by the own statement, there's still things to collect and a case here to deal with. Whether it makes sense to go back to Dallas state court to liquidate an estate claim and then come over here, to us, we just don't think it's efficient to do, and I think the bankruptcy court can deal with that very, very quickly and be teed up and ready to go. That's our position.

THE COURT: All right. Thank you, sir.

MR. SINGH: Thank you.

THE COURT: All right. Mr. Grant, you can call your

first witness.

MR. GRANT: Your Honor, the debtor calls -- well, actually, before we get to that, I would like to move to offer some exhibits. In fact, we would ask to admit all of the debtor's exhibits.

Most of these are judicial notice. I attempted to reach out to debtor's counsel yesterday to talk about which ones could be admitted or not. That discussion never actually happened, but I would like to ask the Court to admit the debtor's -- I'm sorry, the movant's Exhibits 1 through 45.

THE COURT: All right. So at ECF 30, I think, is where your exhibits are filed. Is that correct?

MR. GRANT: That's correct, Your Honor.

THE COURT: Okay. So bear with me for one second. ECF 30-1 to 30-45.

Mr. Singh, I don't know if you have any objections.

MR. SINGH: I do, Your Honor. A lot of them are pleadings in this case. I don't have any problem with some of the judicial -- for -- to take judicial notice of them.

THE COURT: Do you have anything you want to stipulate to at this point in time?

MR. SINGH: At this point in time, I don't believe any of them really are relevant to today. There's stuff from other cases, so no.

THE COURT: Then we'll have to take them up after a

witness.

Mr. Grant, I mean, I apologize, but I can't just admit them over an objection.

MR. GRANT: I understood. Then, I would request that you take judicial notice of the pleading components and I can go through them in groups.

THE COURT: So anything that basically is filed of record in this case, filed of record in the state court case, or filed of record in the federal district court, I'll take judicial notice that those are on file, not for what's contained therein, but they're on file. I'll just do that basically. And so that's done.

I don't know what specific exhibits those are, but it should be pretty evident from my oral ruling what's admitted and what's not.

MR. GRANT: Understood, Your Honor.

THE COURT: All right.

MR. SINGH: No problem with that, Your Honor.

THE COURT: So call your witness.

MR. GRANT: Your Honor, the movant calls Derek Gove.

THE COURT: Sir, if you'll come to the microphone where your lawyer is, I will swear you in. If you will spell your last name for me when you get to the microphone. What's your last name, sir?

MR. GOVE: Gove. G-O-V-E.

THE COURT: Okay. Mr. Gove, will you please raise your right hand to be sworn.

DEREK GOVE, MOVANT'S WITNESS, SWORN

THE COURT: All right. Please be seated, sir.

Mr. Grant, as soon as he's seated, you may begin with your direct testimony.

MR. GRANT: Your Honor, I can proceed by either using my computer out with or I can use the ELMO.

THE COURT: Whatever works for you. I can turn on either one.

MR. GRANT: Let's see if we can get the computer to work.

THE COURT: All right. Then I will connect you to the podium connection. You are now projecting.

MR. GRANT: Sure am.

DIRECT EXAMINATION

Q Mr. Gove, would you state your name for the record?

A Derek Gove.

Q And what is your relationship to the movants?

A Managing partner of TED Ventures.

Q And were you familiar with the transaction that occurred between your companies and the debtor entities?

A Yes.

Q Can you tell us a little bit about the background of TREND Physicians Group, Inc.?

A TREND Physicians Group was operational for several years. Amassed six locations in the Dallas-Fort Worth metroplex area. That's where all operations and all assets kind of how -- were housed out of. It was a multidisciplinary physicians group that we put under a fair market valuation in 2023, entered into a lengthy due diligence and term sheet process with Atul Chopra and Zoo Capital and sold to his entities in December of 2023.

Q Have you had an opportunity to review the exhibits that the movants filed at ECF Number 30? This was exhibit binder you reviewed?

A Yes.

Q And are exhibits -- what are Exhibits 1 through 5? Do you remember?

A I don't have them in front of me. No, sir.

Q Fair enough. Did the closing transaction include an asset purchase and contribution agreement?

A Yes.

Q As well as a subordinated promissory note?

A Yes.

Q A security agreement?

A Yes.

Q A bill of sale?

A Yes.

Q And then did you also receive checks from the purchaser for partial payment for the purchase price?

A Yes.
Q Were -- did those checks clear?
A Some of them did, but $750,000 did not.
Q And are debtor's -- or are Movant's Exhibits --

MR. GRANT: Apologize, Your Honor, I do a lot of debtor work.

BY MR. GRANT:
Q Are Movant's Exhibits 1 through 5, those documents respectively?
A Yes.

MR. GRANT: Your Honor, I'd move for admission of Exhibits 1 through 5.

THE COURT: Any objections?

MR. SINGH: No objection, Your Honor, but I actually think it's probably 1 through 6, Exhibit Number 1 is broken into two. So just (indiscernible) --

MR. GRANT: To clarify, Your Honor, Exhibit Number 1 was too large to upload, so it threw off the ECF suffixes by one digit. It is the Movant's Exhibits T-1 through T-5, but on the ECF, as he indicated, it's Exhibits 30-1 through 30-6.

THE COURT: So, Mr. Singh, as I understand it, you have no objections to 30-1 to 30-6?

MR. SINGH: No objection to 30-1, 2, 3, 4. The 30-5 -- or the 30-6, I do have an objection to. It's some, I think, dishonored checks.

THE COURT: So you don't have any objections to 1 through 5. Is that correct?

MR. SINGH: Correct.

THE COURT: Then 1 through 5 at 30-1 to 30-5 are admitted.

(Movant's Exhibits 30-1 through 30-5 admitted into evidence)

THE COURT: Thank you.

BY MR. GRANT:

Q Mr. Gove, I've shown you what's been marked as Movant's Exhibit T-6. What is this document?

A That's a form from Enterprise Bank, which is our bank at TED Ventures with a returned check from Lucky Chopra from one of his companies, Advanced Diagnostics Health System, under the umbrella of Zoo Capital.

Q And do you -- what about Page 2, 3, 4, 5, and 6? Are these documents all keep in ordinary course of business of the movant in its business records?

A Yes, and these were three checks that were part and parcel to the base cash consideration for the down payment and the asset purchase and contribution agreement of $3 million. This is the $750,000 worth of checks that bounce.

Q And I notice that these checks are from Advanced Diagnostic Health Systems, LLC. Is that any of the buyers or the parties that were subject to the asset purchase and

contribution agreement?
A No.
Q What is Advanced Diagnostic? What does that word designate? Is that -- can you tell me a little bit about that?
A That is the -- the name and one of the entities under Zoo Capital that relates back to that corporate structure of Lucky Chopra's. And to our knowledge now, he commingles all the funds and he uses -- he used this account to -- to write the checks for the base cash consideration.
MR. SINGH: Objection. Non-responsive and argumentative.
THE COURT: I'll sustain the objection. Thank you.
MR. GRANT: Your Honor, the movants move for admission of Exhibit T-6.
THE COURT: Any objections to 30-6?
MR. SINGH: No objection, Your Honor.
THE COURT: It's admitted.
(Movant's Exhibit 30-6 admitted into evidence)
THE COURT: Thank you.
BY MR. GRANT:
Q I've now shown you what has been marked as Exhibit T, I believe it's 41. What is Exhibit T-41, found at ECF 30-42?
A An organizational chart.
Q Who prepared this?
A So the original chart was prepared by Lucky Chopra in

preparation of the APCA. The two entities on top were added, obviously, post-sale. And then the DET Dallas Clinics, formerly AD Dallas Clinics, was modified, I believe, for this presentation to show the naming convention changed.

MR. SINGH: Your Honor, object to the testimony by this witness. He didn't prepare it, no personal knowledge of it. It's prepared, at least by his testimony, by someone else who's not here.

THE COURT: I'll let you respond to that.

MR. GRANT: I have further questions, Your Honor.

THE COURT: Well, let me rule on the objection first.

MR. GRANT: Sorry. Certainly.

THE COURT: He can't testify from it until it's in evidence, technically.

MR. GRANT: That --

THE COURT: So I'll sustain the objection at this point in time. Thank you.

BY MR. GRANT:

Q Okay. So you said you believe that Mr. Chopra prepared this. How did you come into possession of this document?

A So like I said, the original chart was prepared by Lucky Chopra. He gave it to us during the due diligence prior to the sale, and then we prepared the two entities in purple on top, DET Dallas Clinics and TREND Physicians Group, and we've added that to the exhibit since.

Q So does Exhibit T-41 reflect statements made by Mr. Chopra and his representatives to you of the corporate structure of his entities?
A Yes.
MR. SINGH: Objection. Calls for hearsay and still no personal knowledge.
THE COURT: I'll sustain the objection. It's not admissible based on what I've heard so far.
MR. GRANT: I'll argue as that's a statement of admission of a party opponent.
THE COURT: I already ruled on the objection. Thank you. Move along.
MR. GRANT: All right. Very well.
THE COURT: Thank you.
BY MR. GRANT:
Q Did you form an opinion about the organizational structure of the Chopra's entities?
A Yes.
Q How did you form that opinion?
A I formed the opinion through extensive due diligence on the Texas Secretary of State and from documents that he delivered to us through the due diligence.
Q Did you ever show a version of this chart to his representatives?
A Yes.

MR. SINGH: Objection. Assumes facts not in evidence.

THE COURT: I'll sustain the objection. Thank you.

BY MR. GRANT:

Q Were these documents provided to you as a part of your due diligence in entering into the transaction?

MR. SINGH: Objection. Assumes facts not in evidence. (Indiscernible).

THE COURT: I'll overrule the objection. I'm not sure what happened. I think you disconnected. I don't see any way for you to get this into evidence, so I'd ask you to move along.

MR. GRANT: Okay.

THE COURT: Thank you.

MR. GRANT: Fair enough, Your Honor.

BY MR. GRANT:

Q Mr. Gove, I'm showing you what's been marked as Exhibit T-42. Can you identify this document?

A Yes,. This is a corporate structure and restructure document that shows the structure of the advance in Zoo.

Q And again, was this given to you as part of your due diligence with going into the transaction?

MR. SINGH: I'm going to object. Same objection. It's a different chart of the same items.

THE COURT: So what's your objection? I don't --

when you say same objection --

MR. SINGH: Sorry.

THE COURT: -- there have been in multiple objections.

MR. SINGH: Sorry, Your Honor.

THE COURT: Make your objection. I'll rule on it.

MR. SINGH: Lack of personal knowledge.

THE COURT: I'll let you to respond to that. If he didn't prepare it, I'm not sure how he can authenticate it.

BY MR. GRANT:

Q Did you prepare -- or who prepared what's been marked as Exhibit T-42?

THE COURT: And just so the record's clear, we need to refer to them by ECF Number, because that's how they're going to get admitted. So T-42 is actually Exhibit Number 43, 30-43.

MR. GRANT: Understood, Your Honor.

THE COURT: Thank you.

BY MR. GRANT:

Q Did you prepare the document at ECF 30-43?

A No.

Q How did you obtain this document?

A This was provided through the subpoena of Ryan Reneau, the former CFO of Advance, right before the trial setting in Dallas.

MR. GRANT: Your Honor, the movant moves for admission of Exhibit 30-43.

MR. SINGH: Object. Lack of personal knowledge, lack of authentication, Your Honor.

THE COURT: I'll sustain the objection.

MR. GRANT: Your Honor, the movant's move to admit -- or it's previously been admitted that this is 30-31, which is the declaration of Mr. Gove as the proffered testimony of Mr. Gove. It's been admitted for the fact that it's been filed with the Court, but now I'd like to admit it as a proffer of his testimony.

THE COURT: Any objection to the admission of 30-31?

MR. SINGH: I just want to make sure I understand. 30-31 is the -- his declaration?

THE COURT: It's his declaration.

MR. SINGH: I would object to the declaration as an out-of-court statement, Your Honor.

THE COURT: I'll overrule that objection. He's here. You can cross-examine him.

MR. SINGH: Okay.

THE COURT: To the extent that he adopts it in full, that's fine. I'll admit it. You can go to town on the declaration. Thank you. It's admitted.

(Movant's Exhibit 30-31 admitted into evidence)

BY MR. GRANT:

Q I'm showing you what's been marked as Exhibit 44. Do you recognize this letter?
A Yes.
Q Was this correspondence to Ms. Adams sent on your behalf and in your direction?
A Yes.
MR. GRANT: Your Honor, the movants ask for admission of Exhibit 44.
THE COURT: Any objections?
MR. SINGH: Objection of relevance. (Indiscernible) we're here on a motion for relief to go back to state court and a breach of contract.
THE COURT: I'll overrule the objection as to relevance. Thank you. It's admitted.
(Movant's Exhibit 44 admitted into evidence)
MR. GRANT: Your Honor, I'll pass the witness.
THE COURT: Thank you. Mr. Singh?
MR. SINGH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SINGH:
Q Mr. Grove, is that correct?
A Gove.
Q Gove. Sorry about that. I'm going to go back a little bit in the transaction. Prior to the sale of -- okay. Prior to the sale to the debtor's group, did TREND Company, you guys,

you were operating, have a loan with Enterprise Bank?
A It was a party to the loan, yes.
Q And was that loan paid off?
A Was that loan paid off? Sorry, at what point?
Q After the sale?
A No.
Q Has that loan been paid off as of today?
A No.
Q Was that loan supposed to be paid off as part of your transaction?
A The loan in entirety was not supposed to be paid off as part of the transaction.
Q So if I understand correctly, your position is that the sale of the entity was supposed to be sold to someone else, and then the loan that you had on that entity prior to the sale was supposed to transfer to the new buyers?
A No.
Q Okay. So if the loan that you had prior to the sale was not supposed to be transferred and was supposed to be dealt with, but it has not been dealt with as we sit here today, how do you explain that?
A There was a UCC-1 on TREND Physicians Group held by Enterprise Bank and Trust, and they were to lift the UCC-1 on completion of the asset purchase contribution agreement with successful base cash consideration payment, as well as the

rollover securities, and -- as well as the security of the accounts receivables of $15 million.

Q Okay. Was that UCC-1 ever lifted by Enterprise Bank?

A No.

Q Okay. As we sit here today, that UCC-1 is still in place?

A To my knowledge, yes.

Q And Enterprise Bank doesn't have any agreement with the debtors, correct?

A I don't know.

Q Okay. The state court lawsuit, is there counterclaims by the debtor in the state court lawsuit?

A Sorry, is -- do you mind rephrasing your question, re-asking your question?

Q Sure. Did the debtor file counterclaims in the state court lawsuit?

A The debtor meaning TREND Physicians Group, sir?

Q Mm-hmm.

THE COURT: Yeah, there are two debtors.

MR. SINGH: Right, sorry.

THE COURT: So which one are you talking about?

MR. SINGH: Either of the debtors.

BY MR. SINGH:

Q Did either debtor file claims against -- counterclaims in the state court lawsuit?

A To my knowledge, yes.

Q Okay. Do you know what those claims are filed by the debtors?
A Off the top of my head, I don't have them memorized.
Q What -- have you had an opportunity to look at them?
A Over the -- you know, probably about a month ago, I reviewed them.
Q What's your understanding of the counterclaims?
A I believe the counterclaim was involving stating that the -- that TREND Physicians Group was not free and clear at -- prior to the execution of the asset purchasing contribution agreement.
Q Okay. And is part of that allegation the Enterprise loan?
A The Enterprise UCC-1.
Q Which is for a loan, correct?
A It's tied to a loan, yes.
Q Okay. And is your understanding that the counterclaim -- part of the counterclaim is based on the Enterprise loan?
A Yes.
Q Okay. Other -- in the state court litigation, the claims that were brought by TREND Physician Group against the debtors -- sorry, withdraw the question.
Claims against the debtors in the state court lawsuit, what is it for?
A The claims against the debtors?
Q Mm-hmm.

A The debtors here today, DET and TREND Physicians Group?
Q Correct.
A They are party to the claim of -- of non-performance of the asset purchase and contribution agreement as well as the acceleration of the note.
Q Would it be fair to categorize that as a breach of contract or breach of the purchase agreement?
A Yes.
Q Okay. Do you have a judgment in that lawsuit yet?
A Not yet.
Q As we see here today, is that set for trial in the state court?
A I believe it's set for October 6th.
Q Let's see if I understand, maybe a little more background. After the sale happened in 2023, is that about right?
A Sorry, you said -- what was it?
Q The sale, the asset purchasing agreement, that transaction happened in around December of 2023?
A Yes.
Q After that transaction closed, who continued to operate the DET?
A So I knew it as AD Dallas.
Q AD Dallas?
A Lucky Chopra did.
Q Lucky Chopra was running the company?

A Lucky Chopra, yes.
Q What was your position in the entity?
A I had an employment agreement with AD Dallas Clinics that Cognizant Management Solutions had adopted and started to pay under shortly after the transaction.
Q What was your position, actual title?
A For which entity?
Q For AD Dallas.
A I didn't have an actual title with AD Dallas Clinics, LLC.
Q So what was your employment agreement? What was the title in your employment agreement?
A I believe the title of my -- in my employment agreement was to be chief executive officer of TREND Physicians Group and Advanced Surgeons and Physicians Network, to my knowledge.
Q Okay. And what would you say that encompassed?
A Day-to-day administration and oversight of both the physicians group under the Zoo Capital corporate structure and under Lucky's corporate structure.
Q Okay. And to make sure I'm clear, the two debtors, DET or AD Dallas and TREND Physicians Group, those are the entities that you basically were CEO of, correct?
A I was not the CEO of AD Dallas Clinics, LLC.
Q You were the CEO of TREND, which is the operating entity. Is that correct?
A I don't know about the word operating entity. TREND

Physicians Group was operating, and I was the CEO as registered with the state.

Q Okay. So what were you doing?

A Administrating the physicians' group.

Q And so did you have doctor -- were there doctors working for TREND Physicians Group?

A Yes, there were physicians working for TREND Physicians Group.

Q Were the TREND Physicians Group seeing patients?

A The doctors were seeing physician -- sorry, patients, yes.

Q Okay. And you were the CEO overseeing all of that, weren't you?

A Yes, I was the CEO of TREND Physicians Group.

Q Okay. And so how long were you the CEO of TREND Physicians Group?

A After the sale until April 10th of 2025.

Q All right. I'm going to back up a second. DET stands for what?

A DET, I don't know.

Q Okay.

A It was a name change that was done the day before the trial and the bankruptcy.

Q Got it. When -- before the transaction, what was the company called?

A Which company?

Q Your company.
A My company --
Q Mm-hmm.
A -- that's got the claim against your company? It's TED Ventures.
Q Okay. What's TED Ventures stand for?
A It stands for TED Ventures, sir.
Q Okay. It doesn't -- not the last names of the individuals who formed the company?
A No, the last names are Stowhas, Austin, and Gove.
Q Okay. All right. So tell me those three names again.
A Stowhas, Austin, and Gove.
Q And were they, those -- the other two partners, your other two partners, did they have a position in TREND Physicians Group after the transaction?
A Yes.
Q What were their positions?
A Austin was -- Mr. Austin was the chief financial officer and Mr. Stowhas was the chief marketing officer.
Q Okay. So chief financial officer, chief marketing officer, and you were the CEO of the TREND Physician Group after the transaction?
A Yes.
Q Okay. And is it fair to say the three of you maintained and controlled operations of TREND Physician Group?

A Administrative operations, but nothing related to payroll, nothing related to accounting, nothing related to financial matters. That was all handled by Lucky Chopra and Zoo Capital.
Q Okay. Let me ask a question about that. Didn't -- when you were the CEO of TREND Physician Group, didn't you maintain QuickBooks for TREND Physician Group?
A Prior to the sale or after?
Q After the sale.
A No.
Q No one of -- for -- no one that worked under you, you were saying controlled and maintained the QuickBooks for TREND Physician Group?
A The QuickBooks was controlled and maintained by Lucky and his organization, Cognizant Management Solutions, Joe Lenahan, and his accounting team under Cognizant of Joe Lenahan. I believe Ryan Monroe was the CFO at the time, but was not an operator of the QuickBooks. Joe Lenahan and his accounting team under Lucky handled all QuickBooks-related matters, and they were very adamant about that from day one of the transaction.
Q Okay. All right. And if there's evidence that shows that they didn't have access to the QuickBooks, that's going to be false?
MR. GRANT: Objection. Relevance. I can expand.
THE COURT: I'll overrule the objection on relevance.

At this point in time, I'm still trying to figure out what's going on. So to the extent that it helps at all, I'm ready to hear it. Go ahead.

MR. SINGH: Thank you.

THE WITNESS: Do you mind re-asking your question?

BY MR. SINGH:

Q If there's evidence that shows that your -- that QuickBooks was not controlled by any of the entities in Zoo or Lucky or the debtors, that would be incorrect?

A Yes, because post-transaction, a final ledger of QuickBooks was uploaded to the data room, and I know that Trey Austin offered several times to Mr. Reneau, to Lucky, to Joe Lenahan to help get the QuickBooks set up, but they were adamant that they wanted to maintain all payroll, all QuickBooks, all accounting in the Zoo and Cognizant umbrella.

Q Okay. Let's walk forward a little bit. After the transaction in 2023, you and the other two individuals are effectively managed in TREND Physician Group. At some point in time, I think you said 15 months later, you were terminated. Is that correct?

A Yes.

Q And this lawsuit came about after the termination. Is that correct?

A This lawsuit was filed after the termination.

Q Okay. And I want to go back to Enterprise, Enterprise

Bank. One of the deliverables for closing the transaction was that the Enterprise Bank loan, or I think your testimony, the UCC was supposed to be removed. Is that correct?

A One of the conditions of the A -- asset purchase and contribution agreement was that it would be removed, and the agreement with the bank and with Zoo was that it would be removed on completion of the asset purchase and contribution agreement, just like when you're, you know, buying a car or anything else. If there's a lien on it, you have to complete the contract and satisfy the contract to remove the UCC.

Q Let me see if I understand that testimony. As I understand the asset purchase agreement, the Enterprise Bank loan, before it got sold to someone else, just like if you're buying a car, the Enterprise loan needs to be dealt with, and it doesn't go on to the new entity. Is that correct?

A Dealt with. It was -- we had spoken to the bank, and the bank was prepared to release the UCC, but without the completion of the asset purchase and contribution agreement and its requirements, they had nothing to complete and nothing to release. So until there was a completed transaction, they could not release the UCC-1 that they had also agreed to do.

Q But in the asset purchase agreement, the -- one of the closing deliverables to close the transaction, which would be normal, is that any outstanding debt get paid off. Isn't that true?

A I don't have the contract in front of me, but to my knowledge, and per the testimony of the actual Enterprise banker, as well as their officer, as well as that they had spoken with Ryan Reneau and Lucky Chopra, and would release the UCC on completion of the asset purchase agreement, as well as the consideration for the APCA.

Q Was the asset purchase agreement, was Enterprise Bank a signature to the asset purchase agreement?

A They were not a signature to that agreement.

Q So why would they have any say?

A Well, they had a UCC-1 on some of the assets, substantially all the assets that were being transferred.

Q And that UCC-1 was between your entity and Enterprise Bank. Isn't that correct?

A UCC-1 was between TREND Physicians Group and the bank.

Q And so who was supposed to be the one that releases? Isn't that you? Wasn't that one of your deliverables?

A Enterprise is the only person that can release a UCC-1 that they hold.

Q Yeah, but the transaction -- the loan between Enterprise wasn't with TREND Physicians Group, correct?

A The UCC-1 was held by Enterprise with TREND Physicians Group.

Q Let me make sure I'm not messing up your testimony. Who would have been the one to get the UCC-1 from Enterprise Bank

released?
A The bank itself and the senior vice president that was handling the transaction for the bank. And between us and Lucky was Andrew Lipman at the time. He was working hand-in-hand with Ryan Reneau, the current CFO for Lucky and at Zoo Capital at the time. So there was a multitude of conversations and they were prepared to release all UCC-1s on completion of the APCA and the consideration.
Q Did Enterprise Bank have an agreement with Zoo Capital at the time of this transaction back in 2023?
A Yes.
Q Dealing with this UCC-1?
A Yes, they were going to release the UCC-1 over TREND Physicians Group on completion of the asset purchase contribution agreement and consideration.
Q I'm just trying to find out -- what I understood your testimony to be earlier was that Enterprise Bank and the selling entity had a -- they had the loan, correct?
A TED Ventures had a loan with Enterprise Bank, yes.
Q And that's the UCC that was supposed to be released.
A There were several UCCs over TED Ventures and its assets, including TREND Physicians Group and the assets that were being transferred in the APCA.
Q Did Zoo Capital or Lucky Chopra have any ownership interest in TED?

A No.
Q Who were the officers of TED?
A Who were the officers, sir?
Q Uh-huh.
A The officers of TED Ventures are myself, Mr. Austin, Mr. Stowhas.
Q And so anything that TED had to do with Enterprise Bank, it would be one of you three, correct?
A In conjunction with the parties at Zoo and the bank that we all worked together to make sure that they had approved of the agreement, the sale of the assets, and were prepared to release just like any, you know, usual customer sale of anything that we've done with the bank prior --
Q So you --
A -- (indiscernible) transactions.
Q I want to make sure I'm understanding. So you're saying although Lucky had no interest in TED Ventures, he had a way of controlling TED Ventures.
A I never said that, sir.
Q So go back to my question. Any transaction authorization that needed to come from TED Ventures to Enterprise would have had to come from one of the three, yourself or one of your two partners. Is that correct?
A I'm trying to follow your -- your -- your question, sir. Are you -- you're -- do you mind rephrasing your question? I'm

trying to follow it.
Q Sure. If TED, who had to loan with Enterprise Bank, if TED was going to authorize Enterprise Bank to do anything on the loan they have together, that authorization would have to come from you or one of your two partners.
A Authorization of anything related to our loans with Enterprise, yes, and --
Q Okay. Thank you.
A -- I know that -- oh, sorry.
Q Thank you. So the state court litigation, what do you seek in the state court litigation?
A Recovery of our damages.
Q Which is what?
A I believe north of $12 million now.
Q Which is for what?
A Excuse me. Let me restate that. I believe it's just north of 9.2 million as it sits today, plus another $300,000 of unpaid management fees. Let me correct that previous statement.
Q Okay. Let me break that down. The 9 million or so, what does that consist of?
A The damages related to the asset purchase and contribution agreement that was not met.
Q Does it encompass anything else?
A I don't believe so.

Q Okay. Let me move on now to the part you added, which is the $3 million in management fees. Is that not what you said?
A No, sir.
Q So --
A I didn't say $3 million in management fees. I said a little -- little over 300,000.
Q Oh, 300,000 in management fees. Is there a document that evidences management fees are supposed to be paid?
A Yes.
Q What document is that?
A The management services agreement -- agreements, plural.
Q That wasn't one of the documents you reviewed for today's hearing, though, is it?
A I did review it for today's hearing.
Q Was it one of the documents your lawyer showed you?
A My lawyer didn't show me the documents today in this hearing, but we have reviewed those.
Q Okay. And if I understand that, I can categorize that as a breach of contract, correct?
A Yes. The breach of --
Q Okay.
A -- contract for the non-performance of the APCA and the management contracts.
Q All right. And so is there a reason that you can't bring those claims in bankruptcy court?

A I'm not a lawyer, sir. I follow the legal advice of my lawyers on where claims need to go.
Q Okay. Okay. So is your lawyer making a decision not to bring the court -- the claims in bankruptcy court?
A I -- I guess I'm not following the question.
Q Would it hurt you to litigate that breach of contract here in bankruptcy court?
A Would it hurt us?
Q Yeah.
A Yes.
Q Why?
A Because the -- the two parties that -- Zoo and Lucky are separate from TREND Physicians Group and from A.D. Dallas Clinics. It was trial ready. We had done 16 months' worth of discovery, litigation work, et cetera, experts and all the things that got it ready for trial. And yes, it would hurt us not to have that liquidated in the Dallas County Court.
Q Let me sparse that out, because it seems like you're saying there's a number of parties in the state court litigation. Is that correct?
A Yes.
Q All right. The debtors are two of those parties?
A Yes.
Q There's non-debtor parties, correct?
A Yes.

Q And so if the -- just talking about the debtors, how would coming over to bankruptcy court to litigate against the debtors hurt you?

MR. GRANT: Objection, Your Honor. This is really getting close to calling for a litigation strategy and communication -- attorney-client communication.

THE COURT: I'll overrule the objection. Go ahead.

THE WITNESS: Do you mind re-asking the question?

BY MR. SINGH:

Q Sure. The debtors that are in bankruptcy, how would coming to bankruptcy court to litigate those claims against the debtors in bankruptcy, how would that hurt you?

A Without coming to a legal closure, because I'm not a lawyer, you know, to my knowledge, you know, the -- the money is owed by Zoo and Lucky. The debtor -- well, AD Dallas Clinics was a shell, and TREND Physicians Groups has been stripped of all its assets. So how it would hurt, I mean, it would not allow us to seek damages to be recovered.

Q Well, if I understand your statement, is that really you're going after the two non-debtors?

A We've got claims against all four, to my knowledge.

Q Okay. In your declaration, you state that there was $47 million that was raised. I guess I'll say it that way. What's your basis for that claim?

A So the $47 million that you're referring to is personal

injury accounts receivables that Lucky Chopra had showed us in the identification process of the security for the loan agreement. $15 million of the ARs that were identified were to be pledged as security to the note, and through our due diligence process in preparation for the closing of the asset purchase and contribution agreement that $47 million was showed to us as viable accounts receivables that Ryan Reneau and Lucky Chopra had personally worked with us on to identify as the proper security to the note as it called for in the $15 million.

Q Okay. Was that -- was those receivables, the two debtors here today, were those receivables of the debtor?

A They were to be pledged to AD Dallas Clinics, which the UCC loan was granted to TED Ventures and TREND Medical Management -- sorry, to TREND Medical Management over that to the asset purchase agreement. They would be pledged at closing and assigned into that, into AD Dallas Clinics by Lucky Chopra.

Q I get you. All right. I'm going to ask -- I don't know if you answered my question, but let me ask my question. I probably asked a bad question. Was the $47 million of accounts receivable receivables of either of the debtors in this case?

A At what point in time?

Q At the time of this transaction or at the time you say, and this is your declaration I'm reading from, was those receivables receivables of the debtor?

A They were verbally pledged to us and told that they were set aside to be finalized at the closing. And then shortly after, taken out and factored by Lucky.

Q It's probably my fault for asking a bad question. Your declaration says there's $47 million worth of accounts receivable. My question, I think, is easier. I'm going to get to the question I think you want to answer next. My first question is, were those $47 million worth of accounts receivables, were those $47 million worth of accounts receivables of the debtors, either of the debtors in this case?

A To my knowledge, at the closing, they had pledged the receivables. And then we were set to document them. And then 16 days later, they were sold.

Q So you don't know whether it was the debtors' receivables or one of Lucky's other companies receivables or Lucky's receivables or anyone else's receivables. Is that the answer?

A They were pledged to AD Dallas Clinics and that was at closing.

Q Didn't answer the question, but I'll move on. Did you -- your declaration also says $15 million was received.

A Say that again, sir.

Q Your declaration says $15 million was received from that transaction.

A 1-5, 15, sir?

Q 15, 1-5, correct?

A Yes, sir, 15 million by AD Dallas Clinics.

Q Okay. And your basis for that statement?

A Lucky Chopra and Ryan Reneau.

Q And you don't have any -- were there documents?

A They were prepared and segregated for the closing, and then when the documentation was to be sent to us post-closing, it was not.

Q Okay. So no documents were ever signed to pledge those?

A No, and then when they went to pledge them, they had factored them.

Q Okay. You also claim that there was $29 million of intercompany transfers. Tell me what your basis for that is.

A My basis for the $29 million was the accounting that Lucky and Ryan had showed us subsequently. The -- we had asked for a full accounting. Of course, when they didn't perform under the APCA and bounced $750,000 in checks, didn't give the -- they had sold the accounts receivables that were supposed to be pledged and did not provide the rollover securities.

We went into further trying to understand what happened, because we had already transferred -- you know, worked on transferring the assets. The bank was working on that. So we had to provide an explanation to the bank on what happened to the money, including the rationale for the bounced checks. So Lucky and Ryan opened up their books as well as their actual accounts.

Prior to the closing, they had showed us, Lucky had actually logged into the account and showed us the $5 million set aside for this transaction. And then Ryan subsequently and Lucky subsequently showed us all the intercompany transfers that happened on a day-to-day basis.

Q Okay. I'm going to ask my second question here? I'm going to start with the $5 million. Was the $5 million that you saw, was that in the debtor's accounts?

A It was in one of the accounts that Lucky said was set aside to pay for the base cash consideration.

Q But you don't know whether that was the debtor's account or Lucky's account?

A Sitting here right this second, when you say the debtor, you mean Lucky Chopra or in this case (indiscernible) --

Q Either one of the debtors here, as you know, AD Dallas or TREND Physicians Group.

A Well, the money could not have been in TREND Physicians Group and AD Dallas Clinics did not have a bank account to my knowledge.

Q All right. The $29 million that you saw transactions of, was those transactions money coming out of one of the two debtors here account?

A No.

Q Okay. Did you see any money going into one of the two debtors' accounts?

A Lucky had money transferred in to TREND Physicians Group prior to the sale because there was an agreement for transition services that had started in November of 2023. So Lucky and his entities had started putting money into TREND Physicians Group for the transition services agreement and continued to put money into that account post-closing as well.

Q Okay. Your declaration also says there was $15 million that flowed to Cognizant Management Solutions. Who is Cognizant Management Solutions?

A Cognizant Management -- Cognizant Management Solutions is the management company for Advanced Diagnostics Health System under Zoo Capital and Lucky's control.

Q Okay. And the money that flowed -- what did they do? What did Cognizant do? Or what does it do?

A Cognizant is a management and employment entity for administrative folks for the different hospitals, physicians' groups under Zoo Capital.

Q So if I understand then, they're going to collect money and then pay the payables for the company it's collecting on, yeah?

A Yes.

Q Okay. And when you say there's $15 million that flowed to that company, would that -- is that out of the ordinary if they're the management group collecting the funds?

A Is it out of the ordinary? I guess it would be if it's

pledged.

Q You operated or at least managed TREND Physician Group for 15 months after the transaction in 2023. This $15 million in your declaration, did it include the time period when you managed TREND Physician Group?

A We did not manage the finances or payrolls or payables post-closing.

Q I'm going to ask bad questions sometimes. The $15 million in your declaration, did it cover the transfers to the management company? Did it cover the time period when you and your two partners managed TREND Physician Group?

MR. GRANT: Objection. Form.

THE COURT: I'll sustain the objection.

BY MR. SINGH:

Q Give me the time period that money flowed from -- you don't say the debtor in your affidavit, when the money flowed to the management company. When does that $15 million encompass?

A To my knowledge, money was not supposed to flow to Cognizant Management Solutions.

Q My question is, you say $15 million flowed to Cognizant. I'm trying to figure out the time period of that.

A After the closing.

Q The day after the closing all the way through today, time period?

A Well, 16 days after the December closing, that's when the receivables were factored. And then shortly after, those monies were transferred in. And Ryan and Lucky had both admitted that. And actually, that's part of our evidence. It stated that this is their problem. They needed to fix this with the bank.

Q Okay. So December of '23 it closes until today. Your $15 million runs from December of '23 to today.

A I said it was a short time period.

Q Sorry. Maybe I missed that. When does the $15 million that went to the management company, what's the time period for your declaration?

A It would have been post-closing until, you know, it would have been through 2020 -- early 2024.

Q Okay. So it'd be the year while you were CEO.

A It -- it was about six months that I was the administrative CEO. Yeah.

Q Okay. Let's see if I understand that. Because earlier you said you didn't get terminated until 15 months later. When you say administrative CEO, what does that mean?

A We handle all administrative affairs, day-to-day interactions with doctors, making sure systems are set up. When we had no human resources, we had no payroll, accounting, finance. We had no responsibilities or access to any of that through Lucky's system. After the sale, everything was ran

through Lucky's organization.

Q Okay. But you said you were administrative CEO for six months. Did you lose your CEO title at the six-month mark?

A No, I was the CEO of the physicians group until April 10th of 2025.

Q Okay. So the whole time period you're talking about, you were CEO of the $15 million. The whole time, that $15 million transaction to the management company, you were CEO.

A I was the CEO until April 10th, yes.

Q Okay. Your lawyer showed you a letter early on when he was up here, losing our world letter. You remember that?

A I do.

Q Okay. That letter is to the debtors to investigate these transactions we just went through. Is that correct?

A To my knowledge, amongst other things.

Q Here's my question. When we went through your declaration just now, your testimony, at least, was that the debtors at the time didn't have bank accounts. There was no money coming out of the debtors' accounts. That's not the testimony?

A No, sir, that was not my testimony.

Q Maybe I just messed up your testimony. I'm going to go back to my question. When Lucky showed you the $5 million, was that one of the two debtors' bank accounts?

A No.

Q Was those funds in any account for the debtor?

A For TREND Physicians Group, no, and not for AD Dallas Clinics, because --
Q Okay. And those are the two debtors, correct?
A Yes.
Q All right. The $29 million that was transferred, that you saw transferred, were those from the debtors, any account associated with the debtor?
A No.
Q Okay. The $47 million worth of AR, were those AR for the -- either of the debtors?
A Yes. Sorry, excuse me, let me re-correct that. It was pledged to the debtors.
Q But was it -- well, by virtue, if it had to be pledged to the debtor, it wasn't the debtor's AR, correct?
A It was pledged at closing and then stripped away and sold.
Q Okay. So if I understand the letter that was sent on your behalf, has all those same numbers, the 29 million, the 15 million, the 5 million, the 47 million, is it my understanding you're asking the debtor to investigate transactions done by a non-debtor?
A I'm going to rely on what the letter asks for.
Q Say that one more time. I just didn't hear you.
A I'm relying on what the letter asks for.
Q I just had a hard time hearing that first part.
A I'm relying on what the letter asks for.

Q You're relying on what the letter asks for. But it's your letter?

A Yes.

Q And so I'm just trying to understand what you're asking the debtors to do?

A Exactly what's in the letter.

Q To look at transactions that you now -- your testimony that is not in any assets of the debtor.

A We're asking for a complete evaluation per the letter.

MR. SINGH: Okay. All right. Pass the witness, Your Honor.

THE COURT: Thank you. Mr. Grant, I will warn you that I'm going to break at eleven o'clock to pull the very, very short docket. So if you want to proceed now or if you'd prefer to wait, I'll excuse you to 11:15. It's up to you as to what you want to do. I'll let you go for 12 minutes if you want to go for 12 minutes.

MR. GRANT: Your Honor, I don't mind going for 12 minutes as long as I don't have to finish in 12 minutes.

THE COURT: No, sir. I'm not -- I mean, I will be done by 11:15 and then we've got until the end of the day.

MR. GRANT: And we can pick up the examination at that point?

THE COURT: Yeah. Yeah.

MR. GRANT: Okay. Thank you.

THE COURT: So the --

THE WITNESS: Sorry. May I stretch my legs real quick? I had surgery just not too long ago.

THE COURT: Okay. Then let's do this.

THE WITNESS: Yeah.

THE COURT: Given the witness --

THE WITNESS: Yeah.

THE COURT: -- and I want you to break whenever you need to --

THE WITNESS: Yeah.

THE COURT: -- we'll stand adjourned until 11:15. I'll see you back at 11:15. Thank you, sir.

MR. SINGH: Thank you, Your Honor.

MR. GRANT: Thank you, sir.

THE COURT: All right.

THE CLERK: All rise.

(Recess taken at 10:49 a.m.)

(Proceedings resumed at 11:15 a.m.)

THE CLERK: All rise.

THE COURT: Please be seated. All right. It's 11:15. We're back on the record in 26-3026.

Mr. Gove, you're on the stand. I'll remind you that you're still under oath.

Mr. Grant, he's your witness again. You may start.

MR. GRANT: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. GRANT:

Q Mr. Gove, on cross-examination, you talked about the closing of the transaction and the payoff of Enterprise Bank. Could you describe how the transaction was supposed to work so the lien would have been released?

A So at the closing of the asset purchase and contribution agreement, there was supposed to be $3 million in base cash consideration delivered at closing, a $3 million note with $15 million in accounts receivables pledged at security to that with a rollover of securities issued and $6 million. And then, upon completion of the signing as well as the deliverables, the UCC-1 was to be lifted on the assets being transferred and Enterprise Bank had agreed to do that.

THE COURT: All right. Let me interrupt you for just one second, because I inadvertently announced the wrong case number when I came back on the bench. So we're back on the record in 26-35975, not 26-30626.

Go ahead, sir.

BY MR. GRANT:

Q So are you saying that this was -- the lien was going to be paid off by the purchase price?

A Yes.

Q And the lien wasn't paid off because the purchase price wasn't paid?

A Yes, the lien was not removed because the purchase price was not paid.

Q Okay. And did you have any communication with Mr. Chopra about the release of the liens and when that should happen?

A Yes.

Q What did you say?

MR. SINGH: Objection. Calls for hearsay.

THE COURT: I'll sustain the objection.

BY MR. GRANT:

Q None of the questions on the cross-examination were about issues about release of the Enterprise lien, you know, activities of you post-closing and the counterclaims that the debtor has brought against you and your entities. Are those all issues that are as a part of the existing litigation?

A Yes.

Q And that's exactly what would have been tried on the trial date?

A Yes.

MR. GRANT: I'll pass the witness.

THE COURT: Mr. Singh.

MR. SINGH: One quick question, Your Honor.

THE COURT: Sure.

RECROSS-EXAMINATION

BY MR. SINGH:

Q How much is the Enterprise Bank loan?

A For what, sir?
Q The Enterprise Bank loan that the UCC has. How much is that loan?
A For which entity, sir? Sorry, to clarify.
Q As part of the sale -- the transaction in '23, there's an Enterprise Bank loan in UCC. You familiar with that?
A I am.
Q How much is the Enterprise Bank loan?
A TED Ventures held the loan with Enterprise Bank and the asset of TREND Physicians (indiscernible) a UCC-1 as collateral for the loan set with TED Ventures.
Q How much --
A And that loan at the time, I believe was $8 million total.
Q If I understand the transaction as you said it, $3 million is supposed to be in cash. Am I correct?
A Correct.
Q And $3 million was a loan, a promissory note to pay later?
A Yes.
Q And $6 million was pledge of collateral?
A $6 million was rollover securities.
Q Rollover securities. Can you explain to the Court how, going back to your analogy about the car, if you owed Enterprise Bank $8 million, you were only getting $3 million, how were you going to close the transaction to release a $8 million loan with only $3 million in cash?

A Well, very easily. TED Ventures is the one that held the loan and it was senior debt service for TED Ventures to operate, including a revolving line of credit. So knowing that Enterprise was the senior banking entity for TED Ventures, part of the relationship was the buy and sell of entities from time to time. TED Ventures is known to buy businesses, sell businesses, start businesses. And as part of the credit facility, the bank would time from time either release UCCs on sold assets or add UCCs to new assets under TED Ventures. And this was an agreed to released asset should the APCA be executed and then completed with the consideration.

Q So when was that completion? Because the transaction closed, correct, in December of 2023?

A The documents were signed, but the consideration was not paid.

Q So in your position, was the transaction closed?

A Yes, closing was done without consideration being paid in full.

Q But you considered the transaction closed?

A The documents were signed, the assets were transferred in accordance with the documents, and the full consideration was not paid for. That's why we're here.

Q So Enterprise Bank, although they agreed to remove the UCC because as part of your transaction, you didn't get something or the company that TED didn't get something, Enterprise Bank

decided not to remove the UCC.
A Well, the bank didn't get something and TED did not get something. The bank was, again, they're the ones working with Lucky and with Ryan throughout this entire process.
Q What was the bank going to get from closing?
A The proceeds of the $3 million cash consideration, the accounts receivables pledge was going to be part of the total pledge agreement as the assets of TED Ventures. The loan and note was also going to be part of the pledge. So all of that would have become assets out of the TED Ventures.
Q Are all of those terms to Enterprise Bank in the asset purchase agreement?
A All of what terms specifically?
Q Specifically the ones you just went through. That Enterprise Bank was going to get the $3 million. Enterprise Bank was going to get the pledge of assets.
A The money was being sent directly to Enterprise Bank. Those were the wiring instructions.
Q Was Enterprise Bank -- in the asset purchase agreement, does the asset purchase agreement say Enterprise Bank was going to get the $3 million?
MR. GRANT: Objection. Document speaks for itself.
THE COURT: I'll sustain the objection, thank you.
MR. SINGH: Okay. No further questions, Your Honor.
THE COURT: Thank you. Mr. Grant?

MR. GRANT: No follow-up.

THE COURT: All right. Thank you, sir. You're excused.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: All right. Mr. Grant, do you have another witness?

MR. GRANT: Your Honor, the movants call Jonathan Curth.

THE COURT: Mr. Curth, do you want to come forward? If you'll come to the microphone, sir, I'll swear you in and once I've sworn you in, you can be seated.

You spell your last name, K-U-R-T?

MR. CURTH: It's C-U-R-T-H, Jonathan, J-O-N-A-T-H-A-N.

THE COURT: Thank you, sir. Please raise your right hand.

JONATHAN CURTH, MOVANT'S WITNESS, SWORN

THE COURT: All right. Please be seated.

Mr. Grant, as soon as he's seated, you may begin.

DIRECT EXAMINATION

BY MR. GRANT:

Q Good morning, Mr. Kurth. My name is Richard Grant, I represent the movants. Could you describe your capacity for the debtors, DET Dallas Clinics, LLC and TRENT Physicians

Group, Inc.?

A Yes, I'm the general counsel of the enterprise, so I would say the entire -- I'm employed by Zoo Capital. So I'm -- but I'm the general counsel of the -- the entire enterprise. I oversee legal operations.

Q So what entities do you represent, have that capacity for? When you say the entire operation, could you tell me more about that?

A Oh, I mean the subsidiaries, which includes the debtors and the non-debtors that you have been talking about.

Q Does Zoo have non-debtor subsidiaries?

A Yes, yes.

Q About how many?

A I couldn't tell you off the top of my head.

Q More than five?

A Yes, more than five.

Q More than ten?

A More than ten, yeah, but after that, I'd be making up a number.

Q And who is currently making the decisions for DET Dallas Clinics, LLC?

A Currently making the decisions? Well, I don't think the officer slate has changed. Obviously, we're now bound by the obligations, right? We can't just do whatever we want, so we're bound by bankruptcy.

THE COURT: Who's a debtor's rep in the bankruptcy case?

THE WITNESS: Oh, we -- Walker Robertson for TREND and Becky -- Becky Warfield for DET. Now, I may have those two swapped, but -- but it's -- we have those two representatives.

BY MR. GRANT:

Q And who pays your -- are you compensated for your services?

A Yes, sir.

Q Who pays your compensation?

A Actually it gets paid, we've mentioned Cognizant Management Solutions. It's the HR administrative holding company, but, you know, that's where my paycheck comes from, but I'm employed, like I said, by Zoo Capital.

Q And are -- do you view yourself to be a debtor representative of the debtors, or is it Mr. Robertson and Mrs. Warfield, if I got the names right?

A I'm not -- you'd have to probably explain to me what you mean by -- representative in what capacity, like in what sense?

Q Well --

A (Indiscernible) --

Q -- these debtors filed an objection to the motion to lift stay. Who authorized that response?

A I certainly reviewed with Becky and Walker, like I said, but authorized the filing is what you're asking?

Q Who directed your counsel, or who authorized the filing of a response to the motion to lift stay?

A I would say us three together. I reviewed it, talked to our counsel, approved it, and asked him to make the -- make the filing.

Q Was anybody else consulted in making that decision?

A Probably Rob Turner had some discussions.

Q Were any discussions had with Mr. Chopra?

A About these filings?

Q Mm-hmm.

A No, sir.

Q Okay. And so -- but ultimately, who is the person -- or is it -- are you saying that for both debtors, it's the three of you, including Mr. Turner, who collectively make a decision on the choices of the debtors?

A I would say at a high level, yes. I mean, I'm not trying to be cute, but we just made this filing. I haven't even talked much with our counsel about what decisions have to be made, when they have to be made. So right, we want to make sure we don't operate outside the rules. So I can't tell you we have some kind of, you know, document setting forth, this person will do this, and this one will do that yet. But we certainly intend to operate within the bounds of -- of the -- of the rules.

Q So can you answer the question, the buck stops with who

for DET Dallas Clinics?

A Pre or post-filing?

Q Post-filing.

A I would say probably -- I mean, nothing's going to be filed without my review.

Q Okay. And it's the same answer --

THE COURT: Well, your review as a lawyer, or your review as a representative of the debtor, or debtors?

THE WITNESS: As a -- a lawyer, I would say, sir.

THE COURT: Okay.

THE WITNESS: Yeah.

THE COURT: All right. And you are a lawyer, correct?

THE WITNESS: Yes.

THE COURT: All right.

THE WITNESS: Yes, I'm the general counsel.

THE COURT: All right. Go ahead.

MR. GRANT: Okay.

BY MR. GRANT:

Q So are you making the decision, or are you giving advice to somebody?

A I'm certainly giving advice. And as far as decisions to street -- strategic decisions would be made -- what would definitely involve my input, and would have our counsel input.

Q And then the three of you collectively make the decision?

A When you say the decision, the decision of what? I don't -- I don't understand.

Q Well, I mean, if someone is responsible for the conduct of the debtors, who's responsible?

A I would say, again, I think the three individuals, who I named.

Q Okay.

A And if I need to clarify that after, I'm happy to do that. I'm not trying to be cute about anything.

Q So the debtor, when it filed its schedules, did not dispute the claims of my clients. Is that true?

A Dispute in -- in what sense? What do you mean by that, by the schedule? I mean, I know what you mean by the schedules, but dispute in how?

Q When you filed the schedules, you listed all of the claims of my clients as creditors, correct?

A Yes, yes, we did. And we are either have, while we've been sitting here, or we'll shortly follow that up with some amended schedules. We had a call with, I think, the U.S. Trustee and minister yesterday.

Q And what are those changes going to be?

A I can't tell you off the top of my head, but we are adding some executory contracts to include contracts that won't be assumed and rejected. And we also added some additional claims. Because again, we've made the filing, and we're

cleaning things up.
Q Are the new claims in addition -- are the amendments you're talking about in addition to the ones that you filed yesterday?
A Yes.
Q Okay. And -- but in the schedules that are on file, when you list my client's claims, you know, millions of dollars, you didn't check the box disputed, correct?
A I'm not familiar with what checking the box would mean. If you can just clarify, do we dispute that we owe them money? Absolutely. As I saw, again, I'm trying to understand what you're asking. I don't know what checking the box on that form means.
THE COURT: Mr. Curth, have you ever been involved in a bankruptcy proceeding before?
THE WITNESS: I have been involved acquiring some assets out of a 363 sale. And then I have --
THE COURT: Have you ever represented a debtor in bankruptcy?
THE WITNESS: So not as outside counsel, as inside counsel, I have as a general counsel before.
THE COURT: So how familiar are you with the schedules and statements that are filed in this case?
THE WITNESS: If I looked at them, I mean, I've -- I have definitely --

THE COURT: Did you review them before the hearing today?

THE WITNESS: Yes, sir.

THE COURT: Okay. Go ahead.

BY MR. GRANT:

Q Okay. Just to finish the questions, but on the schedules, you didn't check the box -- or the debtors did not check the box disputed, correct?

A I don't know if that's --

Q They didn't check the box unliquidated?

A I don't know about that box.

Q And they didn't check the box contingent?

A I do not know about that box either.

Q Okay. So if --

A I'm certainly going to go back and look at these boxes, so --

Q So looking at the -- I mean the -- I mean, just -- I'll tell you that the debtor schedules are Exhibit 34, which has already been admitted. And I'll say they didn't check those boxes, which means these -- I guess I don't want to argue, sorry. At the moment, it appears that the claims of my clients are not disputed, at least as far as the debtor schedules go. If -- who are the primary creditors of DET?

A From what I recall, we have -- I'm sorry, I can't -- I -- I know the difference between secure and insecure, but I cannot

tell you what -- you know, who's scheduled on what right now. But I know we do have creditors under -- that fall under this lawsuit that we're, you know, that we're challenging. We are amending or have amended, I don't know if that got filed yesterday, what you said, but we're acting a -- we're adding a claim by Dr. Masel. We have multiple claims that -- from -- from other vendors. We also have a claim from the IRS, and we are in the process of adding, like, a few others.

Q How did the -- what was DET doing that accrued claims against it? Was it an operational entity?

A No, DET is a holding company for trained physicians.

Q So with respect to DET, if the claims held by my clients were allowed by whichever court determines them, how would -- does DET have the assets to pay those claims?

A Well, we're in bankruptcy. So I -- I don't know how to answer that question.

Q They do or they don't? DET?

A Again, inside the realm of bankruptcy, I -- I don't -- I don't know how to answer your question. I mean, I think -- I think I -- we filled out that we plan to do a restructuring.

Q What's DET going to restructure? What business?

A Well, again, it's a holding company for the equity of trained physicians. So they're -- the reason we filed both is because I, you know, I think they're one and the same. Not from a structure standpoint, but from an accounting standpoint,

it's a pass through.
Q So does DET have funds to pay $9.5 million in claims?
A I don't know how to answer that question since I'm sitting here right now.
Q Does it have $9.5 million in the bank?
A No, no, I think it's been testified it does not have its own bank account.
Q And so does it have any way of paying the claims of the creditors?
A Again, I'm sorry, I don't know how to answer that question.
Q Same question for TREND. Does it have the capability of paying my client's claims?
A I -- I don't -- I -- I hear too many assumptions in that question. So I don't -- again, I don't know how to answer that.
Q Does it have access to assets that it could liquidate to pay those claims if they were allowed?
A We're intending to be correct and continue pursuing the counterclaims. So in that situation, there -- there should be plenty of assets there. I mean, we have a -- we have a claim that we put on the form well in excess of $10 million from your clients.
Q And that's the claim that you asserted in the state court litigation, correct?

A I believe that's correct.
Q And so had you gone to trial and won, you would have immediately recovered that asset, correct?
A I -- I don't know if that's the case.
Q Of the defendants in that lawsuit, which ones actually have sufficient assets to pay the claims of the creditors of the debtors?
MR. SINGH: Your Honor, I'm going to object to relevance as to non-debtor entities.
THE COURT: I'll overrule that objection.
THE WITNESS: Can you -- can you clarify which parties again?
BY MR. GRANT:
Q Are you familiar with the defendants in the state court cause of action?
A What would the -- I think of the defendants as -- as them. So -- but can you -- can you clarify what parties?
Q I believe you testified that TREND Physicians Group, the debtor, doesn't have sufficient funds to pay the claims.
A I said that.
Q Does Zoo Capital Holdings have sufficient funds to pay the claims?
A For any information that I would have outside of the debtor context would be subject to privilege.
Q Okay. So here's my question to you. First of all, are

you aware of the duties of you as a part of management of the debtors to the estate and to creditors?
A We just started -- generally, yes. We just started talking about that yesterday. We had the interview with, again, I don't know if it was a U.S. Trustee (indiscernible) or administer -- administrator. I don't -- I don't remember exactly what her title was, but we just started talking about that here recently. And so, again, like I said, we don't have some delegation of authority sitting here at this moment about who can do what, but we certainly intend to continue those conversations and make sure that we do everything appropriately.
Q And if, forgive me for a second, that the debtor's duty is as a trustee, the debtor in possession as trustee, and its job is to, you know, object claims to the extent appropriate and to try to seek assets for those creditors as appropriate, the debtors have no assets in general, correct?
A Again, I -- I don't think that is correct.
Q What assets do the debtors have that are significant?
A I don't know how you define significant. I mean, we have -- we have schedules that I believe we list as the assets.
Q If the other defendants that we mentioned, including Mr. Chopra and/or your other client, Zoo Capital, had sufficient funds to pay the purchase price, wouldn't it be in the best interest of the creditors of these debtors, of which

you and your management are fiduciary, to try to allow them to recover money from a third-party non-debtor entity to satisfy the creditors in your bankruptcy estate? Why are the debtors opposing these creditors trying to collect from a non-debtor entity, except for your conflict?

A Well, part of what -- so I think to answer that question, if I understand, is we have the debtors, so let me -- let me -- and I'll keep it -- you -- you say, you know, you think of, you can -- you can parcel out really quickly in your head, I just need a moment more. So the debtors' estates, estates, the two estates, really are the ones with the underlying claims against TED and, you know, the -- the defendants in that case. So the underlying transaction that's really between the debtors is really, I think, is what is at the heart of what we've been discussing today.

Q Who paid the retainer for debtors' counsel?

A I -- I don't recall, but I -- I don't recall (indiscernible).

Q Did the debtors have sufficient funds to pay the $50,000 retainer?

A Like I said, I do not recall who's paid or what account it came out of.

Q I'm showing you what's been marked as Movant's Exhibit 42. Do you recognize this diagram?

A I've never -- I've never seen this -- this -- this

document before.

Q Is it correct?

MR. SINGH: Objection. Assumes facts not in evidence.

THE WITNESS: Also that --

THE COURT: But bear with me. I need to rule on the objection.

THE WITNESS: Yeah, I couldn't even hear him object, so --

THE COURT: Okay. All right. That's fine. He asked if it's correct. I don't think that assumes facts in evidence. You can answer that question. It's that organizational chart, correct? If you know.

THE WITNESS: All right. I believe it is.

MR. GRANT: Your Honor, movants requests admission of Exhibit 42.

THE COURT: Any objection?

MR. SINGH: It's still lack of personal knowledge. It just wasn't created by him.

THE COURT: I'll overrule that objection. He's general counsel, and he said it's true. I'll admit it, it's admitted.

(Movant's Exhibit 42 admitted into evidence)

THE COURT: Thank you.

MR. SINGH: Thank you.

MR. GRANT: I'll pass the witness.

THE COURT: Thank you. Mr. Singh --

MR. SINGH: Thank you, Your Honor.

THE COURT: -- before I pass, let me ask some questions of this witness, trying to get to the heart of the matter.

We have two debtors who basically are involved, apparently, in very contentious litigation between Zoo Capital Holdings -- no, excuse me, TED Ventures, TREND Medical, are suing both debtors, okay, as well as Zoo Capital, Lucky Chopra, and then Ryan Reneau, correct?

THE WITNESS: Yes, they have dismissed Mr. Reneau.

THE COURT: He's out?

THE WITNESS: Yes, sir.

THE COURT: Okay. So basically, at this point in time, the litigation is between the movants, the people who are seeking to lift this stay, the two debtors, Zoo Capital and Lucky Chopra, correct?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. That litigation needs to be heard somewhere, okay? Now, currently, there isn't really any state court litigation, as I understand it. It's been removed to the federal court, all right, in Dallas. We've got that litigation pending. And so the question becomes, given that these are predominantly state court claims, why, and you're a

lawyer, why does the federal court, whether it's a district court or a bankruptcy court, need to hear these claims?

THE WITNESS: Yes. So -- so I think -- well, I think there's probably a lot of questions I was about to get. Our organization, as the debtors, it was -- when we acquired these -- when we acquired these entities, it was an entity acquisition, not like an asset. When we acquired these, it had up to 30 employees, had about a dozen different clinics in the DFW area.

This was a unique add to our -- as a business unit. The primary, I won't say sold, but primary business operations of this had to do with the state workers' comp and the provision of healthcare services for that. We did not have that branch as part of our organization. That is a very lucrative, but we wouldn't have acquired it otherwise.

But when we started digging into post-acquisition, immediately after, we saw many issues. And the organization, that branched started dwindling as we went on over the course of the 15 months prior to the termination.

The reason we ended up in bankruptcy is we want that branch to be -- to flourish again. It -- they -- we have some very -- which we're amending schedules to add the contracts, and we have some very favorable contracts tied to different, like, Aetna Healthcare --

THE COURT: But in your mind, why does that

litigation in any way -- because the claims have to be liquidated, whether you win or lose, they've got to be liquidated somewhere. You can still reorganize irrespective of where those claims are litigated. I'm struggling with why the federal court needs to hear those claims.

THE WITNESS: Well, I think in the federal and the bankruptcy context, because as part of the overall restructuring, we have -- we have some --

THE COURT: And I can deal with a judgment, okay, before they attach assets or do whatever. But you're 16 months into state court litigation. You've got a trial setting that basically now has been upset. Why do I, or some other federal judge in Dallas, why do we need to hear that claim? Why can't the state court basically duke it out and determine who's right and who's wrong and simply, in effect, fix the claim? There is one or there isn't one.

THE WITNESS: Yeah, well, I think -- I think it -- it -- it -- it's -- I think it will detract significantly from the work we're trying to do in a reorganization.

THE COURT: In what way? Be specific.

THE WITNESS: Yeah, sure. So using up the resources of the individuals we talked about, the representatives on this case --

THE COURT: Well, litigation costs are going to be the same whether you're in federal court or state court and

you're already 16 months into state court.

THE WITNESS: Oh, not litigation. I meant the -- the in-house people I named, not the lawyers, like the business representatives. We are trying to build back those clinics, the personnel. We're down to -- from 30 down to 2.

THE COURT: But why do you think that is going to be any different in federal court than it would be in state court? You're still going to have the same sort of issues.

THE WITNESS: Oh, yeah, no, I'm not disputing that. I'm just saying I think it's going to detract from the work we're doing here and the personnel that we have involved on these two bankruptcy cases.

THE COURT: In what way? I mean, if you have to litigate the claims, the time that you have to litigate the claims, in my opinion, is going to be the same in state court or federal court. I'm trying to figure out why we need to hear these claims. What is it about these claims that make them so special that a federal court basically needs to hear them?

THE WITNESS: That make the claims that special? I -- I think that -- that we needed -- I think we need the discovery mechanisms, and we need, I think --

THE COURT: Isn't discovery already over? I mean, I'm not sure how much litigation you do, but I take a removed case exactly as it came out of the state court. If your discovery deadlines are passed, which there's an allegation

they are, I wouldn't reopen them. They're done. You're finished. So again, I'm struggling.

THE WITNESS: Yeah, and I'm not really a litigator with a background. I'm a transactional guy.

THE COURT: Okay.

THE WITNESS: Like --

THE COURT: So let me ask you this question in being a transactional guy, what path forward do you see in this Chapter 11 for these debtors? How do they plan to reorganize? What do they plan to do?

THE WITNESS: We plan -- assuming we can -- we can shed the liabilities or restructure the liabilities, we plan on adding resources, individuals, providers. Again, like I said, we're down from 30 employees down to 2. But we have some very favorable contracts with insurance companies.

THE COURT: So is DET Dallas Clinics, LLC operating?

THE WITNESS: It -- TREND operates -- is the operating brand.

THE COURT: I asked about DET Dallas Clinics LLC. Does it operate at this point in time?

THE WITNESS: No, no, it -- it owns the shares of TREND.

THE COURT: Okay. So it's basically just a holding company.

THE WITNESS: That's correct.

THE COURT: TREND Physicians Group Inc., it operates?
THE WITNESS: Yes, sir.
THE COURT: How many employees does it have?
THE WITNESS: Currently, it has two.
THE COURT: Doctors, what are they?
THE WITNESS: Yeah, one is a doctor. Cannot remember his full name. It starts with an H. And then there's a nurse practitioner that operates underneath him.
THE COURT: Any other employees other than those two employees?
THE WITNESS: No, no, because a lot of the back office is -- is done in that --
THE COURT: Okay. And so how does TREND Physicians Group make money? It bills for the work of the doctor and the NP?
THE WITNESS: Yes. Yes.
THE COURT: Pays them salaries, then lives on the difference?
THE WITNESS: Yes, yes, that's correct.
THE COURT: Okay.
THE WITNESS: That's correct.
THE COURT: And so I haven't looked at the schedules of TREND Physicians Group, how much did it have in sales the month before the filing of the bankruptcy?
THE WITNESS: Very little in the -- in the last 60

days, if I recall.

THE COURT: Well, very little to me means $1.

THE WITNESS: Oh, you know --

THE COURT: Very little to you may mean $100,000.

THE WITNESS: Yeah, yeah, no, we just -- again, I'm not the financial guy on this, but if I recall, I -- I could be wrong, I believe we scheduled maybe 57,000, if I'm recalling. But I could be wrong.

THE COURT: $57,000 in the last 60 days?

THE WITNESS: Yes, but I could be -- I could be wrong. But that could all be after the 60 days. I'm not --

THE COURT: So give me a guess as to how much TREND Physicians nets after it pays the doctor and the NP on that 57-.

THE WITNESS: For those 60 days, it's -- it's probably break even, if -- if not a loss.

THE COURT: Okay.

THE WITNESS: Yeah. But -- but I think we did -- if I believe -- I believe we scheduled what it was for -- for the prior year. And I -- and I think it was over $300,000 in revenue.

THE COURT: All right. Thank you.

THE WITNESS: Again, just based on -- on those two.

THE COURT: All right. Mr. Singh?

MR. SINGH: Let me shortcut some of my questions,

Your Honor.

THE COURT: It seems like we're dancing on the head of a pin. You've discussed the litigation. I know it's contentious. Someone's got to resolve it. And the question, Mr. Singh, is why me?

MR. SINGH: So, Your Honor, I think it's --

THE COURT: And so you can address that. But --

MR. SINGH: Okay.

THE COURT: -- now's your time to ask this question, witnesses.

MR. SINGH: Sure, Your Honor.

THE COURT: Witness question, excuse me.

MR. SINGH: Let me -- I'll cut out some of the background here.

CROSS-EXAMINATION

BY MR. SINGH:

Q I think we understand what the litigation is, at least prior to getting to today. Are you aware if there's a trial date set in the state court litigation?

A I --I -- I believe there is. I can't tell you what the date is, but I think it's sometime in October.

Q Okay.

THE COURT: Well, bear with me for one second. You've got removed litigation. How do you have a trial setting?

MR. SINGH: That's going to be the question.

THE WITNESS: Yeah. Yeah, yeah.

THE COURT: There is no trial setting, right?

MR. SINGH: There's no trial setting, correct.

THE COURT: Okay.

THE WITNESS: Okay.

THE COURT: Okay.

MR. SINGH: Correct.

THE COURT: So you've got a removed action sitting in federal district court?

MR .SINGH: It's in federal district court (indiscernible) --

THE COURT: And they're going to refer it to the bankruptcy court?

MR. SINGH: It hasn't been referred yet, but yes.

THE COURT: Okay.

MR. SINGH: And then we're --

THE COURT: And it's just sitting there. Nothing's happened on it?

MR. SINGH: Correct.

THE COURT: Okay. Go ahead.

MR. SINGH: Probably best to do this by argument, but I will -- but I'll do it by argument. No questions, Your Honor.

THE COURT: All right. So, Mr. Grant, I asked a

bunch of questions. So now's your time to redirect.

MR. GRANT: I guess I have one follow-up.

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. GRANT:

Q Isn't it true that the operation entity TREND was decertified in May of 2025?

A Decertified by who?

Q By the Texas Board of Health, the people who allow you to have doctors who practice.

A By who, I'm sorry?

Q The people who allow you to have doctors to practice.

A I don't know who that is.

Q So the answer is no, you didn't. You weren't aware of that?

A Yeah, I don't -- I don't know who you -- who you're -- the people who allow us to practice?

Q Are you aware of the laws involving the corporate practice of medicine?

A Generally, yes.

Q And do they have to have -- if you don't have a license from the board, can you be practicing medicine? Can TREND be practicing medicine?

A I believe that's -- that's -- that's more like individual doctor base. I mean, all of our doctors are licensed.

Q Okay. So it's your testimony that right now, the doctors can continue practicing and generating revenue in billing?

A Yes.

MR. GRANT: Okay. Pass the witness.

THE COURT: All right, Mr. Singh?

MR. SINGH: No redirect from me.

THE COURT: All right. Thank you, sir. You may step down. I appreciate you coming.

(Witness excused)

THE COURT: Mr. Grant, any other witnesses?

MR. GRANT: No, Your Honor.

THE COURT: Do you rest?

MR. GRANT: Yes.

THE COURT: All right. Mr. Singh, do you have any witnesses you want to call?

MR. SINGH: Your Honor, I'd probably make a motion at 7052 at this time as to, I think, factually, the Court sees what -- has the factual record here. I think the question here is really going to be whether it's faster to come here and litigate these claims. I think that's our position that we could get this done quicker.

THE COURT: Let me ask you a question. Do you have a -- I mean, I asked the question. You bypassed it. Do you have any witnesses you want to call?

MR. SINGH: I'd like to make a motion on 7052 before

I call any witnesses.

THE COURT: But I asked the question first, do you have any witnesses you want to call? I'm going to deny your motion. So do you want -- do you have a witness you want to call? I'll deny your oral motion under 7052. Do you want -- do you have a witness you want to call?

MR. SINGH: Well, let me talk to my client one second.

THE COURT: Thank you.

MR. SINGH: I'm going to call Mr. Curth, Your Honor.

THE COURT: Mr. Curth, come on up here. Still under oath.

JONATHAN CURTH, DEBTOR'S WITNESS, PREVIOUSLY SWORN

THE COURT: As soon as he's seated, you may proceed, Mr. Singh.

MR. SINGH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SINGH:

Q I'm going to try to get some context here. Ms. Curth, you're the GC for the debtors?

A Yes.

Q All right. And you're involved in the transaction that happened between the debtors and the defendants here?

A I'm very familiar with it. I was involved with it after the closing.

Q All right. This is a state court lawsuit. Is that correct?
A Correct.
Q Can you give us a little background on what the basis of the lawsuit is?
A Yes. So in December of 2023, our enterprise, again, was looking for clinics that did a lot of state workers compensation health care. We found those with the TREND Clinics, TREND Physician Group, that owned about six -- half a dozen clinics in the DFW area. We reviewed the financials. We ultimately provided employment contracts to TED, the -- the three individuals, three principals. We had them as part of our organization for about 15 months.
But very early on, we were trying to decipher whether the financials were correct that we looked at, the proformas, even the accounts. We did not manage the QuickBooks of TREND, I'll just clarify. We -- the Enterprise organization has its own QuickBooks, but again, we never -- we tried multiple times, which started raising some early questions, why we could not access, why the debtors could not access those accounts. So we never got that.
So through that, and through a number of other issues that say that I uncovered through Enterprise Bank, there was no lien provided. When I showed up, I started receiving -- I showed up -- I -- I joined the organization June or July of

'24. Immediately, I started being flooded with, Enterprise Bank needs this, and we need these -- these agreements, tripartite agreements. And I started asking questions why. It made absolutely no sense to me. Asked to talk to Enterprise multiple times, never had that opportunity, or was -- was going to have that opportunity, and just for whatever reason, never happened.

We discovered some IRS pre-effective time liabilities that had not been paid, that were not disclosed. Subsequently, later on, we also discovered a very large med mal claim against one of the doctors that was very close with the TED individuals. It was never brought to our attention at all whatsoever, until I got a request to -- to settle, and for us to provide a settlement amount. I said, I don't even know what this is. And it all had to do with pre-effective time claims by -- that were, you know, that were taken on prior to the effective time.

We also, you know, through investigating, you know, I also found that there were a second set of books, a shadow clinic, if you will, going on through these clinics. The same providers that were very close to the TED individuals were essentially running a shadow clinic. So when you start looking at the timeline, the number of, you know, again, I think I said up to three dozen, I've called 30 employees, different providers, nurses, doctors, and they're continually dwindling

down, and the capital that had to continually be injected. This entity was never cash flow positive, as it was projected prior to closing.

So we had to continually cover payroll, essentially, literally from the first two-week period, and had to continue doing that throughout the entire time. So from our perspective, these -- you know, the background to this is, you know, something sold is -- is not what we acquired.

Q Okay. And then, when did that realization come about?

A Suspicions, probably, I think I heard six months. Suspicions probably started accruing around six months. Again, obviously, you need time to transition. We get that. We want to keep the business going. But again, payroll could never be covered from day one.

And so I would say very early on, even within six months, but you chalk it up to transition issues. And then, throughout the course of the remaining 15 months, you know, we -- like I said, I uncovered these other things through investigations. I also uncovered and asked questions about a lawsuit filed by, you know, a very senior citizen, who was allegedly -- it was brought to our attention, was allegedly, you know, ripped off by the same three individuals.

And so I started looking into that. I started looking into a number of different things, and nothing was coming together.

We also engaged a third-party auditor to get information. He's -- he's in Houston. And we engaged him to get information and look at these financials to perform those and anything happening after that. He had a very difficult time. Never actually even got any information he was requesting. Got some PDFs that possibly looked manipulated. He never got the underlying data that you need to do to do an underlying audit.

Again, this all had to do with the debtors. And the -- the financials were -- were bleak. At the time that we terminated them, so then that takes you through a whole year, at about 15 months, April of '25, that would have been April of '25, we terminated the three individuals for cause.

We had found enough, had not received enough to justify that. And immediately after, you know, the -- they sued us, we counter-sued. And, you know, also uncovered everything having to do with Enterprise, you know, not knowing they actually owed, I believe, a lot more than what's being represented.

And we've -- and at that point, that's when the doors had to be shut. We had, you know, we had other claims. The debtor -- debtors have other claims for causes of action against these three individuals for essentially, you know, breaching their contracts.

We -- we went and we received a TRO, not just a TRO,

but then we got a TI. We had an eight-hour hearing and received a TI. And a judge had wrote that these individuals breached their contract in the order, we didn't even ask for.

So throughout that entire course, we have been trying to keep this entity on lifeline. We've been trying to build back the business. We have some very favorable contracts. The debtors -- it's very difficult to negotiate new insurance contracts. And these are legacy contracts that are valuable, that if you bill under them, you get enough providers, which is exactly the whole premise of the entire business unit. Once you get enough of these providers with these legacy contracts, you can do very well.

So -- so I think part of also the reason I think we're here is to help seek the Court's relief and protection from being able to focus on growing back the business. In addition to that, making sure that, you know, it's not being tampered with and that we have the ability to bring back providers and bill through these contracts that only -- that cannot be transferred, that are only with these specific debtors.

Q All right. And in terms of the litigation, what would the effect of the stay lifted do?

A It would totally detract from what we are trying to focus on, on the restructuring with -- with these debtors.

Q And you understand that you're still going to trial.

You're not trying to stop trial from happening, are you?
A No, no, no. No, not at all.
Q All right. And in terms of the debtors -- the contracts, I think you testified earlier that the claims, TREND Physician Group has claims against the defendants, correct?
A Yes. Yes, absolutely.
Q And then the contracts which are with providers or who are they with?
A So -- so they're contracts that are with insurance companies. You know, I'm not going to -- you know, there's probably a dozen of them, but you have them with UMR, Athena, Blue Cross. And so they're, you know, they're contracts that if you bring the providers under, you get them credentialed, which again, we're down to two. But if you bring those in, then -- then, you know, there -- there is a lot of legacy work here. There is a lot of work that we can bring under through these -- through these contracts and build back the business, and we can have the time to focus on that.
Q Okay. And you testified when the judge asked me a question, how many people are involved in the operations of the debtor?
A Currently, it's down to -- to two employees. We have a doctor and a nurse provider.
Q And then, but you have a base more than two to run --
A Oh, yeah, yeah. No, from the back office. I mean, like

the individuals that we have working on trying to come up with a plan, I'll say, you know, a business plan. I don't want to say a plan of reorganization, but a business plan in order to bring back, you know, the lifeline, because we do have other clinics in Dallas. And so, we -- we can bring these contracts, and we can bring the people, and we can bring the providers all under. And if we have the time and ability to do that, then we certainly believe that we can provide this business and make it flourish the way it was before.

Q Gotcha. And early on, the management team for the debtors, where are they located?

A The entire group, entire branch trust is here in Houston.

Q Okay. Anything else further you want the Court to know?

MR. GRANT: Objection, Your Honor. Calls for a narrative.

THE COURT: I'll sustain the objection. Thank you.

MR. SINGH: No further questions, Your Honor.

THE COURT: Thank you. Mr. Grant?

MR. GRANT: No questions, Your Honor.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: Thank you.

(Witness excused)

MR. SINGH: No further witnesses, Your Honor.

THE COURT: Do you rest?

MR. SINGH: I do.

THE COURT: Okay. So I'll hear from you, Mr. Grant, first, and I'll hear from Mr. Singh, second.

And, Mr. Grant, you can close. It's your motion. Go ahead, sir.

MR. GRANT: Thank you, Your Honor. Your Honor, I believe the Court kind of hit the nail on the head. These claims need to be litigated somewhere.

We, of course, think the best place to do it is state court. It's ready to go. There is some confusion over this October 5th hearing, this trial setting. I won't get into that side story. But we believe that all the Sonnax factors are covered and that we would request that the Court lift the stay.

THE COURT: Thank you, sir.

Mr. Singh?

MR. SINGH: Thank you, Your Honor. Again, I think, we're here on some litigated matters. I think the Court realizes and the debtor realizes and I think everyone realizes these claims need to be litigated.

I think in the process of a proof of claim and claim of objection seems to be the fastest way right now. The Court's right. There's no trial date set in the state court at the moment.

We think we can get to trial pretty quickly if need be in bankruptcy court. The Court deals with these all the time. It's an asset of the estate. We think the best place to

litigate that is in bankruptcy court. Thank you, Your Honor.

THE COURT: All right. Thank you. So here are my findings of fact and conclusions of law as it relates to the motion for relief from stay, which is at ECF Number 13.

All right. It's more than evident from the evidence that the Court's heard that there is a large dispute between various parties, including the debtor, the two movants -- the two debtors, excuse me, the two movants, the Zoo Capital Holdings LLC and then Lucky Chopra, all right? The issue basically before the Court is where does that litigation occur because the claims between the parties need to be liquidated.

And at this juncture, I'm going to make just a general comment for the record that bankruptcies filed on the eve of trial, especially state court trials, are in this Court's eyes somewhat suspect. They always have the appearance of simply avoiding trial and avoiding what I would consider to be a final reckoning.

There is a need to litigate the claim. At this juncture, I feel -- find no reason that the state court is not equally or better equipped to litigate the claims. As the pleadings indicate, it was pending for 16 months in state court, discovery deadlines have already elapsed. The case was set for trial. I don't see any real reason that if I don't lift the stay, the case can't be tried very quickly.

But of course, the case is not pending at this point

in time before state court. It's pending before the federal district court in the Northern District of Texas, whom I expect will refer the case to the bankruptcy court. And then I assume that court will either do a couple of things. They'll either remand, or they'll transfer the case down to me.

And so I'm willing to lift the stay for the limited purposes of either remand, trial in the federal court or state court, but only to liquidate claims past that, the stay is not lifted. But the claims clearly need to be liquidated. And I don't see any real reason why a federal court needs to do that.

Along the lines of that, I will also find, just for the record, that the debtor bears the burden of proof on many matters under 362(g). I find that the debtor has failed to meet their burden under 362(g) as to why the stay should not be lifted and why this Court should, in fact, or some other federal court, litigate the claim.

I'll do that by order as soon as I step down from the bench. I appreciate the presentation of evidence. I look forward to hearing any of the motions that are currently before the Court on a going basis. Thank you. We're adjourned.

(Proceedings concluded at 12:11 p.m.)

* * * * *

C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Heidi Jolliff

HEIDI JOLLIFF, AAERT NO. 2850 DATE: November 2, 2026

ACCESS TRANSCRIPTS, LLC